IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

PHILLIP SEUFFERT,

                          Plaintiff,        Civil Action No.
                                           9:13-CV-1303 (FJS/DEP)
     v.

K. PECORE, *et al.*,

                          Defendants.

_____

APPEARANCES:              OF COUNSEL:

FOR PLAINTIFF:

Phillip Seuffert, *Pro Se*
10-A-3656
Clinton Correctional Facility
P.O. Box 2001
Dannemore, NY 12929


FOR DEFENDANT:

HON. ERIC T. SCHNEIDERMAN     LAURA SPRAGUE, ESQ.
New York State Attorney General  Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

*Pro se* plaintiff Phillip Seuffert, a New York State prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 against two prison corrections officers alleging infringement of his constitutional rights. Plaintiff claims that Corrections Officer K. Pecore used excessive force against him in violation of his Eighth Amendment right to be free of cruel and unusual punishment. Plaintiff also asserts an equal protection cause of action under the Fourteenth Amendment based on the allegation that Corrections Officer M. Donovan discriminated against him due to his sexual orientation.

Currently pending before the court is a pre-answer motion brought by defendants Pecore and Donovan seeking the entry of summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, dismissing plaintiff's complaint. For the reasons set forth below, I recommend that the defendants' motion be granted in part and denied in part.

I.    <u>BACKGROUND</u>[1]

Plaintiff is a prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 1. Although now confined elsewhere, at the times relevant to this action he was incarcerated at the Coxsackie Correctional Facility ("Coxsackie"), located in West Coxsackie, New York. *Id.*

On May 26, 2013, plaintiff, a self-identified homosexual, alleges that he was approached by defendant M. Donovan, a corrections officer stationed at Coxsackie, and told "[his] time on this gallery [wa]s limited." Dkt. No. 1 at 6. Plaintiff alleges that defendant Donovan said this to him without any provocation. *Id.* When Seuffert inquired as to the meaning of the statement, defendant Donovan responded by telling him "no homos[exual]s" are permitted on that gallery. *Id.* Plaintiff alleges that after this conversation, defendant Donovan issued him a false misbehavior report. *Id.* Plaintiff also alleges that the report was filed due to defendant Donovan's sexual discrimination against plaintiff, and that plaintiff was unlawfully subjected to disciplinary action based upon his sexual orientation. *Id.* Plaintiff contends that his attempt to lodge a grievance

---

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

complaining of defendant Donovan's alleged discrimination was thwarted when the grievance supervisor at the facility refused to file it. Dkt. No. 1 at 2. Defendants counter by alleging that plaintiff never filed such a grievance.[2] Dkt. No. 12-6 at 2.

According to plaintiff, on May 27, 2013, while he was being escorted, within Coxsackie, defendant Pecore assaulted him without provocation, punching him "with a closed fist about his face, neck, and upper body areas." Dkt. No. 1 at 5. Plaintiff alleges that shortly after this first attack, defendant Pecore continued his attack by "knee[ing] plaintiff about the left side of his ribs . . . grab[bing] plaintiff by his shirt collar and . . . punch[ing], slap[ping], and elbow[ing] plaintiff about his face, neck, head, and upper body." *Id.* Plaintiff claims that, as a result of these attacks, he has sustained permanent physical injuries. *Id.*

Following this incident, plaintiff filed a grievance against defendant Pecore. Dkt. No. 1 at 2. That grievance was ultimately denied, on appeal, by the Central Office Review Committee ("CORC") on October 30, 2013.

---

[2]     As will be discussed more completely below, defendants acknowledge the existence of a letter authored by plaintiff and dated September 16, 2013, that, according to defendants, sought permission to file an untimely grievance regarding his discrimination allegations against defendant Donovan. Dkt. No. 14 at 2. Defendants did not attach that letter, and it is not otherwise in the record before the court. As a result, and because plaintiff has failed to respond in opposition to the pending motion, I am unable to discern the recipient of the letter or otherwise verify defendants' representation concerning its contents.

Dkt. No. 12-7 at 1. According to plaintiff, the CORC's denial was untimely issued. Dkt. No. 1 at 2. On October 21, 2013, nine days before the CORC's decision was rendered, plaintiff commenced this action. *See generally* Dkt. No. 1.

## II.      PROCEDURAL HISTORY

Plaintiff commenced this action by filing a complaint and accompanying application to proceed *in forma pauperis* ("IFP") on October 21, 2013. *See generally* Dkt. No. 1. Plaintiff's complaint asserts claims arising under the Eighth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983, as well as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Dkt. No. 1 at 6; Dkt. No. 1-1 at 2.  As relief, plaintiff seeks compensatory and punitive damages.[3] Dkt. No. 1 at 7.

Following an initial review of plaintiff's complaint and IFP application, Senior District Judge Frederick J. Scullin, Jr., issued an order on October 30, 2013, granting plaintiff's IFP status, dismissing plaintiff's Title VII claim against defendant Donovan, with prejudice, and permitting plaintiff's remaining claims to proceed. Dkt. No. 4 at 5. On January 2, 2014, in lieu of answering plaintiff's complaint, defendants moved for summary judgment seeking dismissal based on plaintiff's alleged failure to fully

---

[3]      Although plaintiff's civil cover sheet requests $4,000,000, the prayer for relief in his complaint requests only $1,000,000. Dkt. No. 1-1 at 2; Dkt. No. 1 at 7.

exhaust the available administrative remedies prior to filing this lawsuit.[4]

*See generally* [Dkt. No. 12-2](#).

Defendants' motion, which plaintiff has not opposed, is now fully briefed and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and the Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Plaintiff's Failure to Oppose Defendants' Motion

Plaintiff has not responded in opposition to defendants' motion for summary judgment. Pursuant to local rule 7.1(b)(3), by failing to oppose defendants' motion, plaintiff has effectively consented to the granting of the relief sought. That rule provides as follows:

> Where a properly filed motion is unopposed and the
> Court determines that the moving party has met its
> burden to demonstrate entitlement to the relief
> requested therein, the non-moving party's failure to
> file or serve any papers as this Rule requires shall
> be deemed as consent to the granting or denial of

---

[4]    Unlike its Rule 12(b) dismissal motion counterpart, a summary judgment motion does not have the effect of automatically staying the requirement of answering a plaintiff's complaint. *Compare* Fed.R.Civ.P. 12(b)(6) *with* Fed.R.Civ.P. 56. In light of the fact that, by moving for summary judgment, defendants are actively defending against plaintiff's claims, and in order to avoid any contention that they have defaulted, in my discretion, I will *sua sponte* order a stay of defendants' time to answer plaintiff's complaint until twenty-one days after a final determination is issued with respect to defendants' motion in the event that the action survives. *Snyder v. Goord*, No. 05-CV-1284, 2007 WL 957530, at *5 (N.D.N.Y. Mar. 29, 2007) (McAvoy, J., *adopting report and recommendation by* Peebles, M.J.).

> the motion, as the case may be, unless good cause
> is shown.

N.D.N.Y. L.R. 7.1(b)(3).

The pending summary judgment was properly filed by the defendants, and defendants, through their motion papers, have met their burden of demonstrating entitlement to the relief requested with respect to plaintiff's Eighth Amendment claim asserted against defendant Pecore.[5] Because defendants have accurately cited proper legal authority supporting the ground upon which their motion is based, and plaintiff has failed to respond in opposition to the motion to dismiss, I find that defendants' motion is facially meritorious regarding this claim. Accordingly, I recommend that defendants' motion to dismiss, regarding plaintiff's Eighth Amendment claim, be granted on this basis.

With respect to plaintiff's Fourteenth Amendment claim asserted against defendant Donovan, however, even considering defendants' lightened burden, I find that a dispute of material fact exists regarding whether plaintiff should be excused from his failure to fully exhaust

---

[5] With respect to the question of whether defendants have satisfied their burden, I note that their "burden of persuasion is lightened such that, in order to succeed, [their] motion need only be 'facially meritorious.'" *See Rodriguez v. Goord*, No. 04-CV-0358, 2007 WL 4246443, at *1 (Scullin, J., *adopting report and recommendation by* Lowe, M.J.) (finding that whether a movant has satisfied its burden to demonstrate entitlement to a dismissal under local rule 7.1(b)(3) "is a more limited endeavor than a review of a contested motion to dismiss" (citing cases)).

administrative remedies prior to filing this lawsuit.[6]  Accordingly, because defendants have failed to demonstrate entitlement to the relief requested with respect to plaintiff's discrimination claim, plaintiff's failure to oppose the motion is of no moment.

B.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

---

[6]        *See* Part III.C.3. of this report, *post.*

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

C.    Exhaustion of Available Administrative Remedies

In support of their motion, defendants argue that plaintiff failed to fully exhaust the available administrative remedies prior to filing this action. Dkt. No. 12-2 at 3. Specifically, defendants submit that plaintiff did not fully exhaust the available administrative remedies with respect to his excessive force claim because the CORC did not issue a final decision regarding that grievance until after plaintiff commenced this action. *Id.* at 6. Moreover, defendants contend that plaintiff never filed a grievance with respect to his discrimination claim, and therefore did not exhaust his administrative remedies with respect to that cause of action. *Id.*; Dkt. No. 14 at 2.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is . . . mandatory. Prisoners must now exhaust all 'available' remedies[.]");

*Hargrove v. Riley,* No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983.").[7] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is an affirmative defense that must be raised by a defendant in response to an inmate suit. *Jones v. Block*, 549 U.S. 199, 212 (2007). In the event the defendant establishes that the inmate plaintiff failed "to fully complete[] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548

---

[7]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

U.S. at 95; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) (citing *Woodford*).[8]

In accordance with the PLRA, the DOCCS has made a grievance procedure, called the Inmate Grievance Program ("IGP"), available to inmates. It is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson*, No. 96-CV-5396, 2004 WL 234898, at *4 (S.D.N.Y. Feb. 20, 2004). Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an inmate first file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. *Id.* A representative of the facility's inmate grievance resolution committee ("IGRC") has up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

---

[8] While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "'in a substantive sense,'" an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. *Id.* at § 701.5(c). The superintendent must issue a written decision within a certain number of days of receipt of the grievant's appeal.[9] *Id.* at § 701.5(c)(i), (ii).

The third and final step of the IGP involves an appeal to the CORC, which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP process, a decision must be entered within a specified time period. Significantly, "[a]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can – and must – be appealed to the next level, including CORC, to complete the grievance process." *Murray v. Palmer*, No. 03-CV-1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing, *inter alia*, 7 N.Y.C.R.R. § 701.6(g)(2)).

---

[9]     Depending on the type of matter complained of by the grievant, the superintendent has either seven or twenty days after receipt of the grievant's appeal to issue a decision. *Id.* at § 701.5(c)(i), (ii).

Generally, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

### 1. Plaintiff's Grievance Regarding His Eighth Amendment Claim Asserted Against Defendant Pecore

In his complaint, plaintiff alleges that he filed a grievance at Coxsackie regarding the alleged use of excessive force against him by defendant Pecore. Dkt. No. 1 at 2. In support of their motion, defendants acknowledge the filing of such a grievance, but contend that plaintiff did not fully exhaust administrative remedies before filing suit because the CORC's final decision regarding the grievance was issued on October 30, 2012, nine days after the commencement of this action. Dkt. No. 12-7 at 1.

Defendants are correct that plaintiff failed to fully exhaust the available administrative remedies prior to commencing this action in light of the CORC's decision rendered after plaintiff filed his lawsuit. *See Couvertier v. Jackson*, No. 12-CV-1282, 2014 WL 2781011, at *4 (N.Y.N.D. June 19, 2014) (Hurd, J., *adopting report and recommendation*

*by* Peebles, M.J.) (finding the inmate failed to fully exhaust his administrative remedies when he filed an action with the court before the CORC had rendered a final decision regarding the grievance); *Partee v. Grood,* No. 06-CV-1552, 2007 WL 2164529, at *3 (S.D.N.Y. July 25, 2007) ("[A]n inmate/plaintiff's claim is not exhausted until he appeals to the CORC and receives a final decision regarding his grievance."). The fact that complete exhaustion has now occurred does not cure this defect. *See Burgos v. Craig*, 307 F. App'x 469, 471 (2d Cir. 2008) ("Assuming arguendo that Plaintiff-Appellant subsequently exhausted his administrative remedies [after filing suit], that is not enough to save his suit, because he is required to have properly exhausted before he sues."); *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001), *overruled on other grounds, Porter v. Nussle*, 534 U.S. 516 (2002), (holding that "[s]ubsequent exhaustion after suit is filed . . . is insufficient" to satisfy the PLRA's exhaustion requirement).

Accordingly, I find that plaintiff did not fully exhaust the available administrative remedies with respect to his Eighth Amendment claim prior to filing this action.

2.      Plaintiff's Grievance Regarding His Fourteenth
        Amendment Claim Asserted Against Defendant Donovan

Although plaintiff contends that he attempted to file a grievance

regarding his discrimination claim against defendant Donovan, he alleges

it "was received but denied filing by the Grievance Supervisor." Dkt. No. 1

at 2. In their motion, defendants argue that plaintiff never filed a grievance

complaining of discrimination while at Coxsackie. Dkt. No. 12-2 at 4. In

support of their position, defendants have submitted an affidavit from Ed

Tillar, the Grievance Supervisor at Coxsackie, in which he avers that,

according to the Coxsackie grievance records, plaintiff never filed "any

grievance alleging discriminatory treatment." Dkt. No. 12-6 at 2.

Moreover, Tillar states that he has no recollection of refusing a grievance

from plaintiff, and, to the extent of his knowledge, all grievances from

inmates are accepted and filed unless they are untimely. *Id.*

Even if the court were to accept as true plaintiff's allegation that Tillar

rejected the grievance against defendant Donovan, it is undisputed that

plaintiff failed to file an appeal when he did not receive a response from

the IGRC. In support of their motion, defendants have submitted an

affidavit from Jeffery Hale ("Hale"), the Assistant Director of the DOCCS

IGP, in which he states that there is no record of plaintiff filing an appeal to

the CORC regarding allegations of discrimination. Dkt. No. 12-5 at 2.

Although Tillar's alleged failure to file plaintiff's grievance may, as discussed more below, excuse plaintiff's failure to fully exhaust administrative remedies, it does change the fact that plaintiff did not follow the required grievance procedures. *See Murray*, 2010 WL 1235591, at *2 & n.4 ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can – and must – be appealed to the next level, including CORC, to complete the grievance process." (footnote omitted) (citing authority)); *Williams v. Hupkowicz*, No. 04-CV-0051, 2007 WL1774876, at *3 (W.D.N.Y. June 18, 2007) ("Even assuming an inmate received no timely official response as contemplated by the regulations to a grievance at any stage in the inmate grievance process, the inmate could nevertheless appeal such grievance to the next level, and the failure to do so constitutes a failure to exhaust his administrative remedies as required under the PLRA."). Accordingly, I find that plaintiff did not fully exhaust the available administrative remedies with respect to his discrimination claim asserted against defendant Donovan.

### 3.    Exceptions to the Exhaustion Rule

Plaintiff's failure to exhaust the available administrative remedies with respect to either his excessive force or his discrimination claim is not necessarily fatal.  In a series of decisions rendered since enactment of the

PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See*, *e.g.*, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004); *see also Macias*, 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id*. In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id*.

Here, although there is nothing in the record suggesting that the IGP was unavailable to plaintiff, the allegations in plaintiff's complaint require the court to consider whether defendants should be estopped from

asserting the exhaustion defense or whether special circumstances exist justifying plaintiff's failure to fully exhaust with respect to his discrimination claim.[10]  In his verified complaint, which is signed under penalty of perjury and has the force and effect of an affidavit,[11] plaintiff alleges that Tillar, the Grievance Supervisor at Coxsackie, rejected his grievance regarding his discrimination allegations against defendant Donovan. Dkt. No. 1 at 2. Even assuming plaintiff's version of the events with respect to this grievance is true, it is well settled that "[a] defendant in a prisoner civil rights action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies . . . based on the actions or inactions of *other* individuals."  *See, e.g., Collins v. Caron*, No. 10-CV-1527, 2014 WL 296859, at *5-6 (N.D.N.Y. Jan. 27, 2014) (Suddaby, J.) (citing cases) (emphasis in original).  Thus, estoppel does not apply in this case.

---

[10]    Plaintiff has not alleged any circumstances that would excuse his failure to fully exhaust the available administrative remedies with respect to his excessive force claim asserted against defendant Pecore.

[11]    *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist[.]").

Nevertheless, assuming plaintiff's allegations are true, they may be sufficient to constitute special circumstances under *Hemphill*.[12] Liberally construing those allegations, plaintiff maintains that Tillar interfered with his ability to file the grievance complaining of defendant Donovan's alleged discrimination. Dkt. No. 1 at 2. The Second Circuit has said that "non-exhaustion is an affirmative defense subject to estoppel in cases where prison officials inhibit an inmate's ability to utilize administrative grievance procedures." *Giano*, 380 F.3d at 677 (citing *Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir. 2004)). Although courts in this circuit have interpreted this holding to mean that only a named-defendant may be *estopped* from asserting the exhaustion defense,[13] other courts have extended the spirit of the holding by applying special circumstances where a non-defendant prison official interferes with an inmate-plaintiff's ability to file a grievance. *See, e.g., Murray*, 2010 WL 1235591, at *6 (finding an allegation "that an unspecified number of unidentified corrections officers (who are not

---

[12]    *See Giano v. Goord*, 380 F.3d 670, 677 n.6 (2d Cir. 2004) ("[T]he case law on the PLRA's exhaustion requirement does not always distinguish clearly between (a) cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense, (b) situations in which administrative remedies are not 'available,' to the plaintiff, and (c) circumstances in which administrative remedies are 'available,' but the prisoner's original failure to exhaust is nonetheless justified, and hence does not bar the prisoner's subsequent suit. This may, of course, be because the same facts sometimes fit into more than one of these categories." (citations omitted)).

[13]    *See, e.g., Collins*, 2014 WL 296859, at *5-6 (citing cases).

[named-defendants]) somehow interfered with the delivery of [the plaintiff's] grievance and appeals . . . could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations"); *Sandin v. Poole*, 575 F. Supp. 2d 484, 488 (W.D.N.Y. 2008) (finding that the plaintiff's allegation that a prison official's "refusal to accept or forward plaintiff's appeals. . . effectively rendered the grievance process unavailable to [the plaintiff]" and would also constitute special circumstances). Because there is record evidence to support both (1) plaintiff's allegation that Tillar refused his grievance complaining of discrimination and (2) defendants' assertion that Tillar did not reject any of plaintiff's grievances, I find that a dispute of material fact exists precluding the granting of defendants' motion with respect to his discrimination claim. Accordingly, I recommend that the court hold an evidentiary hearing to evaluate the issues of fact and assess the credibility of plaintiff and Tillar. *See Messa v. Goord*, 652 F.3d 305, 310 (2d Cir. 2011) ("[T]he Seventh Amendment does not guarantee a jury trial on factual disputes regarding administrative exhaustion under the PLRA.").

Finally, before concluding, I pause to take note of defendants' reply. In their letter brief, defendants acknowledge the existence of a letter from

plaintiff, dated September 16, 2013, in which he sought permission to file an otherwise untimely grievance complaining of discrimination.[14] Dkt. No. 14 at 2. Defendants did not attach plaintiff's letter to their submission, nor does defendants' letter brief disclose to whom plaintiff's letter was addressed. *Id.* Instead, defendants' letter brief suggests that plaintiff "attached [his] letter dated September 16, 2013," but fails to identify where the letter was attached. *Id.* My review of the record in this case, including plaintiff's complaint, which constitutes plaintiff's sole communication with the court in this matter, does not reveal reference to any letter authored by him. In light of plaintiff's allegation that Tillar, the Grievance Supervisor at Coxsackie, "received but denied filing" his "grievance" regarding his discrimination claim asserted against defendant Donovan, I recognize the possibility that plaintiff's allegation regarding his "grievance" actually alludes to the letter defendants highlight in their reply letter brief. [15]

---

[14]      Specifically, defendants contend that plaintiff's request and grievance was untimely pursuant to 9 N.Y.C.R.R. § 701.6. Dkt. No. 14 at 2. According to that provision, although the IGP Supervisor may grant an exception to the time limit for filing a grievance based on mitigating circumstances, "an exception to the time limit may not be granted if the request was made more than 45 days after the an alleged occurrence."  9 N.Y.C.R.R. § 701.6(g)(1)(i)(a). Defendants contend that plaintiff's letter, dated September 16, 2013, which related to his discrimination complaints against defendant Donovan, was untimely because it was filed well beyond the forty-five days provided for in section 701.6. Dkt. No. 14 at 2.

[15]      To the extent that plaintiff's reference to a "grievance" in his complaint actually alludes to his letter seeking permission to file a late grievance, plaintiff's discrimination claim would be ripe for dismissal due to his failure to fully exhaust available

Without a response from plaintiff, however, or the letter itself, I am constrained to conclude that plaintiff's verified complaint constitutes sufficient evidence giving rise to a dispute of material fact regarding whether plaintiff, indeed, filed a grievance as he alleges, or, instead, simply requested permission to file a grievance outside the time limitations provided for in the DOCCS regulations.

## IV.    SUMMARY AND RECOMMENDATION

Defendants seek dismissal of plaintiff's complaint based on his alleged failure to fully exhaust the available administrative remedies prior to filing this lawsuit. Although it is undisputed that plaintiff commenced this action prior to fully exhausting administrative remedies with respect to his excessive force claim, a dispute of material fact exists regarding whether special circumstances exist to excuse his failure to fully exhaust administrative remedies regarding his discrimination claim.

Based upon the foregoing, it is hereby respectfully

---

administrative remedies and provide the court with any reason for his failure. *See, e.g., Hilbert v. Fischer*, No. 12-CV-3843, 2013 WL 4774731, at *7 ("[B]ecause the time to both file a grievance and request an exception to the time limit has long expired, and because Plaintiff has not offered any reason for his delay in filing a grievance . . ., the claim is dismissed with prejudice."); *Cole v. Miraflor*, No. 02-CV-9981, 2006 WL 457817, at *3-4 (S.D.N.Y. Feb. 23, 2006) (finding that the DOCCS's determination that the plaintiff's grievance was untimely "is conclusive on the issue of exhaustion"); *Patterson v. Goord*, No. 02-CV-0759, 2002 WL 31640585, at *1 (S.D.N.Y. Nov. 21, 2002) (dismissing the plaintiff's complaint for failure to exhaust where his request to file a late grievance was denied by prison officials and no other avenues of exhaustion were available).

RECOMMENDED that defendants' motion for summary judgment ([Dkt. No. 12](#)) be GRANTED in part and DENIED in part as follows:

(1) I recommend the court dismiss plaintiff's excessive force cause of action against defendant Pecore, without prejudice, for failure to fully exhaust administrative remedies, and that defendant Pecore be dismissed from the action;

(2) I recommend the court deny defendants' motion to the extent it seeks dismissal of plaintiff's discrimination claim asserted against defendant Donovan without prejudice to renewal following the close of discovery; and

(3) I recommend that if, following discovery, defendants do not again raise the exhaustion argument by renewed motion, the court hold an evidentiary hearing to resolve the issues of fact surrounding whether plaintiff's failure to fully exhaust the available administrative remedies with respect to his discrimination claim is excused under *Hemphill*.

NOTICE: Pursuant to 28 U.S.C. §636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed

with the clerk of the court within FOURTEEN days of service of this report.

FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 86 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this

court's local rules.

Dated:      July 30, 2014
            Syracuse, New York

David E. Peebles
U.S. Magistrate Judge



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma, NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff") brings this *pro se* action pursuant to 42 U.S.C. § 1983 against the Nassau County Sheriff, Nassau County Correctional Facility ("NCCF") and NCCF's medical staff, (collectively, "defendants"), seeking damages for injuries allegedly caused by defendants while he was incarcerated at NCCF. Defendants now move for summary judgment pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that Hargrove's claims should be dismissed because he failed to exhaust administrative remedies, as required by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e. For the following reasons, defendants' motions for summary judgment are granted.

## Background

On August 27, 2004,[FN1] Hargrove filed a complaint, alleging that defendants violated his civil rights when they forcibly administered purified protein derivative skin tests ("PPD test") to test for latent tuberculosis ("TB") in April 2002, 2003 and 2004 while he was incarcerated at NCCF. Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove named Nassau County Sheriff Edward Reilly ("Reilly"), NCCF and Nassau County University Medical Staff [FN2] as defendants.[FN3] On November 22, 2004, after discovery, County Defendants and NHCC Defendants filed separate motions for summary judgment pursuant to Fed.R.Civ.P. 56. Both defendants properly filed a Local Rule 56.1 Statement and served Hargrove a Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment, pursuant to Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27, 2004. The *pro se* clerk's office received and filed the complaint on September 20, 2004. Under the prison mail-box rule, a *pro se* prisoner's complaint is deemed filed when it is delivered to prison authorities. *See, e.g., Walker v. Jastremski,* 430 F.3d 560, 562 (2d Cir.2005)(deeming *pro* se prisoner's § 1983 action filed on date complaint was handed to prison officials). There is no evidence in the record as to when Hargrove handed the complaint to prison officials. However, it is clear the operative date is between August 27, 2004 and September 20, 2004. As discussed, *infra,* both of these dates occur before Hargrove properly exhausted the administrative remedies available to him at NCCF.

FN2. The Nassau County University Medical Staff are employed by the Nassau Health Care Corporation ("NHCC"). Pursuant to the Correctional Center Health Services Agreement between the County of Nassau and NHCC, dated September 24, 1999, NHCC provides medical services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* WEBMD, http://www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

### (3)

### NCCF's Inmate Grievance Procedure

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest argument, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams,* 418 F.Supp.2d at 101, 102 (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams,* 418 F.Supp.2d at 101 (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at *8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs.' Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

### c. Special circumstances

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." *Giano,* 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See Sloane,* 2006 WL 3096031, at *8; *Freeman v. Goord,* No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

### Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." *Woodford,* 126 S.Ct. at 2385. *See also Ruggiero,* 467 F.3d at 178 (citing *Porter,* 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry,* 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry,* 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.,* No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988); *McMunn v. Mem'l Sloan-Kettering Cancer Center,* 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn*, 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn*, 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

### Conclusion

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
**No. 9:04-CV-0471.**

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

### I. FACTS[FN1]

> FN1. The following facts are taken from
> Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

> FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
No. 96 CV 5396(GBD).

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78   1395(7)

78 Civil Rights
  78III Federal Remedies in General
    78k1392 Pleading
      78k1395 Particular Causes of Action
        78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of 1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff, FN1 a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,FN2 and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

    FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

    FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

> FN3. The amended complaint reads as follows:
>
> That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

> FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, also dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996.FN6 On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See,* Toliver v. County of Sullivan, 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prisoner officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g.,* Forster v. Bigger, 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

**\*4** In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

**\*5** Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
James MURRAY, Plaintiff,
v.
R. PALMER, Corrections Officer, Great Meadow
Correctional Facility; S. Griffin, Corrections Officer,
Great Meadow Correctional Facility; M. Terry,
Corrections Officer, Great Meadow Correctional
Facility; F. Englese, Corrections Officer, Great Meadow
Correctional Facility; Sergeant Edwards, Great Meadow
Correctional Facility; K. Bump, Sergeant, Great
Meadow Correctional Facility; K.H. Smith, Sergeant,
Great Meadow Correctional Facility; A. Paolano,
Facility Health Director: and Ted Nesmith, Physicians
Assistant, Defendants.
No. 9:03-CV-1010 (DNH/GLS).

June 20, 2008.
James Murray, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, James Seaman, Esq., Asst. Attorney General,
of Counsel, Albany, NY, for Defendants.

***ORDER***

DAVID N. HURD, District Judge.

**\*1** Plaintiff, James Murray, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a 51 page Report
Recommendation dated February 11, 2008, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted in part (i.e., to the extent that it
requests the dismissal with prejudice of plaintiff's claims
against defendant Paolano and Nesmith); and denied in
part (i.e., to the extent that it requests dismissal of
plaintiff's claims against the remaining defendants on the
grounds of plaintiff's failure to exhaust available
administrative remedies) for the reasons stated in the
Report Recommendation. Lengthy objections to the
Report Recommendation have been filed by the plaintiff.

Based upon a de novo review of the portions of the
Report-Recommendation to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted. See 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is
GRANTED in part and DENIED in part;

2. Plaintiff's complaint against defendants Paolano
and Nesmith is DISMISSED with prejudice;

3. Defendants' motion for summary judgment is
DENIED, to the extent that their request for dismissal of
plaintiff's assault claims under the Eighth Amendment
against the remaining defendants on the grounds of
plaintiff's failure to exhaust available administrative
remedies as stated in the Report-Recommendation.

IT IS SO ORDERED.

JAMES MURRAY, Plaintiff,

-v.-

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow
C.F.; F. ENGLESE, Corrections Officer, Great Meadow
C.F.; P. EDWARDS, Sergeant, Great Meadow C.F.; K.
BUMP, Sergeant, Great Meadow C.F.; K.H. SMITH,
Sergeant, Great Meadow C.F.; A. PAOLANO, Health
Director, Great Meadows C.F.; TED NESMITH,
Physicians Assistant, Great Meadows C.F., Defendants.

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

C.F.; Counter Claimants,

-v.-

JAMES MURRAY, Counter Defendant.

***ORDER and REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 78.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

### A. Plaintiff's Second Amended Complaint

In his Second Amended Complaint, James Murray ("Plaintiff") alleges that nine correctional officials and health care providers employed by the New York State Department of Correctional Services ("DOCS") at Great Meadow Correctional Facility ("Great Meadow C.F .") violated his rights under the Eighth Amendment on August 17, 2000, when (1) Defendants Palmers, Griffin, Terry, and Englese assaulted him without provocation while he was incapacitated by mechanical restraints, (2) Defendants Edwards, Bump, and Smith witnessed, but did not stop, the assault, and (3) Defendants Paolano and Nesmith failed to examine and treat him following the assault despite his complaints of having a broken wrist. (Dkt. No. 10, ¶¶ 6-7 [Plf.'s Second Am. Compl.].)

### B. Defendants' Counterclaim

**\*2** In their Answer to Plaintiff's Second Amended Complaint, three of the nine Defendants (Palmer, Griffin and Terry) assert a counterclaim against Defendant for personal injuries they sustained as a result of Plaintiff's assault and battery upon them during the physical struggle that ensued between them and Plaintiff due to his threatening and violent behavior on August 17, 2000, at Great Meadow C.F. (Dkt. No. 35, Part 1, ¶¶ 23-30 [Defs.' Answer & Counterclaim].)

I note that the docket in this action inaccurately indicates that this Counterclaim is asserted also on behalf of Defendants Englese, Edwards, Bump, Smith, Paolano, and "Nejwith" (later identified as "Nesmith"). (*See* Caption of Docket Sheet.) As a result, at the end of this Report-Recommendation, *I direct the Clerk's Office to correct the docket sheet to remove the names of those individuals as "counter claimants" on the docket.*

I note also that, while such counterclaims are unusual in prisoner civil rights cases (due to the fact that prisoners are often "judgment proof" since they are without funds), Plaintiff paid the $150 filing fee in this action (Dkt. No. 1), and, in his Second Amended Complaint, he alleges that he received a settlement payment in another prisoner civil rights actions in 2002. (Dkt. No. 10, ¶ 10 [Plf.'s Second Am. Compl.].) Further investigation reveals that the settlement resulted in a payment of $20,000 to Plaintiff. *See Murray v. Westchester County Jail,* 98-CV-0959 (S .D.N.Y.) (settled for $20,000 in 2002).

## II. DEFENDANTS' MOTION AND PLAINTIFF'S RESPONSE

### A. Defendants' Motion

In their motion for summary judgment, Defendants argue that Plaintiff's Second Amended Complaint should be dismissed for four reasons: (1) Plaintiff has failed to adduce any evidence establishing that Defendant Paolano, a supervisor, was personally involved in any of the constitutional violations alleged; (2) Plaintiff has failed to adduce any evidence establishing that Defendant Nesmith was deliberately indifferent to any of Plaintiff's serious medical needs; (3) at the very least, Defendant Nesmith is protected from liability by the doctrine of qualified immunity, as a matter of law; and (4) Plaintiff has failed to adduce any evidence establishing that he exhausted his available administrative remedies with respect to his assault claim, before filing that claim in federal court. (Dkt. No. 78, Part 13, at 2, 4-13 [Defs.' Mem. of Law].)

In addition, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

to honor non-life-sustaining medical prescriptions written at a former facility. (*Id.* at 3.) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

**\*3** Defendants' motion is accompanied by a Statement of Material Facts, submitted in accordance with Local Rule 7.1(a)(3) ("Rule 7.1 Statement"). (Dkt. No. 78, Part 12.) Each of the 40 paragraphs contained in Defendants' Rule 7.1 Statement is supported by an accurate citation to the record evidence. (*Id.*) It is worth mentioning that the record evidence consists of (1) the affirmations of Defendants Nesmith and Paolano, and exhibits thereto, (2) the affirmation of the Inmate Grievance Program Director for DOCS, and exhibits thereto, (3) affirmation of the Legal Liaison between Great Meadow C.F. and the New York State Attorney General's Office during the time in question, and exhibits thereto, and (4) a 155-page excerpt from Plaintiff's deposition transcript. (Dkt. No. 78.)

**B. Plaintiff's Response**

After being specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and after being granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83), Plaintiff submitted a barrage of documents: (1) 49 pages of exhibits, which are attached to neither an affidavit nor a memorandum of law (Dkt. No. 84); (2) 113 pages of exhibits, attached to a 25-page affidavit (Dkt. No. 85); (3) 21 pages of exhibits, attached to a 12-page supplemental affidavit (Dkt. No. 86); and (4) a 29-page memorandum of law (Dkt. No. 86); and a 13-page supplemental memorandum of law (Dkt. No. 88). Generally in his Memorandum of Law and Supplemental Memorandum of Law, Plaintiff responds to

the legal arguments advanced by Defendants. (*See* Dkt. No. 86, Plf.'s Memo. of Law [responding to Defs.' exhaustion argument]; Dkt. No. 88, at 7-13 [Plf.'s Supp. Memo. of Law, responding to Defs.' arguments regarding the personal involvement of Defendant Paolano, the lack of evidence supporting a deliberate indifference claim against Defendant Nesmith, the applicability of the qualified immunity defense with regard to Plaintiff's claim against Defendant Nesmith, and the sufficiency and timing of Plaintiff's prescription-review claim against Defendant Paolano].) Those responses are described below in Part IV of this Report-Recommendation.

However, unfortunately, not among the numerous documents that Plaintiff has provided is a *proper* response to Defendants' Rule 7.1 Statement. (*See* Dkt. No. 85, Part 2, at 45-52 [Ex. N to Plf.'s Affid.].) Specifically, Plaintiff's Rule 7.1 Response (which is buried in a pile of exhibits) fails, with very few exceptions, to "set forth ... specific citation[s] to the record," as required by Local Rule 7.1(a)(3). (*Id.*) I note that the notary's "sworn to" stamp at the end of the Rule 7.1. Statement does not transform Plaintiff's Rule 7.1 Response into record evidence so as to render that Response compliant with Local Rule 7.1. First, Local Rule 7.1 expressly states, "The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits." N.D.N.Y. L.R. 7.1(a)(3). In this way, the District's Local Rule, like similar local rules of other districts, contemplates citations to a record that is independent of a Rule 7.1 Response. *See, e.g., Vaden v. GAP, Inc.,* 06-CV-0142, 2007 U.S. Dist. LEXIS 22736, at *3-5, 2007 WL 954256 (M.D.Tenn. March 26, 2007) (finding non-movant's verified response to movant's statement of material facts to be deficient because it did cite to affidavit or declaration, nor did it establish that non-movant had actual knowledge of matters to which he attested); *Waterhouse v. District of Columbia,* 124 F.Supp.2d 1, 4-5 (D.D.C.2000) (criticizing party's "Verified Statement of Material Facts," as being deficient in citations to independent record evidence, lacking "firsthand knowledge," and being purely "self-serving" in nature). Moreover, many of Plaintiff's statements in his Rule 7.1 Response are either argumentative in nature or lacking in specificity and personal knowledge, so as to disqualify those statements from having the effect of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

sworn testimony for purposes of a summary judgment motion. *See, infra,* notes 10-12 of this Report-Recommendation.

### III. GOVERNING LEGAL STANDARD

*\*4* Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists,[FN1] the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN2]

> FN1. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN2. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [FN3] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN4] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN5]

> FN3. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary

judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

> FN4. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN5. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

What this burden-shifting standard means when a plaintiff has failed to *properly* respond to a defendant's Rule 7.1 Statement of Material Facts is that the facts as set forth in that Rule 7.1 Statement will be accepted as true [FN6] to the extent that (1) those facts are supported by the evidence in the record,[FN7] and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment.[FN8]

> FN6. *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*) [emphasis in original].

> FN7. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted].

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

FN8. *See* *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

Implied in the above-stated standard is the fact that a district court has no duty to perform an *independent* review of the record to find proof of a factual dispute, even if the non-movant is proceeding *pro se.*[FN9] In the event the district court chooses to conduct such an independent review of the record, any affidavit submitted by the non-movant, in order to be sufficient to create a factual issue for purposes of a summary judgment motion, must, among other things, not be conclusory.[FN10] (An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.)[FN11] Finally, even where an affidavit is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN12]

FN9. *See* *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN10. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb.15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

## IV. ANALYSIS

## A. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Paolano Was Personally Involved in the Constitutional Violations Alleged

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN13] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN14] If the defendant is a supervisory official, such as a correctional facility superintendent or a facility health services director, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN15] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN16] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN17]

FN13. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN14. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN15. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN16. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN17. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

**\*5** Defendants argue that Plaintiff has not adduced evidence establishing that Defendant Paolano, the Great Meadow C.F. Health Services Director during the time in question, was personally involved in the constitutional violations alleged. (Dkt. No. 78, Part 13, at 2 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that, during the time in which Plaintiff was incarcerated at Great Meadow C.F. (i . e., from early August of 2000 to late November of 2000), Defendant Paolano never treated Plaintiff for any medical condition, much less a broken wrist on August 17, 2000. (*Id.; see also* Dkt. No. 78, Part 4, ¶¶ 7-8 [Paolano Affid.]; Dkt. No. 78, Part 5 [Ex. A to Paolano Affid.]; Dkt. No. 78, Part 11, at 32-33 [Plf.'s Depo.].)

Plaintiff responds that (1) Defendant Paolano was personally involved since he "treated" Plaintiff on August 17, 2000, by virtue of his supervisory position as the Great Meadow C.F.'s Health Services Director, and (2) Defendant Paolano has the "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F. (Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites a paragraph of his Supplemental Affidavit, and an administrative decision, for the proposition that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care." (*Id.; see also* Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14.)

**1. Whether Defendant Paolano Was Personally Involved in Plaintiff's Treatment on August 17, 2000**

With respect to Plaintiff's first point (regarding Defendant Paolano's asserted "treatment" of Plaintiff on August 17, 2000), the problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants' assert, Defendant Paolano did not, in fact, treat Plaintiff on August 17, 2000 (or at any time when Plaintiff was incarcerated at Great Meadow C.F.). This was the fact asserted by Defendants in Paragraphs 38 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶ 38 [Defs.' Rule 7.1 Statement].) Defendants supported this

factual assertion with record evidence. (*Id.* [providing accurate record citations]; *see also* Dkt. No. 78, Part 12, ¶¶ 37-38 [Defs.' Rule 7.1 Statement, indicating that it was Defendant Nesmith, not Defendant Paolano, who treated Plaintiff on 8/17/00].) Plaintiff has failed to specifically controvert this factual assertion, despite having been given an adequate opportunity to conduct discovery, and having been specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and having been granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83). Specifically, Plaintiff fails to cite any record evidence in support of his denial of Defendants' referenced factual assertion. (*See* Dkt. No. 85, Part 2, at 50 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

**\*6** The Court has no duty to perform an independent review of the record to find proof disputing this established fact. *See, supra,* Part III and note 9 of this Report-Recommendation. Moreover, I decline to exercise my discretion, and I recommend that the Court decline to exercise its discretion, to perform an independent review of the record to find such proof for several reasons, any one of which is sufficient reason to make such a decision: (1) as an exercise of discretion, in order to preserve judicial resources in light of the Court's heavy caseload; (2) the fact that Plaintiff has already been afforded considerable leniency in this action, including numerous deadline extensions and liberal constructions; and (3) the fact that Plaintiff is fully knowledgeable about the requirements of a non-movant on a summary judgment motion, due to Defendants' notification of those requirements, and due to Plaintiff's extraordinary litigation experience.

With regard to this last reason, I note that federal courts normally treat the papers filed by *pro se* civil rights litigants with special solicitude. This is because, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process, and because the civil rights claims they assert are of a very serious nature. However, "[t]here are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" that is normally afforded *pro se* litigants.[FN18] Generally, the

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

rationale for diminishing special solicitude (at least in the Second Circuit) is that the *pro se* litigant's extreme litigiousness demonstrates his *experience,* the lack of which is the reason for extending special solicitude to a *pro se* litigant in the first place.[FN19] The Second Circuit has diminished this special solicitude, and/or indicated the acceptability of such a diminishment, on several occasions.[FN20] Similarly, I decide to do so, here, and I recommend the Court do the same.

> FN18. *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept.26, 2007)* (Kahn, J., adopting Report-Recommendation) [citations omitted].

> FN19. *Koehl,* 2007 WL 2846905, at *3 & n. 18 [citations omitted].

> FN20. *See, e.g., Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999)* (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977)[citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

Plaintiff is no stranger to the court system. A review of the Federal Judiciary's Public Access to Court Electronic Records ("PACER") System reveals that Plaintiff has filed at least 15 other federal district court actions, [FN21] and at least three federal court appeals.[FN22] Furthermore, a review of the New York State Unified Court System's website reveals that he has filed at least 20 state court actions,[FN23] and at least two state court appeals.[FN24] Among these many actions he has had at least one victory, resulting in the payment of $20,000 to him in

settlement proceeds.[FN25]

> FN21. *See Murray v. New York,* 96-CV-3413 (S.D.N.Y.); *Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y.); *Murray v. McGinnis,* 99-CV-1908 (W.D.N.Y.); *Murray v. McGinnis,* 99-CV-2945 (S.D.N.Y.); *Murray v. McGinnis,* 00-CV-3510 (S.D.N.Y.); *Murray v. Jacobs,* 04-CV-6231 (W.D.N.Y.); *Murray v. Bushey,* 04-CV-0805 (W.D.N.Y.); *Murray v. Goord,* 05-CV-1113 (N.D.N.Y.); *Murray v. Wissman,* 05-CV-1186 (N.D.N.Y.); *Murray v. Goord,* 05-CV-1579 (N.D.N.Y.); *Murray v. Doe,* 06-CV-0205 (S.D.N.Y.); *Murray v. O'Herron,* 06-CV-0793 (W.D.N.Y.); *Murray v. Goord,* 06-CV-1445 (N.D.N.Y.); *Murray v. Fisher,* 07-CV-0306 (W.D.N.Y.); *Murray v. Escrow,* 07-CV-0353 (W.D.N.Y.).

> FN22. *See Murray v. McGinnis,* No. 01-2533 (2d Cir.); *Murray v. McGinnis,* No. 01-2536 (2d Cir.); *Murray v. McGinnis,* No. 01-2632 (2d Cir.).

> FN23. *See Murray v. Goord,* Index No. 011568/1996 (N.Y. Sup.Ct., Westchester County); *Murray v. Goord,* Index No. 002383/1997 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002131/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002307/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002879/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002683/2004 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002044/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. McGinnis,* Index No. 002099/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Sullivan,* Index No. 002217/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002421/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002495/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002496/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002888/2006 (N.Y. Sup.Ct., Chemung

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

County); *Murray v. LeClaire,* Index No. 002008/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002009/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002010/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002011/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. Fisher,* Index No. 002762/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. New York,* Claim No. 108304, Motion No. 67679 (N.Y.Ct.Cl.); *Murray v. New York,* Motion No. M-67997 (N.Y.Ct.Cl.).

FN24. *See Murray v. Goord,* No. 84875, 709 N.Y. S.2d 662 (N.Y.S.App.Div., 3d Dept.2000); *Murray v. Goord,* No. 83252, 694 N.Y.S .2d 797 (N.Y.S.App.Div., 3d Dept.1999).

FN25. *See Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y .) (settled for $20,000 in 2002).

I will add only that, even if I were inclined to conduct such an independent review of the record, the record evidence that Plaintiff cites regarding this issue in his Supplemental Memorandum of Law does not create such a question of fact. (*See* Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law, citing Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14].) It appears entirely likely that Defendant Paolano had the ultimate responsibility for providing medical treatment to the inmates at Great Meadow C.F.[FN26] However, this duty arose solely because of his supervisory position, i.e., as the Facility Health Services Director. It is precisely this sort of supervisory duty that does *not* result in liability under 42 U.S.C. § 1983, as explained above.

FN26. To the extent that Plaintiff relies on this evidence to support the proposition that Defendant Paolano had the "sole" responsibility for such health care, that reliance is misplaced. Setting aside the loose nature of the administrative decision's use of the word "sole," and the different context in which that word was used (regarding the review of Plaintiff's grievance about having had his prescription

discontinued), the administrative decision's rationale for its decision holds no preclusive effect in this Court. I note that this argument by Plaintiff, which is creative and which implicitly relies on principles of estoppel, demonstrates his facility with the law due to his extraordinary litigation experience.

**\*7** As for the other ways through which a supervisory official may be deemed "personally involved" in a constitutional violation under 42 U.S.C. § 1983, Plaintiff does not even argue (or allege facts plausibly suggesting)[FN27] that Defendant Paolano *failed to remedy* the alleged deliberate indifference to Plaintiff's serious medical needs on August 17, 2000, after learning of that deliberate indifference through a report or appeal. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano created, or allowed to continue, *a policy or custom* under which the alleged deliberate indifference on August 17, 2000, occurred. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano had been *grossly negligent* in managing subordinates (such as Defendant Nesmith) who caused the alleged deliberate indifference. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano exhibited *deliberate indifference* to the rights of Plaintiff by failing to act on information indicating that Defendant Nesmith was violating Plaintiff's constitutional rights.

FN27. *See Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (holding that, for a plaintiff's complaint to state a claim upon which relief might be granted under Fed.R.Civ.P. 8 and 12, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," or, in other words, there must be "plausible grounds to infer [actionable conduct]"), *accord, Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

original].

In the alternative, I reach the same conclusion (that Plaintiff's claim against Defendant Paolano arising from the events of August 17, 2000, lacks merit) on the ground that there was no constitutional violation committed by Defendant Nesmith on August 17, 2000, in which Defendant Paolano could have been personally involved, for the reasons discussed below in Part IV.B. of this Report-Recommendation.

**2. Whether Defendant Paolano Was Personally Involved in the Review of Plaintiff's Prescriptions in Early August of 2000**

With respect to Plaintiff's second point (regarding Defendant Paolano's asserted "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F.), there are three problems with this argument.

First, the argument regards a claim that is not properly before this Court for the reasons explained below in Part IV.E. of this Report-Recommendation.

Second, as Defendants argue, even if the Court were to reach the merits of this claim, it should rule that Plaintiff has failed to adduce evidence establishing that Defendant Paolano was personally involved in the creation or implementation of DOCS' prescription-review policy. It is an uncontroverted fact, for purposes of Defendants' motion, that (1) the decision to temporarily deprive Plaintiff of his previously prescribed pain medication (i.e., pending the review of that medication by a physician at Great Meadow C.F.) upon his arrival at Great Meadow C.F. was made by an "intake nurse," not by Defendant Paolano, (2) the nurse's decision was made pursuant to a policy instituted by DOCS, not by Defendant Paolano, and (3) Defendant Paolano did not have the authority to alter that policy. These were the facts asserted by Defendants in Paragraphs 6 through 9 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 6-9 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits two of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at

46-47 [Ex. N to Plf.'s Affid.].)

**\*8** For example, in support of his denial of Defendants' factual assertion that "[t]his policy is not unique to Great Meadow, but applies to DOCS facilities generally," Plaintiff says that, at an unidentified point in time, "Downstate CF honored doctors proscribed [sic] treatment and filled by prescriptions from Southport Correctional Facility .... Also I've been transferred to other prisons such as Auburn [C.F.] in which they honored doctors prescribe[d] orders." (*Id.*) I will set aside the fact that Defendants' factual assertion is not that the policy applies to every single DOCS facility but that it applies to them as a general matter. I will also set aside the fact that Plaintiff's assertion is not supported by a citation to independent record evidence. The main problem with this assertion is that it is not specific as to what year or years he had these experiences, nor does it even say that his prescriptions were immediately honored without a review by a physician at the new facility.

The other piece of "evidence" Plaintiff cites in support of this denial is "Superintendent George B. Duncan's 9/22/00 decision of Appeal to him regarding [Plaintiff's Grievance No.] GM-30651-00." (*Id.*) The problem is that the referenced determination states merely that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care, and has the final say regarding all medical prescriptions." (Dkt. No. 86, at 14 [Ex. 14 to Plf.'s Suppl. Affid.].) For the sake of much-needed brevity, I will set aside the issue of whether an IGP Program Director's broadly stated *rationale* for an appellate determination with respect to a prisoner's grievance can ever constitute evidence sufficient to create proof of a genuine issue of fact for purposes of a summary judgment motion. The main problem with this "evidence" is that there is absolutely nothing inconsistent between (1) a DOCS policy to temporarily deprive prisoners of non-life-sustaining prescription medications upon their arrival at a correctional facility, pending the review of those medical prescriptions by a physician at the facility, and (2) a DOCS policy to give Facility Health Service Directors the "final say" regarding the review of those medical prescriptions.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Because Plaintiff has failed to support his denial of these factual assertions with citations to record evidence that actually controverts the facts asserted, I will consider the facts asserted by Defendants as true. N.D.N.Y. L.R. 7.1(a)(3). Under the circumstances, I decline, and I recommend the Court decline, to perform an independent review of the record to find proof disputing this established fact for the several reasons described above in Part IV.A.1. of this Report-Recommendation.

Third, Plaintiff has failed to adduce evidence establishing that the policy in question is even unconstitutional. I note that, in his Supplemental Memorandum of Law, Plaintiff argues that "deliberate indifference to serious medical needs is ... shown by the fact that prisoners are denied access to a doctor and physical examination upon arrival at [Great Meadow] C.F. to determine the need for pain medications which aren't life sustaining ...." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) As a threshold matter, Plaintiff's argument is misplaced to the extent he is arguing about the medical care other prisoners may not have received upon their arrival at Great Meadow C.F. since this is not a class-action. More importantly, to the extent he is arguing about any medical care that he (allegedly) did not receive upon his arrival at Great Meadow C.F., he cites no record evidence in support of such an assertion. (*Id.*) Indeed, he does not even cite any record evidence establishing that, upon his arrival at Great Meadow C.F. in early 2000, either (1) he asked a Defendant in this action for such medical care, or (2) he was suffering from a serious medical need for purposes of the Eighth Amendment. (*Id.*)

**\*9** If Plaintiff is complaining that Defendant Paolano is liable for recklessly causing a physician at Great Meadow C.F. to excessively delay a review Plaintiff's pain medication upon his arrival at Great Meadow C.F., then Plaintiff should have asserted that allegation (and some basic facts supporting it) in a pleading in this action so that Defendants could have taken adequate discovery on it, and so that the Court could squarely review the merits of it. (Dkt. No. 78, Part 11, at 53 [Plf.'s Depo.].)

For all of these reasons, I recommend that Plaintiff's claims against Defendant Paolano be dismissed with prejudice.

**B. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Nesmith Was Deliberately Indifferent to Plaintiff's Serious Medical Needs**

Generally, to state a claim for inadequate medical care, a plaintiff must allege facts plausibly suggesting two things: (1) that he had a sufficiently serious medical need; and (2) that the defendants were deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Defendants argue that, even assuming that Plaintiff's broken wrist constituted a sufficiently serious medical condition for purposes of the Eighth Amendment, Plaintiff has not adduced evidence establishing that, on August 17, 2000, Defendant Nesmith acted with deliberate indifference to that medical condition. (Dkt. No. 78, Part 13, at 4-9 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that Defendant Nesmith sutured lacerations in Plaintiff's forehead, ordered an x-ray examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. (*Id.* at 7-9 [providing accurate record citations].) Moreover, argue Defendants, Plaintiff's medical records indicate that he did not first complain of an injury to his wrist until hours after he experienced that injury. (*Id.* at 8 [providing accurate record citation].)

Plaintiff responds that "[he] informed P.A. Nesmith that his wrist felt broken and P.A. Nesmith ignored plaintiff, which isn't reasonable. P.A. Nesmith didn't even care to do a physical examination to begin with[,] which would've revealed [the broken wrist] and is fundamental medical care after physical trauma." (Dkt. No. 88, at 11 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites *no* record evidence. (*Id.* at 11-12.)

The main problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants have argued, Defendant Nesmith (1) sutured lacerations in Plaintiff's forehead within hours if not minutes of Plaintiff's injury and (2) ordered an x-ray

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. These facts were asserted by Defendants in Paragraphs 27 through 32 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 27-32 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits most of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at 48-50 [Ex. N to Plf.'s Affid.].)

**\*10** The only denial he supports with a record citation is with regard to when, within the referenced 24-hour period, Defendant Nesmith ordered his wrist x-ray. This issue is not material, since I have assumed, for purposes of Defendants' motion, merely that Defendant Nesmith ordered Plaintiff's wrist x-ray within 24 hours of the onset of Plaintiff's injury.[FN28] (Indeed, whether the wrist x-ray was ordered in the late evening of August 17, 2000, or the early morning of August 18, 2000, would appear to be immaterial for the additional reason that it would appear unlikely that any x-rays could be conducted in the middle of the night in Great Meadow C.F.)

FN28. Furthermore, I note that the record evidence he references (in support of his argument that the x-ray was on the morning of August 18, 2000, not the evening of August 17, 2000) is "Defendants exhibit 20," which he says "contains [an] 11/20/00 Great Meadow Correctional Facility Investigation Sheet by P. Bundrick, RN, NA, and Interdepartmental Communication from defendant Ted Nesmith P.A. that state [that the] X ray was ordered on 8/18/00 in the morning." (*Id.*) I cannot find, in the record, any "exhibit 20" having been submitted by Defendants, who designated their exhibits by letter, not number. (*See generally* Dkt. No. 78.) However, at Exhibit G of Defendant Nesmith's affidavit, there is the "Investigation Sheet" to which Plaintiff refers. (Dkt. No. 78, Part 3, at 28 [Ex. G to Nesmith

Affid.].) The problem is that document does not say what Plaintiff says. Rather, it says, "Later that evening [on August 17, 2000] ... [a]n x-ray was ordered for the following morning ...." (*Id.*) In short, the document says that the x-ray was not ordered *on* the morning of August 18, 2007, but *for* that morning. Granted, the second document to which Plaintiff refers, the "Interdepartmental Communication" from Defendant Nesmith, does say that "I saw him the next morning and ordered an xray ...." (*Id.* at 29.) I believe that this is a misstatement, given the overwhelming record evidence to the contrary.

Moreover, in confirming the accuracy of Defendants' record citations contained in their Rule 7.1 Statement, I discovered several facts further supporting a finding that Defendant Nesmith's medical care to Plaintiff was both prompt and responsive. In particular, the record evidence cited by Defendants reveals the following specific facts:

(1) at approximately 10:17 a.m. on August 17, 2000, Plaintiff was first seen by someone in the medical unit at Great Meadow C.F. (Nurse Hillary Cooper);

(2) at approximately 10:40 a.m. on August 17, 2000, Defendant Nesmith examined Plaintiff; during that examination, the main focus of Defendant Nesmith's attention was Plaintiff's complaint of the lack of feeling in his lower extremities; Defendant Nesmith responded to this complaint by confirming that Plaintiff could still move his lower extremities, causing Plaintiff to receive an x-ray examination of his spine (which films did not indicate any pathology), and admitting Plaintiff to the prison infirmary for observation;

(3) at approximately 11:00 a.m. on August 17, 2000, Defendant Nesmith placed four sutures in each of two 1/4" lacerations on Plaintiff's left and right forehead;

(4) by 11:20 a.m. Plaintiff was given, or at least prescribed, Tylenol by a medical care provider;

(5) Plaintiff's medical records reflect no complaint by Plaintiff of any injury to his wrist at any point in time other than between 4:00 p.m. and midnight on August 17,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

2000;

(6) at some point after 9:00 p.m. on August 17, 2000, and 9:00 a.m. on the morning of August 18, 2000, Defendant Nesmith ordered that Plaintiff's wrist be examined by x-ray, in response to Plaintiff's complaint of an injured wrist; that x-ray examination occurred at Great Meadow C.F. at some point between 9:00 a.m. on August 17, 2000, and 11:00 a.m. on August 18, 2000, when Defendant Nesmith personally performed a "wet read" of the x-rays before sending them to Albany Medical Center for a formal reading by a radiologist;

(7) at approximately 11:00 a.m. on August 18, 2000, Defendant Nesmith placed a splint on Plaintiff's wrist and forearm with the intent of replacing it with a cast in a couple of days; the reason that Defendant Nesmith did not use a cast at that time was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith believed, based on 30 years experience treating hundreds of fractures, that it was generally not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides;

**\*11** (8) on August 22, 2000, Defendant Nesmith replaced the splint with a cast;

(9) on August 23, 2000, Plaintiff was discharged from the infirmary at Great Meadow C.F.; and

(10) on August 30, 2000, Defendant Nesmith removed the sutures from Plaintiff's forehead. (*See generally* Dkt. No. 78, Part 2, ¶¶ 3-15 [Aff. of Nesmith]; Dkt. No. 78, Part 3, Exs. A-E [Exs. to Aff. of Nesmith].)

"[D]eliberate indifference describes a state of mind more blameworthy than negligence," [FN29] one that is "equivalent to criminal recklessness." [FN30] There is no evidence of such criminal recklessness on the part of Defendant Nesmith, based on the uncontroverted facts before the Court, which show a rather prompt and responsive level of medical care given by Defendant Nesmith to Plaintiff, during the hours and days following the onset of his injuries.

FN29. *Farmer v. Brennan,* 511 U.S. 825, 835,

114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at \*4 (N.D.N.Y. Apr.9, 1998) (Pooler, J.) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

FN30. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *cf. Farmer,* 511 U.S. at 827 ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment.").

In his argument that his treatment in question constituted deliberate indifference to a serious medical need, Plaintiff focuses on the approximate 24-hour period that appears to have elapsed between the onset of his injury and his receipt of an x-ray examination of his wrist. He argues that this 24-hour period of time constituted a delay that was unreasonable and reckless. In support of his argument, he cites two cases. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). However, the facts of both cases are clearly distinguishable from the facts of the case at hand.

In *Brown v. Hughes,* the Eleventh Circuit found a genuine issue of material fact was created as to whether a correctional officer knew of a prisoner's foot injury during the four hours in which no medical care was provided to the prisoner, so as to preclude summary judgment for that officer. *Brown,* 894 F.2d at 1538-39. However, the Eleventh Circuit expressly stated that the question of fact was created because the prisoner had "submitted affidavits stating that [the officer] was called to his cell because there had been a fight, that while [the officer] was present [the prisoner] began to limp and then hop on one leg, that his foot began to swell severely, that he told [the officer] his foot felt as though it were broken, and that [the officer] promised to send someone to look at it but never did." *Id.* Those are *not* the facts of this case.

In *Loe v. Armistead,* the Fourth Circuit found merely that, in light of the extraordinary leniency with which *pro se* complaints are construed, the court was unable to conclude that a prisoner had failed to state a claim upon which relief might be granted for purposes of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b) (6) because the prisoner had alleged that the defendants-*despite being (at some point) "notified" of the prisoner's injured arm-*had inexplicably delayed for 22 hours in giving him medical treatment for the injury. *Loe,* 582 F.2d at 1296. More specifically, the court expressly construed the prisoner's complaint as alleging that, following the onset of the plaintiff's injury at 10:00 a.m. on the day in question, the plaintiff was immediately taken to the prison's infirmary where a nurse, while examining the prisoner's arm, heard him complain to her about pain. *Id.* at 1292. Furthermore, the court construed the prisoner's complaint as alleging that, "[t]hroughout the day, until approximately 6:00 p.m., [the prisoner] repeatedly requested that he be taken to the hospital. He was repeatedly told that only the marshals could take him to a hospital and that they had been notified of his injury." *Id.* at 1292-93. Again, those are *not* the facts of this case.

**\*12** Specifically, there is no evidence in the record of which I am aware that at any time before 4:00 p.m. on August 17, 2000, Defendant Nesmith either (1) heard Plaintiff utter a complaint about a wrist injury sufficient to warrant an x-ray examination or (2) observed physical symptoms in Plaintiff's wrist (such as an obvious deformity) that would place him on notice of such an injury. As previously stated, I decline, and I urge the Court to decline, to tediously sift through the 262 pages of documents that Plaintiff has submitted in the hope of finding a shred of evidence sufficient to create a triable issue of fact as to whether Plaintiff made, and Defendant Nesmith heard, such a complaint before 4:00 p.m. on August 17, 2000.

I note that, in reviewing Plaintiff's legal arguments, I have read his testimony on this issue. That testimony is contained in Paragraphs 8 through 12, and Paragraph 18, of his Supplemental Affidavit. (*See* Dkt. No. 86, at ¶¶ 8-10, 18 [Plf.'s Supp. Affid., containing two sets of Paragraphs numbed "5" through "11"].) In those Paragraphs, Plaintiff swears, in pertinent part, that "[w]hile I was on the x-ray table I told defendant Ted Nesmith, P.A. and/or Bill Redmond RN ... that my wrist felt broken, and was ignored." (*Id.* at ¶ 9.) Plaintiff also swears that "I was [then] put into a room in the facility clinic[,] and I asked defendant Ted Nesmith, PA[,] shortly thereafter for [an] x-ray of [my] wrist[,] pain medication and [an] ice pack but wasn't given it [sic]." (*Id.* at ¶ 10.) Finally, Plaintiff swears as follows: "At one point on 8/17/00 defendant Nesmith told me that he didn't give a damn when I kept complaining that my wrist felt broken and how I'm going to sue him cause I'm not stupid

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

[enough] to not know he's supposed to do [a] physical examination [of me], [and not] to ignore my complaints about [my] wrist feeling broke and feeling extreem [sic] pain. He told me [to] stop complaining [and that] he's done with me for the day." (*Id.* at ¶ 18.)

This last factual assertion is important since a response of "message received" from the defendant appears to have been critical in the two cases cited by Plaintiff. It should be emphasized that, according to the undisputed facts, when Plaintiff made his asserted wrist complaint to Defendant Nesmith during the morning of August 17, 2000, Defendant Nesmith was either suturing up Plaintiff's forehead or focusing on Plaintiff's complaint of a lack of feeling in his lower extremities. (This complaint of lack of feeling, by the way, was found to be inconsistent with Defendant Nesmith's physical examination of Plaintiff.)

In any event, Defendant Nesmith can hardly be said to have, in fact, "ignored" Plaintiff since he placed him under *observation* in the prison's infirmary (and apparently was responsible for the prescription of Tylenol for Plaintiff).[FN31] Indeed, it was in the infirmary that Plaintiff was observed by a medical staff member to be complaining about his wrist, which resulted in an x-ray examination of Plaintiff's wrist.

> FN31. In support of my conclusion that this fact alone is a sufficient reason to dismiss Plaintiff's claims against Defendant Nesmith, I rely on a case cited by Plaintiff himself. *See Brown,* 894 F.2d at 1539 ("Although no nurses were present [in the hospital] at the jail that day, the procedure of sending [the plaintiff] to the hospital, once employed, was sufficient to ensure that [the plaintiff's broken] foot was treated promptly. Thus, [the plaintiff] has failed to raise an issue of deliberate indifference on the part of these defendants, and the order of summary judgment in their favor must be affirmed.").

**\*13** Even if it were true that Plaintiff made a wrist complaint directly to Defendant Nesmith (during Defendant Nesmith's examination and treatment of Plaintiff between 10:40 a.m. and 11:00 a.m. on August 17,

2000), and Defendant Nesmith heard that complaint, and that complaint were specific and credible enough to warrant an immediate x-ray examination, there would be, at most, only some *negligence* by Defendant Nesmith in not ordering an x-ray examination until 9:00 p.m. that night.

As the Supreme Court has observed, "[T]he question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.[FN32] For this reason, this Court has actually held that a *17-day* delay between the onset of the prisoner's apparent wrist fracture and the provision of an x-ray examination and cast did not constitute deliberate indifference, as a matter of law. *Miles v. County of Broome,* 04-CV-1147, 2006 U.S. Dist. LEXIS 15482, at \*27-28, 2006 WL 561247 (N.D.N.Y. Mar. 6, 2006) (McAvoy, J.) (granting defendants' motion for summary judgment with regard to prisoner's deliberate indifference claim).

> FN32. *See also Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (prisoner's "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention [with regard to the treatment of his broken finger], are not adequate grounds for a section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.") [citation omitted]; *cf. O'Bryan v. Federal Bureau of Prisons,* 07-CV-0076, 2007 U.S. Dist. LEXIS 65287, at \*24-28 (E.D.Ky. Sept. 4, 2007) (holding no deliberate indifference where prisoner wore wrist brace/bandage on his broken wrist for two months even though he had asked for a cast; finding that "the type of wrap would only go the difference of opinion between a patient and doctor about what should be done, and the Supreme Court has stated that a difference of opinion regarding the plaintiff's

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

diagnosis and treatment does not state a constitutional claim.").

As I read Plaintiff's complaints about the medical care provided to him by Defendant Nesmith in this action, I am reminded of what the Second Circuit once observed:

> It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably seeks .... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ....

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

For all of these reasons, I recommend that Plaintiff's claims against Defendant Nesmith be dismissed with prejudice.

### C. Whether Defendant Nesmith Is Protected from Liability by the Doctrine of Qualified Immunity, As a Matter of Law

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " [FN33] In determining whether a particular right was *clearly established,* courts in this Circuit consider three factors:

> FN33. *Williams,* 781 F.2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ).

**\*14** (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. [FN34]

> FN34. *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted).

Regarding the issue of whether *a reasonable person would have known* he was violating a clearly established right, this "objective reasonableness" [FN35] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." [FN36] As the Supreme Court explained,

> FN35. See *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

> FN36. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law .... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

should be recognized.[FN37]

> FN37. *Malley,* 475 U.S. at 341.

Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law."[FN38]

> FN38. *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases].)

Here, I agree with Defendants that, based on the current record, it was not clearly established that, between August 17, 2000, and August 22, 2000, Plaintiff possessed an Eighth Amendment right to receive an x-ray examination and casting of his wrist any sooner than he did. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].) I note that neither of the two decisions cited by Plaintiff (discussed earlier in this Report-Recommendation) were controlling in the Second Circuit. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). I also note that what was controlling was the Supreme Court's decision in *Estelle v. Gamble,* holding that "the question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.

Furthermore, I agree with Defendants that, at the very least, officers of reasonable competence could have believed that Defendant Nesmith's actions in conducting the x-ray examination and casting when he did were legal.[FN39] In his memorandum of law, Plaintiff argues that Defendant Nesmith *intentionally* delayed giving Plaintiff an x-ray for 12 hours, and that the four-day delay of placing a hard cast on Plaintiff's wrist caused Plaintiff *permanent injury to his wrist.* (Dkt. No. 88, at 12-13 [Plf.'s Supp. Memo. of Law].) He cites no portion of the

record for either assertion. (*Id.*) Nor would the fact of permanent injury even be enough to propel Plaintiff's Eighth Amendment claim to a jury.[FN40] I emphasize that it is an undisputed fact, for purposes of Defendants' motion, that the reason that Defendant Nesmith placed a splint and not a cast on Plaintiff's wrist and arm on the morning of August 18, 2000, was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith's medical judgment (based on his experience) was that it was not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides.[FN41] Officers of reasonable competence could have believed that decision was legal.

> FN39. (*Id.*)

> FN40. This particular point of law was recognized in one of the cases Plaintiff himself cites. *Loe,* 582 F.2d at 1296, n. 3 ("[Plaintiff's] assertion that he suffered pain two and one-half weeks after the injury and that the fracture had not healed do not establish deliberate indifference or lack of due process. Similarly, his allegation that he has not achieved a satisfactory recovery suggests nothing more than possible medical malpractice. It does not assert a constitutional tort.").

> FN41. (Dkt. No. 78, Part 12, ¶¶ 31-33 [Defs.' Rule 7.1 Statement]; *see also* Dkt. No. 78, Part 2, ¶¶ 11-13 [Affid. of Nesmith]; Dkt. No. 78, Part 3, Ex. C [Exs. to Affid. of Nesmith] )

**\*15** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Nesmith based on the doctrine of qualified immunity.

**D. Whether Plaintiff Has Adduced Evidence Establishing that He Exhausted His Available Administrative Remedies with Respect to His Assault Claim**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison,

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

or other correctional facility until such administrative remedies as are available are exhausted." [FN42] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN43] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN44]

FN42. 42 U.S.C. § 1997e.

FN43. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

FN44. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure.[FN45] *First,* an inmate must file a complaint with the facility's IGP clerk within fourteen (14) calendar days of the alleged occurrence. A representative of the facility's inmate grievance resolution committee ("IGRC") has seven working days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within seven (7) working days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within four (4) working days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within ten (10) working days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within four (4) working days of receipt of the superintendent's written decision. CORC is to render a written decision within twenty (20) working days of receipt of the appeal. It is important to emphasize that *any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.* [FN46]

FN45. 7 N.Y.C.R.R. § 701.7; *see also White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

FN46. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g ., Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. [FN47] However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA.[FN48] *First,* "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [FN49] *Second,* if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [FN50] *Third,* if the remedies were available and some of the defendants did not forfeit, and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." FN51

> FN47. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

> FN48. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).

> FN49. *Hemphill,* 380 F.3d at 686 (citation omitted).

> FN50. *Id.* [citations omitted].

> FN51. *Id.* [citations and internal quotations omitted].

*16 Defendants argue that Plaintiff never exhausted his available administrative remedies with regard to his claim arising out of the assault that allegedly occurred on August 17, 2000. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].)

Plaintiff responds with four different legal arguments. First, he appears to argue that he handed a written grievance to an unidentified corrections officer but never got a response from the IGRC, and that filing an appeal under such a circumstance is merely optional, under the PLRA (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) Second, he argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (*Id.* at 25-29.) In support of this argument, he cites unspecified record evidence that, although he sent a letter to one "Sally Reams" at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) Third, he argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (*Id.* at 30-38.) Fourth, he argues that Defendants rendered any

administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (*Id.* at 39-45.) FN52

> FN52. I note that the breadth of Plaintiff's creative, thoughtful and well-developed legal arguments further demonstrates his extraordinary experience as a litigant.

For the reasons set forth below, I reject each of these arguments. However, I am unable to conclude, for another reason, that Plaintiff has failed to exhaust his administrative remedies as a matter of law, based on the current record.

**1. Plaintiff's Apparent Argument that an Appeal from His Lost or Ignored Grievance Was "Optional" Under the PLRA**

Plaintiff apparently argues that filing an appeal to CORC when one has not received a response to one's grievance is merely optional under the PLRA. (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) If this is Plaintiff's argument, it misses the point.

It may be true that the decision of whether or not to file an appeal in an action is always "optional"-from a metaphysical standpoint. However, it is also true that, in order to satisfy the PLRA's exhaustion requirement, one *must* file an appeal when one has not received a response to one's grievance (unless one of the exceptions contained in the Second Circuit's three-party inquiry exists). *See, supra,* note 46 of this Report-Recommendation.

**2. Plaintiff's Argument that Defendants "Can't Realistically Show" that Plaintiff Never Sent any Grievances or Appeals to the Great Meadow C.F. Inmate Grievance Clerk**

Plaintiff also argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (Dkt. No. 86,

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

at 25-29 [Plf.'s Memo. of Law].) This argument also fails.

**\*17** Plaintiff appears to misunderstand the parties' respective burdens on Defendants' motion for summary judgment. Even though a failure to exhaust is an affirmative defense that a defendant must plead and prove, once a defendant has met his initial burden of establishing the absence of any genuine issue of material fact regarding exhaustion (which initial burden has been appropriately characterized as "modest"),[FN53] the burden then shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial regarding exhaustion. *See, supra,* Part III of this Report-Recommendation.

> FN53. *See Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at \*9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at \*17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.).

Here, it is an uncontroverted fact, for purposes of Defendants' motion, that (1) grievance records at Great Meadow C.F. indicate that Plaintiff never filed a timely grievance alleging that he had been assaulted by corrections officers at Great Meadow C.F. in 2000, and (2) records maintained by CORC indicate that Plaintiff never filed an appeal (to CORC) regarding any grievance alleging that he had been so assaulted. (*See* Dkt. No. 78, Part 12, ¶¶ 39-40 [Defs.' Rule 7.1 Statement, providing accurate record citations].) Plaintiff has failed to properly controvert these factual assertions with specific citations to record evidence that actually creates a genuine issue of fact. (*See* Dkt. No. 85, Part 2, at 50-51 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

With respect to Plaintiff's argument that the referenced factual assertions are basically meaningless because Great Meadow C.F. did not (during the time in question) have a grievance "receipt system," that argument also fails. In support of this argument, Plaintiff cites unspecified record evidence that, although he sent a letter to Sally Reams (the IGP Supervisor at Great Meadow C.F. in May 2003) at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) (*See* Dkt. No. 86, at 29 [Plf.'s Memo. of Law].) After examining Plaintiff's original Affidavit and exhibits, I located and carefully read the documents in question. (Dkt. No. 85, Part 1, ¶ 23 [Plf.'s Affid.]; Dkt. No. 85, Part 2 [Exs. F and G to Plf.'s Affid.].)

These documents do not constitute sufficient evidence to create a triable question of fact on the issue of whether, in August and/or September of 2000, Great Meadow C.F. did not have a grievance "receipt system." At most, they indicate that (1) at some point, nearly three years after the events at issue, Plaintiff (while incarcerated at Attica C.F.) wrote to Ms. Reams complaining about the alleged assault on August 17, 2000, (2) she responded to Plaintiff, on May 5, 2003, that he must grieve the issue at Attica C .F., where he must request permission to file an untimely grievance, and (3) at some point between April 7, 2003, and June 23, 2003, Ms. Reams informed Mr. Eagen that she did not "remember" receiving "correspondence" from Plaintiff. (*Id.*) The fact that Ms. Reams, after the passing of several weeks and perhaps months, did not retain an independent memory (not record) of receiving a piece of "correspondence" (not grievance) from Plaintiff (who was not an inmate currently incarcerated at her facility) bears little if any relevance on the issue of whether Great Meadow C.F. had, in April and/or May of 2003, a mechanism by which it recorded its receipt of *grievances.* Moreover, whether or not Great Meadow C.F. had a grievance "receipt system" in April and/or of 2003 bears little if any relevance to whether it had a grievance "receipt system" in August and/or September of 2000.

**\*18** It should be emphasized that Defendants have adduced record evidence specifically establishing that, in August and September 2000, Great Meadow C.F. had a *functioning* grievance-recording process through which,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

when a prisoner (and specifically Plaintiff) filed a grievance, it was "assign[ed] a number, title and code" and "log[ged] ... into facility records." (Dkt. No. 78, Part 6, ¶¶ 7-9 [Bellamy Decl.]; Dkt. No. 78, Part 7, at 2 [Ex. A to Bellamy Decl.] Dkt. No. 78, Part 8, ¶ 4 [Brooks Decl.]; Dkt. No. 78, Part 9, at 6 [Ex. B to Brooks Decl.].)

Finally, even if Great Meadow C.F. did not (during the time in question) have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level. *See, supra,* note 46 of this Report-Recommendation.

### 3. Plaintiff's Argument that the Determination He Received from CORC Satisfied the PLRA's Exhaustion Requirement

Plaintiff argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (Dkt. No. 86, at 30-38 [Plf.'s Memo. of Law].) This argument also fails.

Plaintiff does not clearly articulate the specific portion of the record where this determination is located. (*See id.* at 30 [Plf.'s Affid., referencing merely "plaintiff's affidavit and exhibits"].) Again, the Court has no duty to *sua sponte* scour the 209 pages that comprise Plaintiff's "affidavit and exhibits" for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed what I believe to be the material portions of the documents to which Plaintiff refers. I report that Plaintiff appears to be referring to a determination by the Upstate C.F. Inmate Grievance Program, dated June 20, 2003, stating, "After reviewing [your June 11, 2003, Upstate C.F.] grievance with CORC, it has been determined that the grievance is unacceptable. It does not present appropriate mitigating circumstances for an untimely filing." (Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.]; *see also* Dkt. No. 85, Part 1, ¶¶ 22-34 [Plf.'s Affid.].)

There are two problems for Plaintiff with this document. First, this document does *not* constitute a written determination by *CORC* on a written appeal by

Plaintiff to *CORC* from an Upstate C.F. written determination. (*See* Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.].) This fact is confirmed by one of Plaintiff's own exhibits, wherein DOCS IGP Director Thomas Eagen advises Plaintiff, "Contrary to the IGP Supervisor's assertion in his memorandum dated June 20, 2003, the IGP Supervisor's denial of an extension of the time frames to file your grievance from Great Meadow in August 2000 has not been reviewed by the Central Office Review Committee (CORC). The IGP Supervisor did review the matter with Central Office staff who is [sic] not a member of CORC." (*See* Dkt. No. 85, Part 2, at 39 [Ex. K to Plf.'s Affid.].) At best, the document in question is an indication by Upstate C.F. that the success of an appeal by Plaintiff to CORC would be unlikely.

**\*19** Second, even if the document does somehow constitute a written determination by CORC on appeal by Plaintiff, the grievance to which the determination refers is a grievance filed by Plaintiff on June 11, 2003, at Upstate C.F., not a grievance filed by Plaintiff on August 30, 2000, at Great Meadow C.F. (Dkt. No. 85, Part 2, at 32-35 [Ex. I to Plf.'s Affid.].) Specifically, Plaintiff's June 11, 2003, grievance, filed at Upstate C.F., requested permission to file an admittedly *untimely* grievance regarding the injuries he sustained during the assault on August 17, 2000. (*Id.*)

A prisoner has not exhausted his administrative remedies with CORC when, years after failing to file a timely appeal with CORC, the prisoner requests *and is denied* permission to file an untimely (especially, a two-year-old) appeal with CORC due to an unpersuasive showing of "mitigating circumstances." *See Burns v. Zwillinger,* 02-CV-5802, 2005 U.S. Dist. LEXIS 1912, at *11 (S.D.N .Y. Feb. 8, 2005) ("Since [plaintiff] failed to present mitigating circumstances for his untimely appeal to the IGP Superintendent, the CORC, or this Court, [defendant's] motion to dismiss on the grounds that [plaintiff] failed to timely exhaust his administrative remedies is granted."); *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004) ("Without mitigating circumstances, courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies.") [collecting cases]. If the rule were to the contrary, then, as

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

a practical matter, no prisoner could ever be said to have failed to exhaust his administrative remedies because, immediately before filing suit in federal court, he could perfunctorily write to CORC asking for permission to file an untimely appeal, and whatever the answer, he could claim to have completed the exhaustion requirement. The very reason for requiring that a prisoner obtain permission before filing an untimely appeal presumes that the permitted appeal would be required to complete the exhaustion requirement. Viewed from another standpoint, a decision by CORC to refuse the filing of an untimely appeal does not involve a review of the merits of the appeal.

**4. Plaintiff's Argument that Defendants Rendered any Administrative Remedies "Unavailable" to Plaintiff**

Plaintiff also argues that Defendants rendered any administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (Dkt. No. 86, at 39-45 [Plf.'s Memo. of Law].) This argument also fails.

In support of this argument, Plaintiff "incorporates by reference all the previously asserted points, Plaintiff's Affidavit in Opposition with supporting exhibits, as well as[ ] the entire transcripts of Defendants['] deposition on [sic] Plaintiff ...." (*Id.* at 40, 45.) Again, the Court has no duty to *sua sponte* scour the 265 pages that comprise Plaintiff's Affidavit, Supplemental Affidavit, exhibits, and deposition transcript for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed the documents to which Plaintiff refers, and I report that I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.

**\*20** For example, Plaintiff has adduced no evidence

that he possesses any *personal knowledge* (only speculation) of any Defendant in this action having "trashed" his alleged grievance(s) and appeal(s),[FN54] nor has he even adduced evidence that it was *one of the named Defendants in this action* to whom he handed his alleged grievance(s) and appeal(s) for delivery to the Great Meadow C.F. Inmate Grievance Program Clerk on August 30, 2000, September 13, 2000, and September 27, 2000.[FN55] Similarly, the legal case cited by Plaintiff appears to have nothing to do with any Defendant to this action, nor does it even have to do with Great Meadow C.F.[FN56]

FN54. (*See* Dkt. No. 85, Part 1, ¶¶ 13-14, 16-17 [Plf.'s Affid., asserting, "Prison officials trashed my grievances and appeals since they claim not to have them despite [the] fact I sent them in a timely manner. It's [the] only reason they wouldn't have them.... Prison officials have a history of trashing grievances and appeals.... I've been subjected to having my grievances and appeals trashed prior to and since this matter and have spoken to alot [sic] of other prisoners whom [sic] said that they were also subjected to having their grievances and appeals trashed before and after this incident, in alot [sic] of facilities.... Suspecting foul play with respect to my grievances and appeals, I wrote, and spoke to[,] prison officials and staff that did nothing to rectify the matter, which isn't surprising considering [the] fact that it's an old problem ...."].)

FN55. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk ... which contained the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail, in F-Block

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

SHU [at] Great Meadow CF ...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid., asserting only that "[o]n September 27th, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

FN56. (*See* Dkt. No. 85, Part 1, ¶ 15 [Plf.'s Affid., referencing case]; Dkt. No. 85, Part 2, at 16-17 [Ex. B to Plf.'s Affid., attaching a hand-written copy of case, which mentioned a prisoner's grievances that had been discarded in *1996* by an *unidentified* corrections officer at *Sing Sing Correctional Facility* ].)

**5. Record Evidence Creating Genuine Issue of Fact**

Although I decline to *sua sponte* scour the lengthy record for proof of a triable issue of fact regarding exhaustion, I have, while deciding the many issues presented by Defendants' motion, had occasion to review in detail many portions of the record. In so doing, I have discovered evidence that I believe is sufficient to create a triable issue of fact on exhaustion.

Specifically, the record contains Plaintiff's testimony that (1) on August 30, 2000, he gave a corrections officer a grievance regarding the alleged assault on August 17, 2000, but he never received a response to that grievance, (2) on September 13, 2000, he gave a corrections officer an appeal (to the Superintendent) from that non-response, but again did not receive a response, and (3) on September 27, 2000, he gave a corrections officer an appeal (to CORC) from that non-response, but again did not receive a response.[FN57]

FN57. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk in which contained [sic] the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent

by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail; in F-Block SHU [at] Great Meadow CF...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid ., asserting only that "[o]n September 27h, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

The remaining issue then, as it appears to me, is whether or not this affidavit testimony is so self-serving and unsubstantiated by other direct evidence that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN58] Granted, this testimony appears self-serving. However, based on the present record, I am unable to find that the testimony is so wholly unsubstantiated by other direct evidence as to be incredible. Rather, this testimony appears corroborated by two pieces of evidence. First, the record contains what Plaintiff asserts is the grievance that he handed to a corrections officer on August 30, 2000, regarding the alleged assault on August 17, 2000. (Dkt. No. 85, Part 2, at 65-75 [Ex. Q to Plf.'s Affid.].) Second, the record contains two pieces of correspondence between Plaintiff and legal professionals *during or immediately following the time period in question* containing language suggesting that Plaintiff had received no response to his grievance. (Dkt. No. 85, Part 2, at 19-21 [Exs. C-D to Plf.'s Affid .].)

FN58. *See, supra,* note 12 of this Report-Recommendation (collecting cases).

Stated simply, I find that sufficient record evidence exists to create a genuine issue of fact as to (1) whether Plaintiff's administrative remedies were, with respect to his assault grievance during the time in question, "available" to him, for purposes of the first part of the Second Circuit's three-part exhaustion inquiry, and/or (2) whether Plaintiff has shown "special circumstances" justifying his failure to comply with the administrative procedural requirements, for purposes of the third part of the Second Circuit's three-part exhaustion inquiry.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

**\*21** As a result, I recommend that the Court deny this portion of Defendants' motion for summary judgment.

**E. Whether Plaintiff Has Sufficiently Alleged, or Established, that Defendants Were Liable for the Policy to Review the Non-Life-Sustaining Medical Prescriptions of Prisoners Upon Arrival at Great Meadow C.F.**

As explained above in Part II.A. of this Report-Recommendation, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing to honor non-life-sustaining medical prescriptions written at a former facility. (Dkt. No. 78, Part 13, at 3 [Defs.' Mem. of Law].) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

Plaintiff responds that "[he] didn't have to get in particular [sic] about the policy [of] discontinuing all incoming prisoners['] non[-]life[-]sustaining medications without examination and indiscriminently [sic] upon arrival at [Great Meadow] C.F. in [his Second] Amended Complaint. Pleading[s] are just supposed to inform [a] party about [a] claim[,] and plaintiff informed defendant [of] the nature of [his] claims including [the claim of] inadequate medical care. And discovery revealed [the] detail[s] [of that claim] as [Plaintiff had] intended." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) In addition, Plaintiff responds that Defendant Paolano must have been personally involved in the creation and/or implementation of the policy in question since he was the Great Meadow Health Services Director. (*Id.* at 10.)

I agree with Defendants that this claim is not properly

before this Court. Plaintiff's characterization of the notice-pleading standard, and of the contents of his Amended Complaint, are patently without support (both legally and factually). It has long been recognized that a "claim," under Fed.R.Civ.P. 8, denotes "the aggregate of operative facts which give rise to a right enforceable in the courts." [FN59] Clearly, Plaintiff's Second Amended Complaint alleges no facts whatsoever giving rise to an asserted right to be free from the application of the prescription-review policy at Great Meadow C.F. Indeed, his Second Amended Complaint-which asserts Eighth Amendment claims arising *solely* out of events that (allegedly) transpired on August 17, 2000-says nothing at all of the events that transpired immediately upon his arrival at Great Meadow C.F. in early August of 2000, nor does the Second Amended Complaint even casually mention the words "prescription," "medication" or "policy." (*See generally* Dkt. No. 10 [Second Am. Compl.].)

FN59. *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.,* 133 F.2d 187, 189 (2d Cir.1943); *United States v. Iroquois Apartments, Inc.,* 21 F.R.D. 151, 153 (E.D.N.Y.1957); *Birnbaum v. Birrell,* 9 F.R.D. 72, 74 (S.D.N.Y.1948).

**\*22** Furthermore, under the notice-pleading standard set forth by Fed.R.Civ.P. 8(a)(2), to which Plaintiff refers in his Supplemental Memorandum of Law, Defendants are entitled to *fair notice* of Plaintiff's claims. [FN60] The obvious purpose of this rule is to protect defendants from undefined charges and to facilitate a proper decision on the merits. [FN61] A complaint that fails to provide such fair notice "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN62] This fair notice does not occur where, as here, news of the claim first springs up in a deposition more than two years after the action was commenced, approximately seven months after the amended-pleading deadline expired, and approximately two weeks before discovery in the action was scheduled to close. (*Compare* Dkt. No. 1 [Plf.'s Compl., filed 8/14/03] *with* Dkt. No. 42, at 1-2 [Pretrial Scheduling Order setting amended-pleading deadline as 2/28/05] *and* Dkt. No. 78, Part 11, at 52-53 [Plf.'s Depo.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Transcript, dated 9/30/05] *and* Dkt. No. 49 [Order setting discovery deadline as 10/14/05].)

FN60. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (the statement required by Fed.R.Civ.P. 8 [a][2] must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

FN61. *Ruffolo v. Oppenheimer & Co., Inc.,* 90-CV-4593, 1991 WL 17857, at *2 (S.D.N.Y. Feb.5, 1991); *Howard v. Koch,* 575 F.Supp. 1299, 1304 (E.D.N.Y.1982); *Walter Reade's Theatres, Inc. v. Loew's Inc.,* 20 F.R.D. 579, 582 (S.D.N.Y.1957).

FN62. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Tech., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

Under the circumstances, the mechanism by which to assert such a late-blossoming claim was a motion to reopen the amended-pleading filing deadline (the success of which depended on a showing of cause), coupled with a motion for leave file a Third Amended Complaint (the success of which depended, in part, on a showing of lack of prejudice to Defendants, as well as a lack of futility). Plaintiff never made such motions, nor showed such cause.

I acknowledge that, generally, the liberal notice-pleading standard set forth by Fed.R.Civ.P. 8 is applied with even greater force where the plaintiff is proceeding *pro se.* In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are

generally construed with an *extra* degree of liberality. As an initial matter, I have already concluded, based on my review of Plaintiff's extensive litigation experience, that he need not be afforded such an extra degree of leniency since the rationale for such an extension is a *pro se* litigant's inexperience with the court system and legal terminology, and here Plaintiff has an abundance of such experience. *See, supra,* notes 21-25 of this Report-Recommendation. Moreover, even if he were afforded such an extra degree of leniency, his phantom prescription-review claim could not be read into his Second Amended Pleading, for the reasons discussed above. (I note that, even when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended.") FN63

FN63. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

Nor could Plaintiff's late-blossoming prescription-review claim properly be read into his papers in opposition to Defendants' motion for summary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

judgment. Granted, a *pro se* plaintiff's papers in opposition to a *motion to dismiss* may sometimes be read as effectively amending a pleading (e.g., if the allegations in those papers are consistent with those in the pleading). However, a *pro se* plaintiff's papers in opposition to a *motion for summary judgment* may not be so read, in large part due to prejudice that would inure to the defendants through having the pleading changed after discovery has occurred and they have gone through the expense of filing a motion for summary judgment.[FN64]

> FN64. *See Auguste v. Dept. of Corr.,* 424 F.Supp.2d 363, 368 (D.Conn.2006) ("Auguste [a *pro se* civil rights plaintiff] cannot amend his complaint in his memorandum in response to defendants' motion for summary judgment.") [citations omitted].

**\*23** Finally, in the event the Court decides to construe Plaintiff's Second Amended Complaint as somehow asserting this claim, I agree with Defendants that the Court should dismiss that claim, also for the reasons discussed above in Part IV.A.2. of this Report-Recommendation. Specifically, Plaintiff has failed to adduce evidence establishing that Defendant Paolano (or any named Defendant in this action) was personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided evidence establishing that the policy is even unconstitutional. *See, supra,* Part IV.A.2. of this Report-Recommendation.

**ACCORDINGLY,** it is

**ORDERED** that the Clerk's Office shall, in accordance with note 1 of this Order and Report-Recommendation, correct the docket sheet to remove the names of Defendants Englese, Edwards, Bump, Smith, Paolano, and Nesmith as "counter claimants" in this action; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 78) be ***GRANTED* in part** (i.e., to the extent that it requests the dismissal with prejudice of Plaintiff's claims against Defendants Paolano and Nesmith) and ***DENIED* in part** (i.e., to the extent that it requests dismissal of Plaintiff's claims against the

remaining Defendants on the grounds of Plaintiff's failure to exhaust available administrative remedies) for the reasons stated above.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2008.

Murray v. Palmer
Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2014 WL 2781011 (N.D.N.Y.)
**(Cite as: 2014 WL 2781011 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Eli Pagan COUVERTIER, also known as Eli Pagan, Plaintiff,
v.
Julie JACKSON, et al., Defendants.

No. 9:12–CV–1282 (DNH/DEP).
Signed June 19, 2014.

Eli Pagan Couvertier, Brooklyn, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Christopher W. Hall, Esq., Ass't Attorney General, of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER
DAVID N. HURD, District Judge.

**\*1** Pro se plaintiff Eli Pagan Couvertier brought this action pursuant to 42 U.S.C. §§ 1983, 2000cc et seq., alleging deprivations of his civil rights. On May 22, 2014, the Honorable David E. Peebles, United States Magistrate Judge, advised by Report–Recommendation that defendants' motion for summary judgment be granted. No objections to the Report–Recommendation were filed.

Based upon a careful review of the entire file and the recommendations of the Magistrate Judge, the Report–Recommendation is accepted in whole. *See* 28 U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED; and

2. Plaintiff's complaint is DISMISSED in its entirety.

The Clerk is directed to serve a copy of this Decision and Order upon plaintiff in accordance with the Local Rules and close the file.

### REPORT AND RECOMMENDATION
DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Eli Pagan Couvertier, a former New York State prison inmate, commenced this action against the State of New York, as well as individuals employed by the state's Department of Corrections and Community Supervision ("DOCCS"), pursuant to 42 U.S.C. §§ 1983, 2000cc et seq., alleging deprivation of his civil rights. Plaintiff's claims stem from allegations that defendants denied him the right to practice his chosen religion.

Currently pending before the court is a motion brought by the defendants requesting the entry of summary judgment dismissing all or portions of plaintiff's complaint on three grounds, including for failure to fully exhaust administrative remedies before filing suit. For the reasons set forth below, I recommend that the motion be granted.

### I. BACKGROUND[FN1]

> FN1. In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Although plaintiff has since been released from prison, at the time of commencement of this action, on August 9, 2012, he was an inmate in the custody of the DOCCS. Dkt. No. 1 at 1; Dkt. No. 14. At all times relevant to the events giving rise to this action Couvertier was confined at the Watertown Correctional Facility ("Watertown") located in Watertown, New York. *See generally* Dkt. No. 1.

In his complaint, plaintiff alleges that while he was incarcerated, defendants deprived him of his

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

right to practice his chosen religion in violation of the First Amendment to the United States Constitution and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Dkt. No. 1 at 1, 4–5. Specifically, he alleges that, although he notified corrections officers, corrections counselors, and the Chaplain at Watertown that he practices Taino, a Native American religion, he was not permitted to participate in any religious observances before proving his Native American ancestry. *See generally* Dkt. No. 1. He further alleges that he was sent to a different prison facility for a mental health observation in retaliation for complaining about his religious needs, and additionally that he was verbally harassed by corrections officers. *Id.* at 4–5.

**\*2** On May 22, 2012, in accordance with the DOCCS Inmate Grievance Program ("IGP"),[FN2] plaintiff filed a grievance regarding his alleged religious deprivations. Dkt. No. 1 at 3; Dkt. No. 47–2 at 4–5. The Inmate Grievance Resolution Committee ("IGRC") at Watertown denied the grievance at the initial stage of the grievance process. Dkt. No. 1 at 3; Dkt. No. 47–2 at 7. Plaintiff appealed that decision to the superintendent of Watertown on or about June 6, 2012. *Id.* Following the superintendent's denial of that appeal, plaintiff sought review by the Central Office Review Committee ("CORC") on June 14, 2012.[FN3] Dkt. No. 1 at 3; Dkt. No. 47–2 at 9. The CORC issued its decision upholding the superintendent's determination on February 20, 2013.[FN4] Dkt. No. 47–3 at 6.

> FN2. The IGP will be explained more completely in part III.B. of this report.

> FN3. Plaintiff's appeal was received by the CORC on October 30, 2012. Dkt. No. 47–3 at 2, 4.

> FN4. The denial of plaintiff's request to practice his chosen religion appears to have been based upon his failure to provide documentation reflecting his membership in the Taino Nation. *See, e.g.,* Dkt. No. 47–2. In its decision, while upholding

the superintendent's determination, the CORC noted that plaintiff's request to change his religious designation had been approved, and that verification of his lineage had been properly required. Dkt. No. 47–3. Copies of e-mails between DOCCS officials, provided to the court by the plaintiff in support of his opposition to the pending motion, appear to confirm that he was recognized by the DOCCS as a Native American in or around July, 2012. Dkt. No. 50 at 12.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action with the filing a complaint and accompanying motions to proceed *in forma pauperis* ("IFP") and for a temporary restraining order on or about August 9, 2012. Dkt. Nos. 1, 2, 4. Following an initial review of plaintiff's complaint, District Judge David N. Hurd issued an order on March 8, 2013, *inter alia,* dismissing plaintiff's claims asserted against the State of New York, denying plaintiff's application for a temporary restraining order, and ordering the issuance of summonses for the remaining individual defendants.[FN5] Dkt. No. 15.

> FN5. The individual defendants named in the complaint include the following: (1) Julie Jackson, the deputy superintendent for programs at Watertown; (2) Michael Bocciolatt, plaintiff's A.S.A.T. counselor at Watertown; (3) Kathryn Gascon, the IGP supervisor; (4) M.P. Geoghegan, the deputy superintendent of security at Watertown; (5) S. Thackston, the deputy superintendent of administration at Watertown; (6) Beth Steria, the acting deputy of programs at Watertown; (7) Diane Kogut, a corrections counselor at Watertown; and (8) Ekpe D. Ekpe, the facility superintendent at Watertown. Dkt. No. 1 at 2–3.

Currently pending before the court is a motion by defendants seeking the entry of summary judgment dismissing plaintiff's complaint pursuant to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Rule 56 of the Federal Rules of Civil Procedure. Dkt. No. 47. Defendants contend that dismissal is appropriate for several reasons, including because plaintiff failed to exhaust the available administrative remedies prior to filing suit in federal court. Dkt. No. 47–4 at 3–5. The motion, to which plaintiff has responded, is now fully briefed and ripe for determination, and has been referred to me for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir.2004).* A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson, 477 U.S. at 248; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir.2005)* (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248.*

**\*3** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson, 477 U.S. at 250* n.4; *Sec. Ins. Co., 391 F .3d at 83.* In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a ma-

terial dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 250.*

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys, 426 F.3d at 553; Wright v. Coughlin, 132 F.3d 133, 137–38 (2d Cir.1998).* The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass' n v. McGowan, 311 F.3d 501, 507–08 (2d Cir.2002); see also Anderson, 477 U.S. at 250* (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Exhaustion of Available Administrative Remedies*

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo, 548 U.S. 81, 84 (2006)* ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley, No. 04–CV–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan. 31, 2007)* ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983.").[FN6] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle, 534 U.S. 516, 532 (2002).*

FN6. Copies of all unreported decisions

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is an affirmative defense that must be raised by a defendant in response to an inmate suit.[FN7] *Jones v. Block,* 549 U.S. 199, 212 (2007). In the event the defendant establishes that the inmate plaintiff failed "to fully complete [ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy,* No. 04–CV0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ).[FN8]

> FN7. In their answers, defendants have asserted failure to exhaust as a defense. *See* Dkt. Nos. 31 at 2; 34 at 2; 36 at 2; and 40 at 2.

> FN8. While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted)).

**\*4** In accordance with the PLRA, the DOCCS has made the IGP available to prison inmates. It is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N .Y.C.R.R. § 701.5; *Mingues v. Nelson,* No. 96–CV–5396, 2004 WL 234898, at *4 (S.D.N.Y. Feb. 20, 2004). Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an inmate first file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. *Id.* A representative of the facility's IGRC has up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. *Id.* at § 701.5(c). The superintendent must issue a written decision within a certain number of days of receipt of the grievant's appeal.[FN9] *Id.* at § 701.5(c)(i), (ii).

> FN9. Depending on the type of matter complained of by the grievant, the superintendent has either seven or twenty days after receipt of the grievant's appeal to issue a decision. *Id.* at § 701.5(c) (i), (ii).

The third and final step of the IGP involves an appeal to the CORC, which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP, a decision must be entered within a specified time period. Significantly, "[a]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can—and must—be appealed to the next level, including CORC, to complete the grievance process." *Murray v. Palmer,* No. 03–CV–1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Hurd, J., *adopting re-*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*port and recommendation by* Lowe, M.J.) (citing, *inter alia,* 7 N.Y.C.R.R. § 701.6(g)(2)). The IGP provides no mechanism for enforcing the requirement that the CORC issue a decision in thirty days. *Torres v. Carry,* 672 F.Supp.2d 338, 345 (S.D.N.Y.2009).

Generally, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange,* 467 F.3d 170, 176 (2d Cir.2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

In this case, at the time the plaintiff filed this action, on or about August 9, 2012, the CORC had not yet issued its decision denying plaintiff's grievance, and did not do so until February 2013. Dkt. No. 1; Dkt. No. 47–3 at 6. Thus, plaintiff failed to fully exhaust the available administrative remedies prior to filing this action. *See Partee v. Grood,* No. 06–CV–1552, 2007 WL 2164529, at *3 (S.D.N.Y.2007) ("[A]n inmate/plaintiff's claim is not exhausted until he appeals to the CORC and receives a final decision regarding his grievance."). The fact that complete exhaustion has now occurred does not cure this defect. *See Burgos v. Craig,* 307 F. App'x 469, 471 (2d Cir.2008) ( "Assuming arguendo that Plaintiff–Appellant subsequently exhausted his administrative remedies [after filing suit], that is not enough to save his suit, because he is required to have properly exhausted before he sues."); *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *overruled on other grounds, Porter v. Nussle,* 534 U.S. 516 (2002), (holding that "[s]ubsequent exhaustion after suit is filed ... is insufficient" to satisfy the PLRA's exhaustion requirement).

**\*5** Plaintiff's failure to exhaust, however, does not warrant dismissal of his complaint without further inquiry. In a series of decisions rendered since

enactment of the PLRA, the Second Circuit has prescribed a threepart test for determining whether dismissal of an inmate-plaintiff's complaint is justified for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Macias,* 495 F .3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

With respect to the first factor, there is no dispute that the IGP was available to plaintiff in light of the fact that he filed a grievance, received responses from the appropriate officials, and filed his appeals. Dkt. No. 1 at 3; Dkt. No. 47–2 at 4–5, 7,9; Dkt. No. 47–3 at 6. In addition, plaintiff does not allege, and there is nothing in the record suggesting that defendants should be estopped from pursuing the defense of failure to exhaust.

Turning to the third factor, liberally construed, plaintiff argues that the court should conclude that special circumstances exist to excuse him from his failure to exhaust. Dkt. No. 50. More specifically, he contends that DOCCS officials did not comply with the time limitations set forth in the IGP and improperly delayed the filing of his appeal to the CORC. *Id.* at 1. In support of this position, plaintiff has submitted an e-mail dated July 17, 2012, from

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

an individual named Julie A. Dennis, identified as IGP Coordinator, in which Dennis indicated to defendant Gascon that the CORC is "at least five months behind" and that plaintiff's grievance had not yet been "entered into the system." *Id.* at 10. An administrative delay in processing or deciding an inmate's appeal of a grievance, however, does not constitute a special circumstance justifying excusal of the exhaustion requirement. *See Ford v. Smith,* No. 12–CV–1109, 2014 WL 652933, at *3 (N.D.N.Y. Feb. 19, 2014) (McAvoy, J., *adopting report and recommendation by* Dancks, M.J.) ("CORC's failure to act within the time frame set out in the regulations does not constitute special circumstances justifying the failure to exhaust.").

**\*6** In sum, because plaintiff failed to fully exhaust the available administrative remedies prior to filing this action, and there is nothing in the record now before the court to suggest he should be excused from that requirement, I recommend that defendants' motion be granted.<sup>FN10</sup>

> **FN10.** In light of my recommendation that the complaint be dismissed due to plaintiff's failure to exhaust, I have not considered the other grounds for dismissal contained in defendants' motion.

## IV. *SUMMARY AND RECOMMENDATION*

Despite being aware of the administrative remedies available to him, plaintiff commenced this action before he had fully exhausted them. Because an administrative delay in reviewing a grievance does not eliminate that requirement, I conclude that plaintiff's failure to exhaust the available administrative remedies prior to filing suit cannot be ignored. Based on the foregoing, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 47) be GRANTED; and it is further

RECOMMENDED that plaintiff's complaint be DISMISSED, without prejudice, based upon his

failure to fully exhaust available administrative remedies before commencing this action.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a) , 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Filed May 22, 2014.

N.D.N.Y.,2014.
Couvertier v. Jackson
Slip Copy, 2014 WL 2781011 (N.D.N.Y.)

END OF DOCUMENT

Not Reported in F.Supp.2d, 2007 WL 2164529 (S.D.N.Y.)
**(Cite as: 2007 WL 2164529 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Cedric PARTEE, Plaintiff,
v.
Glenn GROOD, Commissioner of the New York
State Department of Correctional Service, Lester N.
Wright, Dental Director of New York State Department of Correctional Serv., William J. Connoll, Superintendent of Fishkill Correctional Facility, L.
Zwillinger, Regional Health Administrator at
Fishkill Correctional Facility, and Mary D'Silva,
Dentist at Fishkill Correctional Facility, Defendants.

No. 06 Civ. 15528(SAS).
July 25, 2007.

Cedric Partee, Fishkill Correctional Facility,
Beacon, New York, Plaintiff pro se.

Benjamin Lee, Assistant Attorney General, New
York, NY, for Defendants.

*OPINION AND ORDER*
SCHEINDLIN, J.
I. INTRODUCTION
    **\*1** Cedric Partee, an inmate of the New York
State Department of Correctional Services
("DOCS"), proceeding pro se, brings suit under
section 1983 of Title 42 of the United States Code
against Glenn Goord,[FN1] Lester N. Wright, William J. Connolly,[FN2] and Lawrence Zwillinger, all
of whom are present or former DOCS employees,
and Mary D'Silva, a dentist at Fishkill Correctional
Facility (collectively, "Defendants"). Partee alleges
that all of the defendants acted with deliberate disregard for his medical needs in violation of his
rights under the Eighth and Fourteenth Amendments.[FN3] He seeks an award of $100,000 against
each defendant.[FN4]

FN1. Former Commissioner Goord is sued
incorrectly herein as "Glenn Grood."

FN2. Superintendent Connolly is sued incorrectly herein as "William J. Connoll."

FN3. *See* Complaint ("Compl.") ¶¶ II(D),
V.

FN4. *See id.* ¶ V.

    Defendants now move to dismiss the lawsuit
based on Partee's failure to exhaust administrative
remedies.[FN5] Defendants additionally move to dismiss the claims against Goord, Zwillinger, Connolly and Wright, claiming qualified immunity and
lack of personal involvement, and, with regard to
Goord and Zwillinger, for failure to state a claim.[FN6]
For the reasons below, defendants' motion is
granted and this case is dismissed.

FN5. *See* 42 U.S.C.1997e(a).

FN6. *See* Fed.R.Civ.P. 12(b)(6).

II. FACTS [FN7]

FN7. The following factual allegations,
taken from the Complaint, are accepted as
true for purposes of this motion.

    In April of 2003, while Partee was being
housed as a prisoner in Clinton Correctional Facility, his dentures were damaged as a result of "self
adjustment." [FN8] Dr. Afzal, an employee of the
Clinton Correctional Facility, submitted a request
to the "Central Office Director of Dental Services"
for Partee to receive new dentures, which was
denied because Partee was "ineligible to receive
new dentures until 4/12/06." [FN9] On April 17,
2003, Partee filed a grievance through the DOCS
Inmate Grievance Program ("IGP"), requesting that
his denture be repaired. After two unfavorable decisions, Partee was advised by the CORC that, as
his own "self adjustment to [the] denture rendered

it irreparable[,]" he would either have to pay for a replacement denture at his own expense, or wait until April 12, 2006, when he would be eligible for a new set of dentures at DOCS's expense.[FN10]

> FN8. 6/11/03 Central Office Review Committee Determination ("CORC Determination"), Ex. A to Compl. at p. 2.

> FN9. 7/3/06 Letter from Plaintiff to William J. Connolly ("Connolly Letter"), Ex. B. to Compl., at p. 1.

> FN10. CORC Determination at p. 2.

In September of 2003, Partee was transferred to Attica Correctional Facility.[FN11] While there, Partee underwent dental surgery on July 26, 2005, and some of his upper teeth were extracted "based on a dental diagnosis."[FN12] Three months later, in November of 2005, Partee was scheduled to have impressions of his remaining teeth taken in preparation for new dentures.[FN13] Before the impressions were taken, he was transferred to Gowanda Correctional Facility "because his classification had dropped."[FN14] At Gowanda, Partee was placed on a six-month waiting list to have the impressions taken, but before his turn came, he was again transferred, this time to Fishkill Correctional Facility.[FN15] On May 28, 2006, at Fishkill, Partee was seen by Dr. D'Silva, who advised Partee that there was "no bone to hold [his] teeth," and that no impression would be taken unless he allowed D'Silva to remove his remaining upper teeth.[FN16] Partee refused to consent to the extraction of his teeth and remains without dentures.[FN17] As a result, Partee has suffered pain and an "inability to engage in normal activities, such as eat properly [sic]."[FN18]

> FN11. See Compl. ¶ II(D).

> FN12. Id.

> FN13. See id.

> FN14. Connolly Letter at 1.

> FN15. See Compl. ¶ II(D).

> FN16. Connolly Letter at 1.

> FN17. See 6/29/06 Grievance, Ex. A to Compl., at 1 (requesting that dental work be completed).

> FN18. Plaintiff's Traverse ¶ 6.

**\*2** On June 29, 2006, Partee filed grievance # 28014-06, through the IGP, against D'Silva, requesting that his "dential [sic] work be completed without the added opinion of Dr. D'Silda [sic]...."[FN19] After a hearing, the Inmate Grievance Review Committee ("IGRC") rendered a decision, denying Partee's grievance.[FN20] The IGRC concluded that Partee's "requested action [was] beyond the purview of the IGRC."[FN21] The cover sheet to the IGRC decision stated that if Partee wished to appeal the decision, he would have to do so by April 17, 2006-a date which had passed three months earlier.[FN22] Partee subsequently submitted typed letters to Lester N. Wright, Deputy Commissioner and Chief Medical Officer of DOCS,[FN23] and William J. Connolly, then-Superintendent at Fishkill Correctional Facility,[FN24] complaining about Dr. D'Silva's refusal to provide dentures unless Partee first agreed to allow the extraction of his upper teeth. The letter to Wright requested that Dr. D'Silva be directed to complete Partee's impressions.[FN25] Partee's letter to Connolly accused Dr. D'Silva of racism and demanded that an investigation be conducted against her.[FN26] Partee did not formally appeal the IGRC decision on grievance # 28014-06.[FN27] Instead, he commenced the instant action on October 4, 2006.[FN28]

> FN19. 6/29/06 Grievance at 1.

> FN20. See 7/11/06 Memorandum, Ex. A to Compl., at 4.

> FN21. Id.

> FN22. See id. at 3

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN23. *See* 6/28/06 Letter from Plaintiff to Letter N. Wright ("Wright Letter"), Ex. C to Compl., at 1-2.

FN24. *See* Connolly Letter at 1-3.

FN25. Wright Letter at 2.

FN26. *See* Connolly Letter at 2.

FN27. *See* Compl. ¶ IV(F)(3).

FN28. *See id.* at 7.

## III. LEGAL STANDARDS

### A. Motion to Dismiss

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary...." FN29 When a complaint is attacked by a Rule 12(b)(6) motion to dismiss, the plaintiff need not provide "detailed factual allegations." FN30 To survive a motion to dismiss, it is enough that the complaint "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." FN31

FN29. *Erickson v. Pardus,* 127 S.Ct. 2197, 2200 (2007).

FN30. *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1964 (2007).

FN31. *Id.*

When determining the sufficiency of plaintiff's claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in plaintiff's complaint, which are accepted as true, as well as "documents relied on or incorporated by reference in the complaint." FN32 To survive dismissal, the allegations in the complaint must meet the standard of "plausibility." FN33 A complaint must "amplify a claim with some factual allegations ... to render the claim *plausible.*" FN34 In other words, the complaint must provide "the grounds upon which

[the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" FN35 Thus, while a court must take the plaintiff's allegations as true, "the claim may still fail as a matter of law if it appears ... that the plaintiff can prove no set of facts in support of its claim which would entitle [him] to relief, or if the claim is not legally feasible." FN36

FN32. *International Design Concepts, LLC v. Saks, Inc.,* 486 F.Supp.2d 229, 235-36 (S.D.N.Y.2007).

FN33. *Bell Atlantic,* 550 U.S. 544, 127 S.Ct. at 1970.

FN34. *Iqbal v. Hasty,* No. 05 Civ. 5768, 2007 WL 1717803, at *11 (2d Cir. June 14, 2007) (holding that the plaintiff's complaint adequately alleged the personal involvement of the Attorney General because it was plausible that officials of the Department of Justice would be aware of policies concerning individuals arrested after 9/11).

FN35. *ATSI Commc'ns v. Shaar Fund, Ltd.,* 493 F.3d 87, 2007 WL 1989336, at *5 (2d Cir. July 11, 2007) (quoting *Bell Atlantic,* 551 U.S. __, 127 S.Ct. at 1965).

FN36. *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 457 F.Supp.2d 455, 459 (S.D.N.Y.2006) (citing *Allaire Corp. v. Okumus,* 433 F.3d 248, 250 (2d Cir.2006)).

### B. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1995 ("PLRA") mandates exhaustion by prisoners of all administrative remedies before bringing an action regarding prison conditions. FN37 The PLRA's exhaustion requirement is mandatory. FN38 Failure to exhaust is an absolute bar to an inmate's action in federal court: "[section] 1997e(a) *requires* exhaustion of available administrative remedies *before* in-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2164529 (S.D.N.Y.)
**(Cite as: 2007 WL 2164529 (S.D.N.Y.))**

mate-plaintiffs may bring their federal claims to court *at all.*" [FN39] Because the plain language of section 1997e(a) states "no action shall be brought," an inmate must have exhausted his claims at the time of the initial filing, given that "[s]ubsequent exhaustion after suit is filed ... is insufficient." [FN40] Moreover, the exhaustion of administrative remedies must be *proper*-that is, in compliance with a prison grievance program's deadlines and other critical procedural rules-in order to suffice. [FN41] The United States Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN42]

> FN37. See 42 U.S.C. § 1997e(a), which provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

> FN38. See *Porter v. Nussle,* 534 U.S. 516, 516 (2002). *See also Booth v. Churner,* 532 U.S. 732, 739 (2001).

> FN39. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (quotation marks and citation omitted).

> FN40. *Id.*

> FN41. See *Woodford v. Ngo,* 126 S.Ct. 2378, 2386-87 (2006).

> FN42. *Porter,* 534 U.S. at 532.

*3 Before bringing suit in federal court, an inmate must fully present his claim for internal resolution within the correctional facility and the DOCS. The DOCS grievance procedure is the IGP, which consists of three tiers. [FN43] *First,* the inmate files a grievance with the Grievance Clerk, and the griev-

ance will be decided by the IGRC. [FN44] An adverse decision from the IGRC may be appealed to the Superintendent of the facility. [FN45] Finally, adverse decisions at the Superintendent level can be appealed to the CORC. [FN46] In order to survive a motion to dismiss, an inmate/plaintiff must have fully exhausted administrative remedies at all levels of appeal. [FN47] Thus, an inmate/plaintiff's claim is not exhausted until he appeals to the CORC and receives a final decision regarding his grievance.

> FN43. See *Hemphill v. New York,* 380 F.3d 680, 682 (2d Cir.2004).

> FN44. See 7 N.Y. Comp.Codes R. & Regs. §§ 701.5(a) & (b).

> FN45. See id. § 701.5(c).

> FN46. See id. § 701.5(d).

> FN47. See *Mendez v. Artuz,* No. 01 Civ. 4157, 2002 WL 313796, at *2 (S.D.N.Y. Feb. 27, 2002) ("[T]he exhaustion requirement is not satisfied until the administrative process has reached a final result.").

The Second Circuit has, however, recognized that in certain situations a prisoner who fails to fully exhaust administrative remedies may survive a motion to dismiss. [FN48] In *Hemphill v. New York,* the court announced a three-part inquiry "appropriate in cases where a prisoner plaintiff plausibly seeks to counter defendants' contention that the prisoner has failed to exhaust available administrative remedies as required by the PLRA." [FN49] Examining the complaint, the court must ask:

> FN48. See *Hemphill,* 380 F.3d at 687-90.

> FN49. *Id.* at 686.

[*First,*] whether administrative remedies were in fact 'available' to the prisoner. [*Second* ], ... whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2164529 (S.D.N.Y.)
**(Cite as: 2007 WL 2164529 (S.D.N.Y.))**

plaintiff's failure to exhaust as a defense. [*Third* ], [i]f the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements.[FN50]

> FN50. *Id.*

"What constitutes justification in the PLRA context 'must be determined by looking at the circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way." ' [FN51] If the court determines that the inmate plaintiff was indeed justified in failing to exhaust-and exhaustion can no longer be achieved because administrative remedies are no longer available-this shortcoming is excused, and the suit may proceed.[FN52]

> FN51. *Brownell v. Krom,* 446 F.3d 305, 312 (2d Cir.2006) (quoting *Giano v. Goord,* 380 F.3d 670, 675-76 (2d Cir.2004)).

> FN52. *See Giano,* 380 F.3d at 676.

C. Constitutional Standard: The Eighth Amendment
The Eighth Amendment prohibits the infliction of cruel and unusual punishment. This prohibition has been interpreted to "[impose] a duty on prison officials to ensure that inmates receive adequate medical care." [FN53] To establish an Eighth Amendment violation arising out of the denial of medical care, a plaintiff must prove that defendants were deliberately indifferent to his serious medical needs.[FN54] The deliberate indifference standard contains both an objective and subjective prong. [FN55] Under the objective prong, an inmate must prove "that the deprivation alleged is 'objectively sufficiently serious' such that plaintiff was denied 'the minimal civilized measure of life's necessit-

ies." ' [FN56] This includes " 'not only deprivations of medical care that produce physical torture and lingering death, but also less serious denials which cause or perpetuate pain." ' [FN57] The condition, however, must be "one of urgency that may produce death, degeneration, or extreme pain." [FN58] The subjective prong requires a showing that defendant "possessed a 'sufficiently culpable state of mind.' " [FN59] The level of culpability must be something "more than negligence, but less than conduct undertaken for the very purpose of causing harm." [FN60] Thus, deliberate indifference will exist when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." [FN61]

> FN53. *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006).

> FN54. *See Trammell v. Keane,* 338 F.3d 155, 161-62 (2d Cir.2003).

> FN55. *See Farmer v. Brennan,* 511 U.S. 825, 834 (1994).

> FN56. *Trammell,* 338 F.3d at 162 (quoting *Farmer,* 511 U.S. at 834).

> FN57. *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003) (quoting *Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977)). Accord *Brady v. Griffith,* No. 95 Civ. 2364, 1998 WL 8146, at *3 (S.D.N.Y. Nov. 23, 1998).

> FN58. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994).

> FN59. *Trammell,* 338 F.3d at 162 (quoting *Farmer,* 511 U.S. at 837).

> FN60. *Hathaway,* 37 F.3d at 66.

> FN61. *Farmer,* 511 U.S. at 847.

IV. DISCUSSION
**\*4** The instant motion presents two issues: (1)

whether Partee's admitted failure to exhaust administrative remedies can be justified, such that his federal claims should be permitted to proceed, and (2) if Partee's failure to exhaust can be justified, whether the allegations in the Complaint succeed in stating a viable claim.

A. Special Circumstances and the Failure to Exhaust

Partee pursued his administrative grievance against Dr. D'Silva through the IGRC level, but did not appeal the adverse decision to the CORC. Such a failure to exhaust typically results in dismissal of the complaint. Partee, however, has alleged "special circumstances" which may serve to excuse this deficiency.[FN62] Specifically, Partee points out that the IGRC decision held that "[t]he grievant's requested action is beyond the purview of the IGRC."[FN63] Partee argues that he reasonably understood this decision to mean that his dispute with Dr. D'Silva was not grievable and that "if the grievance personnel say it's not grievable, then Plaintiff should be protected from having a court say later that the Plaintiff should have grievanced [sic] it."[FN64]

> FN62. *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Pl.Opp.") at 3-4.
>
> FN63. 7/11/06 Memorandum at 4.
>
> FN64. Pl. Opp. at 3.

The circumstances surrounding Partee's failure to exhaust are similar to those found in *Giano v. Goord.* In that case, the Inmate/Plaintiff brought suit without first exhausting because he misread DOCS regulations and concluded that administrative redress was foreclosed as to one of his grievances when in fact it was not.[FN65] When the defendants in *Giano* asserted failure to exhaust as a ground for dismissal, the Second Circuit held that although Giano had "read DOCS regulations incorrectly, his interpretation was hardly unreasonable."[FN66] Noting that the standard by which a proffered

justification should be evaluated is whether the circumstances "might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way[,]" the court found Giano's failure to exhaust to be justified.[FN67] Similarly, an uncounselled prisoner might understandably fail to properly appeal his grievance to the CORC level when the IGRC decision itself declares the grievance to be outside the "purview of the IGRC."[FN68] Therefore, Partee's failure to fully exhaust his claims in grievance # 28014-06 as required by the PLRA is justified.

> FN65. *See* 380 F.3d at 674.
>
> FN66. *Id.* at 679.
>
> FN67. *Id.*
>
> FN68. 7/16/06 Memorandum at 4.

The next question, then, is whether administrative remedies are still available to Partee (in which case dismissal without prejudice is proper) or whether administrative remedies are unavailable to him (in which case the suit should continue on to the merits).[FN69] The IGP rules mandate that "[i]f the grievant ... wishes to appeal to the superintendent, he or she must complete and sign the appeal section on the IGRC response form ... and submit it to the grievance clerk *within seven calendar days* after receipt of the IGRC's written response."[FN70] As any appeal by Partee is now time-barred, he no longer has administrative remedies available.

> FN69. *See Giano*, 380 F.3d at 679-80.
>
> FN70. 7 N.Y. Comp.Codes R. & Regs. § 701.5(c)(1).

B. Deliberate Indifference and Failure to State a Claim

1. Dr. D'Silva

**\*5** In order to state a claim for deliberate indifference, Partee must allege facts indicating that a

Not Reported in F.Supp.2d, 2007 WL 2164529 (S.D.N.Y.)
**(Cite as: 2007 WL 2164529 (S.D.N.Y.))**

substantial risk of serious harm would arise from the denial of the requested dental care-i.e. new dentures-and that the defendants perceived this risk and chose not to provide the requested treatment. Partee has satisfied the first requirement. As the Second Circuit held in *Chance v. Armstrong,* insufficient dental treatment may rise to the level of a Constitutional violation if it leads to extreme pain, deterioration of the teeth, and an inability to eat properly. FN71 Partee has alleged "pain, loss of teeth, discomfort, ... infection and life threatening complications [ ]" as a result of Dr. D'Silva's refusal to provide dentures without first extracting Partee's teeth. FN72 Taking these allegations to be true, the negative consequences alleged are "sufficiently serious" to satisfy the objective component of the deliberate indifference standard.

FN71. 143 F.3d 698, 703 (2d Cir.1998).

FN72. Compl. ¶ III.

On the other hand, Partee has not satisfied the subjective component of the deliberate indifference standard. Partee's allegations, in fact, show that D'Silva perceived Partee's need for dentures and offered to take the impressions necessary to provide them. FN73 The allegation that D'Silva refused to provide the dentures unless she was allowed to extract Partee's upper teeth indicates not deliberate indifference to Partee's dental needs, but rather a medical determination that *additional* treatment was necessary. FN74

FN73. *See* 6/29/06 Grievance at 1.

FN74. *See id.*

Partee's allegations, at bottom, reflect his opinion that the course of treatment prescribed by Dr. D'Silva was incorrect, and that the impressions should have been taken without first extracting Partee's teeth. The Second Circuit has long held that " '[t]he prisoner's right is to medical care-not the type or scope of medical care which he personally desires. A difference of opinion between a

physician and a patient does not give rise to a constitutional right or sustain a claim under section 1983." ' FN75 Moreover, Partee's assertion that the dentists who saw him at Clinton Correctional Facility and Gowanda Correctional Facility did not reach the same conclusion as D'Silva also fails to transform D'Silva's actions into a constitutional violation. FN76 *First,* six months elapsed between the last time Partee was seen by a dentist and his visit to D'Silva, during which time Partee's dental condition could have changed. FN77 *Second,* even if D'Silva's diagnosis was incorrect, Partee has only stated a claim for negligence or medical malpractice, and "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." FN78 The proper venue for Partee's claim against D'Silva, therefore, is state court. Accordingly, the Complaint is dismissed as to defendant D'Silva.

FN75. *U.S. ex rel. Hyde v. McGinnis,* 429 F.2d 864, 868 (2d Cir.1970) (quoting *Coppinger v. Townsend,* 398 F.2d 392, 394 (10th Cir.1968)).

FN76. *See* Compl. ¶ II(D).

FN77. *See id.*

FN78. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

2. Defendants Zwillinger, Connolly, and Wright

The Complaint makes no allegations showing deliberate indifference by defendants Zwillinger, Connolly, and Wright. The only allegation made as to these defendants is that they were "informed [of Partee's situation] and took no action whatsoever." FN79 In this Circuit, a "plaintiff must show that the defendant was personally involved in the alleged deprivation of his constitutional rights, since the doctrine of *respondeat superior* does not apply to § 1983 actions." FN80 Even if the allegations showed deliberate indifference on D'Silva's part, a prison official "cannot be held liable on the sole basis that he did not act in response to letters of protest...."

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN81 Moreover, as discussed above, Partee has failed to allege a constitutional violation. The Complaint is accordingly dismissed as to Defendants Zwillinger, Connolly, and Wright.

> FN79. Compl. ¶ II(D).

> FN80. *Watson v. McGinnis,* 964 F.Supp. 127 (S.D.N.Y.1997) (compiling cases stating personal involvement requirement).

> FN81. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) (citing *Greenwaldt v. Coughlin,* No. 93 Civ. 6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr. 19, 1995)).

3. Defendant Goord

**\*6** Partee alleges that, in addition to "[taking] no action" after being informed of Partee's situation, former Commissioner Goord further violated Partee's constitutional rights by being "responsible for the policy that resulted in Plaintiff being uprooted from one facility and transferred to another while undergoing medical procedures and each time being placed at the end of a new list for at least six months or more...." FN82 *First,* Partee's deliberate indifference claim against Goord is dismissed for lack of personal involvement and the failure to allege a constitutional violation. *Second,* Partee's claim that the DOCS transfer policy violates his constitutional rights has not been fully grieved through the IGP. The "special circumstances" which served to justify Partee's failure to exhaust his deliberate indifference claim do not apply to this transfer claim, as no mention of unconstitutional transfer procedures was made in IGP Grievance # 28014-06. Therefore, the Complaint must be dismissed as to defendant Goord for failure to exhaust administrative remedies before bringing suit as required by the PLRA. FN83

> FN82. Plaintiff's Traverse ¶ 6.

> FN83. Plaintiff's Fourteenth Amendment claim, which consists entirely of an assertion of a right "to expect equal protection

of the law to in include [sic] due process in prison administrative proceeding," must also be dismissed for failure to exhaust. Compl. ¶ V.

IV. CONCLUSION

For the reasons stated above, defendants' motion to dismiss is granted and this case is dismissed. The Clerk of the Court is directed to close this motion [Docket # 10] and this case.

SO ORDERED:

S.D.N.Y.,2007.
Partee v. Grood
Not Reported in F.Supp.2d, 2007 WL 2164529 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 1774876 (W.D.N.Y.)
**(Cite as: 2007 WL 1774876 (W.D.N.Y.))**

C
Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Thomas WILLIAMS, Plaintiff,
v.
John HUPKOWICZ, et al., Defendants.

No. 04-CV-51S(F).
June 18, 2007.

Thomas Williams, Dannemora, NY, pro se.

Andrew M. Cuomo, Attorney General, State of New York, Darren Longo, Assistant Attorney General, of Counsel, Buffalo, NY, for Defendants.

### DECISION AND ORDER

WILLIAM M. SKRETNY, United States District Judge.

**\*1** 1. Plaintiff commenced this civil rights action *pro se* on January 26, 2004. Defendants moved for summary judgment on July 14, 2005. (Docket No. 15).

2. The Court referred this matter to the Honorable Leslie G. Foschio, United States Magistrate Judge, to hear and report upon dispositive motions and issue a Report and Recommendation for the consideration of the District Judge pursuant to 28 U.S.C. § 636(b) (1)(B).

3. In a Report and Recommendation dated March 29, 2007, Judge Foschio recommended that Defendants' motion for summary judgment be granted.

4. On May 24, 2007, Plaintiff filed Objections to Judge Foschio's Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) (C) and Local Rule 72.3(a)(3).

5. The Court has thoroughly reviewed this case

*de novo* and has considered Judge Foschio's Report and Recommendation, Plaintiff's Objections thereto and the applicable law. Upon due consideration, this Court will accept Judge Foschio's recommendation and grant Defendants' motion for summary judgment for the reasons stated in the Report and Recommendation. Plaintiff's Objections are therefore denied.

IT HEREBY IS ORDERED, that this Court accepts Judge Foschio's March 29, 2007 Report and Recommendation (Docket No. 32) in its entirety, including the authorities cited and the reasons given therein, and Defendants' Motion for Summary Judgment (Docket No. 15) is GRANTED.

FURTHER, that Plaintiff's Objections (Docket No. 36) are DENIED.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

### REPORT and RECOMMENDATION

LESLIE G. FOSCHIO, United States Magistrate Judge.

THOMAS WILLIAMS,

Plaintiff,

v.

C.O. JOHN HUPKOWICZ,

C.O. DEAN MORRIS,

C.O. EDWARD FREESE,

C.O. MICHAEL MAZUR,

C.O. Capt. MARK BRADT,[FN1]

> FN1. C.O. Capt. Mark Bradt was terminated as a Defendant on June 1, 2004.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1774876 (W.D.N.Y.)
**(Cite as: 2007 WL 1774876 (W.D.N.Y.))**

C.O. Sergeant JOHN DOE, and

C.O. Sergeant GLEN RANDALL,

Defendants.

### *JURISDICTION*

This case was referred to the undersigned by Honorable William M. Skretny on July 14, 2005 for pretrial matters, including report and recommendation on dispositive motions. The matter is presently before the court on Defendants' motion for summary judgment (Doc. No. 15), filed July 14, 2005.

### *BACKGROUND and FACTS*

Plaintiff commenced this civil rights action *pro se* on January 26, 2004, while incarcerated at Clinton Correctional Facility ("Clinton"), alleging that on February 5, 2001, while Plaintiff was incarcerated in Attica Correctional Facility ("Attica"), he was assaulted in two separate incidents, first by Defendants Hupkowicz and Morris, and later by Defendants Freese and Mazur while Defendant Randall watched. On June 25, 2004, Plaintiff filed an Amended Complaint (Doc. No. 4) ("Amended Complaint").

On July 14, 2005, Defendants filed the instant motion seeking summary judgment on the ground that Plaintiff had failed to exhaust administrative remedies with regard to his claims. The motion is supported by a Memorandum of Law (Doc. No. 21) ("Defendants' Memorandum"), a Statement of Undisputed Facts (Doc. No. 20) ("Defendants' Statement of Undisputed Facts"), and the Declarations of Tara Brousseau (Doc. No. 16) ("Brousseau Declaration"), Thomas Eagen (Doc. No. 17) ("Eagen Declaration"), Deborah Jarvis (Doc. No. 18) ("Jarvis Declaration"), and George Struebel (Doc. No. 19) ("Struebel Declaration"). In opposition to summary judgment, Plaintiff filed on August 22, 2005, a Memorandum of Law (Doc. No. 25) ("Plaintiff's Memorandum"), and an Affidavit (Doc. No. 26) ("Plaintiff's Affidavit") with attached exhibits ("Plaintiff's Exh(s) ___"). Oral argument was deemed unnecessary.

**\*2** Based on the following, Defendants' motion for summary judgment should be GRANTED.

### *FACTS*[FN2]

FN2. Taken from the pleadings and motion papers filed in this action.

According to Plaintiff, on February 5, 2001, while incarcerated in Attica, he was assaulted in two separate incidents, first by Defendants Hupkowicz and Morris and, later, by Defendants Freese and Mazur while Defendants Randall watched, but did not intervene to protect Plaintiff. On February 16, 2001, while still incarcerated at Attica, Plaintiff filed Inmate Grievance # A-41807-01 ("Grievance # A-41807-01"), complaining of both assaults allegedly occurring on February 5, 2001. Pursuant to the Department of Correctional Services ("DOCS") expedited procedure for harassment grievances, the Superintendent of Attica investigated the matter and, on March 5, 2001, denied Grievance # A-41807-01.

On March 21, 2001, after the time in which to appeal the initial denial of Grievance # A-41807-01 had elapsed, Plaintiff was transferred from Attica to Southport Correctional Facility ("Southport"), where Plaintiff remained until July 19, 2001 when Plaintiff was transferred to Green Haven Correctional Facility ("Green Haven"). On July 27, 2001, Plaintiff was transferred from Green Haven back to Southport where he remained until March 4, 2002, when Plaintiff was transferred to Clinton Correctional Facility ("Clinton") where he remains to date.

On April 12, 2004, while incarcerated at Clinton, Plaintiff filed Inmate Grievance # CL-50029-04, requesting the opportunity to exhaust Grievance # A-41807-01, as well as another grievance not relevant to the instant action. A hearing on Grievance No. CL-500029-04 was held before Clinton's Inmate Grievance Resolution Committee ("IGRC") at Clinton on April 14, 2004 following which the IGRC denied Grievance # CL-50029-04

based on Plaintiff's failure to present mitigating circumstances relative to his failure to appeal Grievance # A-41807-01. Plaintiff appealed the denial to the Central Office Review Committee ("CORC") and, on May 19, 2004, ("IGP") Director Thomas G. Eagan denied Grievance # CL-50029-04 the basis that Plaintiff had failed to provide any mitigating circumstances explaining his delay in appealing the denial of Grievance # A-41807-01 so as to warrant acceptance of the late appeal.

### *DISCUSSION*

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex,* 477 U.S. at 322. Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995). In the instant case, Defendants seeks summary judgment on the basis that Plaintiff failed to exhaust administrative remedies relevant to his claim, as required by the Prison Litigation Reform Act ("PLRA")

**\*3** The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section ... 1983 [of this title], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative

remedies as are available are exhausted." 42 U.S.C. § 1997(e)(a). The PLRA requires exhaustion in all inmate suits concerning prison life, regardless of the federal right or statute asserted. *Porter v. Nussle,* 534 U.S. 516, 525-27 (2002).

New York State provides a grievance procedure for inmates. Pursuant to section 139 of the New York State Corrections Law and the regulations promulgated thereunder, inmates are permitted to file grievances concerning a variety of issues. According to 7 N.Y.C.R.R. § 701.3(e), the only issues that are not grievable involve individual decisions or dispositions of any current or subsequent program or procedure having a written appeal mechanism which extends review outside the facility.

The Inmate Grievance Program provides for a three-step process. After being filed within 14 days of the incident, the grievance is investigated and reviewed by a committee comprised of inmates and DOCS employees. That decision is subject to review by the Superintendent at the relevant correctional facility. The inmate is then permitted to appeal, within four working days, the superintendent's determination to the Central Office Review Committee ("CORC"). 7 N.Y.C.R.R § 701.7(a), (b), (c). Only after an inmate appeals to the CORC has he been deemed to have exhausted his administrative remedies. *Parkinson v. Goord,* 116 F.Supp.2d 390, 394 (W.D.N.Y.2000). Accordingly, plaintiff may bring suit in federal court pursuant to 42 U.S.C. § 1983 only after he has exhausted "any available administrative remedies, including all appellate remedies provided within the [DOCS grievance] system." *Fletcher v. Haase,* 2002 WL 313799 at *1 (S.D.N.Y. February 27, 2002) (citing *Booth v. Churner,* 532 U.S. 731, 735 (2001)).

District courts follow a three-part inquiry when determining whether an inmate plaintiff has exhausted administrative remedies prior to filing a federal court action challenging prison conditions. *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004). Specifically, courts are to consider "whether administrative remedies were in fact

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

'available' to the prisoner." *Id.* Next, the court inquires as to whether defendants' own actions estop defendants from asserting the failure to exhaust defense. *Id.* Finally, if administrative remedies were available and defendants are not estopped from asserting the failure to exhaust defense, the court considers whether any " 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Id.* Furthermore, the Second Circuit has observed that administrative remedies may be "informally" exhausted. In particular, insofar as 7 N.Y.C.R.R. § 701.3(a) "advise[s] inmates 'to attempt to resolve a problem on [their] own' before resorting to formal procedures, ... an inmate who obtains a favorable resolution of his complaint through informal processes has exhausted available administrative remedies under the DOCS scheme." *Hemphill, supra,* 380 F.3d at 682 n. 4 (quoting 7 N.Y.C .R.R. § 701.3(a), and citing *Marvin v. Goord,* 255 F.3d 40, 43 n. 3 (2d Cir.2001)). Even assuming that an inmate received no timely official response as contemplated by the regulations to a grievance at any stage in the inmate grievance process, the inmate could nevertheless appeal such grievance to the next level, and the failure to do so constitutes a failure to exhaust his administrative remedies as required under the PLRA. *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) (observing that if inmate never received any response to grievance, he could still pursue other avenues of administrative relief and quoting *Porter, supra,* at 524). Thus, the court considers whether the record establishes that Plaintiff, either formally or informally exhausted administrative remedies.

**\*4** In support of summary judgment, Defendants argue that Plaintiff has failed to exhaust his administrative remedies as to his claims and, as found in connection with Grievance # CL-52009-04, failed to offer any explanation justifying such failure, as discussed in *Hemphill, supra,* is barred from litigation on such claims. Defendants' Memorandum at 2-8. Attached as exhibits to Defendants' papers are copies of the denial of Grievance # CL-

50029-04, corroborating Defendants' assertions regarding Plaintiff's failure to exhaust Grievance # A-41807-01. *See* Brousseau Declaration Exh. A (copy of Grievance # CL-50029-04). Significantly, Plaintiff does not dispute the authenticity or accuracy of such evidence.

Rather, Plaintiff argues in opposition to summary judgment that he never received any copy of the initial decision denying Grievance # A-41807-01 until January 9, 2004 and, as such, was unable to appeal that decision. Plaintiff's Memorandum ¶¶ 10-19. According to Plaintiff, because no decision on Grievance # A-41807-01 had been received by him, he was forced to write letters to Eagen and Attica's IGP Supervisor George Struebel ("Struebel") inquiring as to the status of such grievance. *Id.* ¶¶ 10-19. Nevertheless, it was not until January 9, 2004 that Struebel responded to Plaintiff's inquiries and furnished Plaintiff with Attica's Superintendent's appeals decision denying as untimely. *Id.* ¶ 19.

Submitted in opposition to summary judgment is an internal memorandum dated September 7, 2001, prepared by Attica's IGP Supervisor Struebel ("Struebel Memorandum"), Defendants' Exh. at 27, to Plaintiff advising that Struebel had received several letters from Plaintiff regarding the status of numerous grievances, including Grievance No. A-41807-01. Struebel further observed that Plaintiff's correspondence regarding his numerous grievances contains the correct Grievance numbers, which Plaintiff would not know but for Plaintiff's receipt of the initial decisions denying such Grievances, thereby creating serious doubt as to Plaintiff's assertions that he never received such denials. *Id.* Plaintiff makes no attempt to explain how he was aware of the Grievance number assigned each of his grievances in the absence of receiving a denial of such grievances. Accordingly, no admissible evidence in the record would cause a reasonable juror to believe Plaintiff was prevented from filing a timely appeal of the denied grievances.

As such, the record establishes that Plaintiff

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1774876 (W.D.N.Y.)
**(Cite as: 2007 WL 1774876 (W.D.N.Y.))**

failed to exhaust his administrative remedies as to Grievance No. A-41807-01 and, as such, is barred from pursuing the instant litigation.

### CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment (Doc. No. 15) should be GRANTED; the Clerk of the Court should be directed to close the file.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**\*5 ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

W.D.N.Y.,2007.
Williams v. Hupkowicz
Not Reported in F.Supp.2d, 2007 WL 1774876 (W.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2014 WL 296859 (N.D.N.Y.)
**(Cite as: 2014 WL 296859 (N.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Jeffrey COLLINS, Plaintiff,
v.
Sergeant CARON, Upstate Corr. Facility; Marsh,
Corr. Officer, Upstate Corr. Facility; J. McGaw,
Corr. Officer, Upstate Corr. Facility; and John Doe,
Corr. Officer, Upstate Corr. Facility, Defendants.

No. 9:10–CV–1527 (GTS/RFT).
Jan. 27, 2014.

Nixon Peabody LLP, Daniel J. Hurteau, Esq., of
Counsel, Albany, NY, for Plaintiff.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, Laura A. Sprague, Esq., As-
sistant Attorney General, of Counsel, Albany, NY,
for Defendants.

*DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** An evidentiary hearing in this prisoner civil
rights action, filed *pro se* by Jeffrey Collins
("Plaintiff") pursuant to 42 U .S.C. § 1983, was
held on October 29, 2013, before the undersigned.
The hearing regarded the affirmative defense of the
four above-described New York State correctional
employees ("Defendants") that Plaintiff failed to
exhaust his available administrative remedies, as
required by the Prison Litigation Reform Act, be-
fore filing this action on December 9, 2010. At the
two-hour-long hearing, documentary evidence was
admitted. In addition, testimony was taken of
Plaintiff as well as two defense witness (Upstate
Correctional Facility Inmate Grievance Program
Supervisor Scott Woodward, and New York State
Department of Corrections and Community Super-
vision Inmate Grievance Program Director Karen
Bellamy) whom Plaintiff was able to cross-examine
through an experienced *pro bono* trial counsel. At

the conclusion of the hearing, the undersigned in-
dicated that a written decision would follow. This is
that written decision. For the reasons stated below,
Plaintiff's Second Amended Complaint is dismissed
without prejudice because of his failure to exhaust
his available administrative remedies before filing
this action.

**I. RELEVANT LEGAL STANDARD**

The Prison Litigation Reform Act of 1995
("PLRA") requires that prisoners who bring suit in
federal court must first exhaust their available ad-
ministrative remedies: "No action shall be brought
with respect to prison conditions under § 1983 ... by
a prisoner confined in any jail, prison, or other cor-
rectional facility until such administrative remedies
as are available are exhausted." 42 U .S.C. § 1997e.
The PLRA was enacted "to reduce the quantity and
improve the quality of prisoner suits" by
"afford[ing] corrections officials time and oppor-
tunity to address complaints internally before al-
lowing the initiation of a federal case." *Porter v.
Nussle,* 534 U.S. 516, 524–25 (2002). In this re-
gard, exhaustion serves two major purposes. First,
it protects "administrative agency authority" by
giving the agency "an opportunity to correct its
own mistakes with respect to the programs it ad-
ministers before it is haled into federal court, and it
discourages disregard of the agency's procedures."
*Woodford v. Ngo,* 548 U.S. 81, 89 (2006). Second,
exhaustion promotes efficiency because (a)
"[c]laims generally can be resolved much more
quickly and economically in proceedings before an
agency than in litigation in federal court," and (b)
"even where a controversy survives administrative
review, exhaustion of the administrative procedure
may produce a useful record for subsequent judicial
consideration." *Woodford,* 548 U .S. at 89.[FN1]
"[T]he PLRA's exhaustion requirement applies to
all inmate suits about prison life, whether they in-
volve general circumstances or particular episodes,
and whether they allege excessive force or some
other wrong." *Porter,* 534 U.S. at 532.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN1. In addition, a third purpose of the PLRA has been identified by the Second Circuit: "to curtail what Congress perceived to be inmate abuses of the judicial process." *Ortiz v. McBride,* 380 F.3d 649, 658 (2d Cir.2004).

**\*2** In accordance with the PLRA, the New York State Department of Corrections and Community Supervision ("DOCCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7.FN2 *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.FN3 If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

FN2. *See also Murray v. Palmer,* 03–CV–1010, 2010 WL 1235591, at \*1 & n. 1 (N.D.N.Y. March 31, 2010) [citation omitted].

FN3. The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied.FN4 Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can—and must—be appealed to the next level, including CORC, to complete the grievance process. 7 N.Y.C.R.R. §

701.6(g)(2) ("Absent [an] extension, matters not decided within the time limits may be appealed to the next step.").FN5

FN4. *See Murray v. Palmer,* 03–CV–1010, 2010 WL 1235591, at *2 & n. 3 (N.D.N.Y. March 31, 2010) (citing *Groves v. Knight,* 05–CV–0183, Decision and Order at 3 [N.D.N.Y. filed Aug. 4, 2009], an appeal from which was subsequently dismissed as frivolous, *see Groves v. Knight,* No. 09–3641, Mandate [2d Cir. filed Jan. 15, 2010].)

FN5. *See also Murray,* 2010 WL 1235591, at *2 & n. 4 [collecting cases].

**\*3** In light of the plain language of 7 N.Y.C.R.R. § 701.6(g)(2), the Second Circuit has indicated that the IGRC's nonresponse must be appealed to the superintendent even where the plaintiff's grievance was never assigned a grievance number.FN6 Moreover, this point of law has been expressly recognized by district courts in the Northern District,FN7 Southern District,FN8 and Western District.FN9 The Court notes that, if the plaintiff attaches to his appeal a copy of his grievance (or even if he adequately describes, in his appeal to the superintendent, the substance of that grievance), there is something for the superintendent to review.FN10

FN6. *See Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

FN7. *See, e.g., Rosado v. Fessetto,* 09–CV–0067, 2010 WL 3808813, at *7

(N.D.N.Y. Aug. 4, 2010) (Baxter, M.J.) ("Courts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement."), *adopted by* 2010 WL 3809991 (N.D.N.Y. Sept. 21, 2010) (Hurd, J.); *Murray v. Palmer,* 03–CV–1010, 2008 WL 2522324, at *15, 18 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting ReportRecommendation of Lowe, M.J.) ("[E]ven if Great Meadow C.F. did not ... have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level."), *accord, Midalgo v. Bass,* 03–CV–1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept. 26, 2006) (Mordue, C.J., adopting Report–Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *cf. Croswell v. McCoy,* 01–CV–0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA.").

FN8. *See, e.g., Walters v. Carpenter,* 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004); *Veloz v. New York,* 339 F.Supp.2d 505, 515–16 (S.D.N.Y.2004) (rejecting inmate's argument that prison's grievance procedure had been rendered unavailable by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial

filing was not forthcoming"), *aff'd,* 178 F. App'x 39 (2d Cir.2006); *Hernandez v. Coffey,* 99–CV–11615, 2003 WL 22241431, at *4 (S.D.N.Y. Sept. 29, 2003) (rejecting plaintiff's argument that he could not have exhausted because he never received a grievance number, finding he could nonetheless have appealed any such non-response to the next level); *cf. Wesley v. Hardy,* 05–CV–6492, 2006 WL 3898199, at *4 (S.D.N.Y. Dec. 12, 2006) ("If a prisoner submits a grievance and receives no response, he cannot be considered to have been actively obstructed or frustrated, as he is free to appeal to the next level of review."), *accord, Sims v. Blot,* 00–CV–2524, 2003 WL 21738766, at *3 (S.D.N.Y. July 25, 2003) ("[E]ven if no response is received by an inmate to his grievance within the allotted time period, he may then appeal that grievance (and the absence of a decision thereon) to the next step in the grievance process."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002) ("Had plaintiff utilized this procedure, any failure by Artuz to render a decision on his matter within twelve working days could have been appealed to Albany, thus completing the grievance cycle and exhausting his remedies in a matter of weeks."), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *Martinez v. Williams,* 186 F.Supp.2d 353, 357 (S .D.N.Y.2002) ("[P]laintiff now argues in his opposition brief that he filed a grievance in November 1999 and did not receive a response.... Plaintiff's argument that he is excused because defendants failed to act with respect to the grievance is unpersuasive. Plaintiff could have and should have appealed the grievance in accordance with grievance procedures."); *Waters v. Schneider,* 01–CV–5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr. 23, 2002) ("Waters alleges

that he attempted to file a grievance with the Inmate Grievance Resolution Committee ... in April 2001 but never received a response.... In either case, it is undisputed that Waters did not pursue the available appeals within the prison grievance system.").

FN9. *See, e.g., Collins v. Cunningham,* 06–CV–0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available where his grievance of March 20, 2004, was not assigned a grievance number); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

FN10. This point of law has been explicitly recognized in some cases. *See, e.g., Goodson v. Silver,* 09–CV–0494, 2012 WL 4449937, at *4 (N.D.N.Y. Sept. 25, 2012) (Suddaby, J.); accord, *Murray,* 2010 WL 1235591, at *2. In addition, it has been implicitly recognized in other cases. *See, e,g, Murray,* 2008 WL 2522324, at *15, 18 & n. 46 ("[E]ven if Great Meadow C.F. did not ... have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level."); *Midalgo,* 2006 WL 2795332, at *7 (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Hernandez,* 2003 WL 22241431, at *4 (rejecting plaintiff's argument that he could not have exhausted because he never received a grievance number, finding he could nonetheless have ap-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

pealed any such non-response to the next level); *Collins,* 2009 WL 2163214, at *3, 6 (rejecting plaintiff's argument that his administrative remedies were not available where his grievance of March 20, 2004, was not assigned a grievance number).

It is also important to note that DOCCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

"An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040.

Generally, if a prisoner has failed to properly follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies, and his claims are subject to dismissal. *Woodford,* 548 U.S. at 93; *Porter,* 534 U.S. at 524; *Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 175 (2d Cir.2006). However, a plaintiff's failure to exhaust does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

**\*4** With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678–79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004).[FN11] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing,[FN12] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim.[FN13] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

DOCCS regulations governing the grievability of his claim, (b) the inmate was specifically informed that the claim in question was grievable, (c) the inmate separately pursued the proper grievance process by filing a grievance with the IGRC, (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion, and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC.[FN14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim, and/or (b) the inmate did not appeal his disciplinary hearing conviction.[FN15]

> FN11. The Court recognizes that the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88–103 (emphasis added). It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano–Testman* line of cases.

> FN12. *Giano,* 380 F.3d at 678 ("[W]hile

Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696–98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

> FN13. *Testman,* 380 F.3d at 696–98 (remanding case so that district court could consider, *inter alia.* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internally"); *see also Murray,* 2010 WL 1235591, at *3 & n. 9 [citing cases].

> FN14. *Murray,* 2010 WL 1235591, at *3 & nn. 10–14 [citing cases].

> FN15. *Id.* at *3 & nn. 15–16 [citing cases].

Finally, two additional points bear mentioning regarding exhaustion hearings. First, the Second Circuit has ruled that a plaintiff in a lawsuit governed by PLRA is not entitled to a jury trial on disputed factual issues relating to his exhaustion of administrative remedies; rather, PLRA exhaustion is a matter of judicial administration. *Messa v. Goord,* 652 F.3d 305, 308–10 (2d Cir.2011). Second, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies.[FN16] However, once a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then "counter" the defendant's assertion by showing exhaustion,

unavailability, estoppel, or "special circumstances." FN17 As a result, practically speaking, while the burden on this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it.

FN16. *Id.* at *4 [citation omitted].

FN17. *Id.* at *4 & n. 17 [citing cases].

## II. ANALYSIS

### A. Availability of Administrative Remedies

After carefully considering the evidence submitted at the exhaustion hearing, the Court finds that Plaintiff did not file a grievance regarding the assault alleged in this action, despite the fact that administrative remedies were available to Plaintiff during the time in question. The Court makes this finding for the following five reasons.

**\*5** First, Defendants have adduced admissible evidence establishing that Plaintiff did not file a grievance regarding the assault alleged in this action, nor did he pursue any such grievance to CORC. (*See, e.g.,* Hrg. Tr. at 5, 12, 31–32, 34–36; Hrg. Exs. D–2, D–3; *cf.* Dkt. No. 8, at ¶ 53, 55–57, 60; Hrg. Exs. P–2, P–4, P–5, P–6.)

Second, Defendants have adduced admissible evidence establishing that, during the time in question, an inmate grievance program was in existence at Upstate Correctional Facility ("Upstate C.F."). (Hrg. Tr. at 5–11, 24; Hrg. Exs. D–1, D–2, D–4.)

Third, Defendants have adduced admissible evidence establishing that, during the time in question, Plaintiff was advised of Directive 4040 each time he was received at a correctional facility, had access to Directive 4040, and was aware of the inmate grievance program at Upstate C.F. (Hrg. Tr. at 41–42, 48–49, 54–55, 60–61, 63, 71–72; Hrg. Exs. D–3, D–4.) For example, Plaintiff filed grievances at Upstate C.F. on March 20, 2009, and April 1, 2009. (Hrg. Ex. D–3; Hrg. Tr. at 71–72.) Similarly, Plaintiff had filed grievances at another correctional facility on August 29, 2006, October 13, 2006, January 19, 2007, and February 18, 2009. (Hrg. Ex. D–3; Hrg. Tr. at 30–32, 54, 73.) Moreover, in his Verified Second Amended Complaint, Plaintiff swore that, during the time in question, he was aware of (1) the need to file a grievance, and (2) the office at Upstate C.F. to which to submit that grievance. (Dkt. No. 8, at ¶¶ 51–58.)

Fourth, Defendants have adduced admissible evidence establishing that the inmate grievance program at Upstate C.F. was working during the time in question. (Hrg. Tr. at 11–12, 38–41, 43–45; Hrg. Ex. D–2.) For example, on March 20, 2009, and April 1, 2009, Plaintiff filed grievances at Upstate C.F., which he subsequently pursued all the way to CORC. (Hrg. Ex. D–3; Hrg. Tr. at 71–72.) Indeed, between July 5, 2009, and July 20, 2009, forty-one other staff misconduct grievances were successfully filed at Upstate C.F. (Hrg. Ex. D–2; Hrg. Tr. at 11–12.)

Fifth, the Court finds the relevant portions of Plaintiff's hearing testimony (i.e., that he mailed grievances to the grievance office on July 6, 2009, July 16, 2009, and July 19, 2009, which were lost or destroyed during mailing or processing) to be incredible due to various admissions, omissions and/ or inconsistencies in that testimony, and his demeanor during his testimony. (Hrg. Exs. P–1, P–2, P–3; Hrg. Tr. at 3–22, 47–80.)

### B. Forfeiture/Estoppel

After carefully considering the evidence submitted at the exhaustion hearing, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or that Defendants are estopped from raising the defense by taking actions that inhibited Plaintiff's exhaustion of remedies.

With regard to the forfeiture issue, Defendant's Amended Answer asserted this affirmative defense, and Plaintiff's counsel made no argument regarding forfeiture at the hearing. (Dkt. No. 50, at ¶ 18; *see generally* Hr. Tr. 80–87.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*6** Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* in any way interfered with Plaintiff's ability to file a grievance during the time in question. (*See, e.g.,* Hrg. Tr. at 51–52, 72–73.) A defendant in a prisoner civil rights action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies (for purposes of the second part of the three-part inquiry established by the Second Circuit) based on the actions or inactions of *other* individuals. This point of law is clear from Second Circuit cases.[FN18] Furthermore, this point of law has been relied on by district courts in the Northern District,[FN19] Southern District,[FN20] Eastern District,[FN21] and Western District.[FN22]

FN18. *See Amador v. Andrews,* 655 F.3d 89, 102 (2d Cir.2011) ("The second part considers whether defendants forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether defendants' *own* actions inhibiting the inmate's exhaustion of remedies estops one or more of the defendants from raising the exhaustion defense.") (emphasis added); *Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 178 (2d Cir.2006) ("In our prior cases recognizing that *defendants' actions* may estop them from raising non-exhaustion as a defense .... Ruggiero does not allege beatings or threats of retaliation for filing a grievance or that he made any attempt to file a grievance and was denied that opportunity *by Defendants–Appellants."* ) (emphasis added); *Hemphill v. New York,* 380 F.3d 680, 689 (2d Cir.2004) (explaining that, where several defendants played different roles in the acts giving rise to estoppel, "it is possible that some individual defendants may be estopped, *while other may not be"* ) (emphasis added).

FN19. *See, e.g., Belile v. Griffin,* 11–CV–0092, 2013 WL 1776086, at \*9 (N.D.N.Y. Feb. 12, 2013) (Peebles, M.J.), *adopted by* 2013 WL 1291720 (N.D.N.Y. March 27, 2013) (McAvoy, J.); *Bailey v. Fortier,* 09–CV–0742, 2013 WL 310306, at \*2 (N.D.N.Y. Jan. 25, 2013) (Sharpe, C.J.); *Thompson v. Bellevue Hosp.,* 09–CV–1038, 2011 WL 4369132, at \*12 (N.D.N.Y. Aug. 29, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4369132 (N.D.N.Y. Aug. 29, 2011) (Mordue, C.J .); *Calloway v. Grimshaw,* 09–CV–1354, 2011 WL 4345299, at \*4 (N.D .N.Y. Aug. 10, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4345296 (N.D.N.Y. Sep. 15, 2011) (McAvoy, J.); *Murray v. Palmer,* 03–CV–1010, 2010 WL 1235591, at \*5 & n. 26 (N.D.N.Y. March 31, 2010) (Suddaby, J.); *Snyder v. Whittier,* 05–CV–1284, 2009 WL 691940, at \*9 (N.D.N.Y. March 12, 2009) (Report–Recommendation of Peebles, M .J., adopted by McAvoy, J.); *Murray v. Palmer,* 03–CV–1010, 2008 WL 2522324, at \*19 (N.D.N.Y. June 20, 2008) (Report–Recommendation of Lowe, M.J., adopted by Hurd, J.); *McCloud v. Tureglio,* 07–CV–0650, 2008 WL 1772305, at \* 12 (N.D.N.Y. Apr. 15, 2008) (Report–Recommendation of Lowe, M.J., adopted by Mordue, C.J.); *Shaheen v. McIntyre,* 05–CV–0173, 2007 WL 3274835, at \*16 (N.D.N.Y. Nov. 5, 2007) (Report–Recommendation of Lowe, M.J., adopted by McAvoy, J.); *Gill v. Frawley,* 02–CV–1380, 2006 WL 1742378, at \*12 (N.D.N.Y. June 22, 2006) (Report–Recommendation by Lowe, M.J., adopted by McAvoy, J.); *Smith v. Woods,* 03–CV–0480, 2006 WL 1133247, at \*16 (N.D.N.Y. Apr. 24, 2006) (Report–Recommendation of Lowe, M.J., adopted by Hurd, J.).

FN20. *See, e.g., Collins v. Goord,* 438 F.Supp.2d 399, 415, n. 16 (S.D.N.Y.2006).

FN21. *See, e.g., McCullough v. Burroughs,* 04–CV–3216, 2005 WL 3164248, at *4 (E.D.N.Y. Nov. 29, 2005).

FN22. *See, e.g., Barad v. Comstock,* 03–CV–0736, 2005 WL 1579794, at *6 (W.D.N.Y. June 30, 2005).

The Court notes that a contrary interpretation of the second part of the Second Circuit's three-part exhaustion inquiry would turn the ancient doctrine of estoppel on its head, transforming it-in Orwellian fashion-into one of "vicarious estoppel." *See Black's Law Dictionary* at 629 (9th ed) (defining "estoppel" as "[a] bar that prevents one from asserting a claim or right that contradicts what one has said or done before ...."). Moreover, such an invention would be wholly unnecessary: the vicarious conduct sought to be protected against is already protected against by the "special circumstances" inquiry established by the Second Circuit.

Finally, while it may be argued that such an interpretation of the doctrine of estoppel is nonetheless appropriate because the purpose of the PLRA is to enable the institution to resolve disputes efficiently rather than protect the individual,FN23 prisoner civil rights suits are suits against prison officials in their individual capacities rather than suits against them in their official capacities (which would effectively be suits against the State and thus be barred by the Eleventh Amendment). As a result, the crux of the second part of the Second Circuit's three-part exhaustion inquiry is whether the officials may avail themselves of that defense, not whether the institution may avail itself of the defense.

FN23. For the sake of brevity, the Court will set aside the fact that this argument ignores the fact that there are two other purposes for the PLRA (i.e., to produce a useful record for subsequent judicial consideration, and to curtail what Congress perceived to be inmate abuses of the judicial process). *See, supra,* Part I of this Decision

and Order.

**C. Special Circumstances**

After carefully considering the issue, the Court finds that there exists no special circumstances justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's cross-examination of Defendants' witness, raise the specter of four excuses for not having exhausted his available administrative remedies before he filed this action on December 9, 2009:(1) Plaintiff reasonably misunderstood the grievance process to permit him to appeal the non-processing of his grievances directly to CORC on July 28, 2009; (2) Plaintiff's letter of August 30, 2009, to the Superintendent of Elmira Correctional Facility ("Elmira C.F.") notifying him that Plaintiff "would like to have [his] appeal sent to" CORC completed the exhaustion process; (3) Plaintiff's contact with the Inspector General's Office in September of 2009 completed the exhaustion process; and (4) Plaintiff's initial exchange of correspondence with the office of the Superintendent of Upstate C.F. between July 5, 2009, and July 12, 2009, satisfied the pre-appeal exhaustion process.

**\*7** With regard to Plaintiff's first excuse (i.e., that he reasonably misunderstood the grievance process to permit him to appeal the non-processing of his grievances directly to CORC), the Court finds that this excuse does not suffice for two alternative reasons: (1) he does not credibly argue that he misunderstood the need to first appeal to the facility superintendent; and (2) any such misunderstanding of the proper grievance process was not reasonable, given that (a) the language of 7 N.Y.C.R.R. § 701.6(g)(2) clearly stated this part of the process,FN24 (b) Plaintiff possessed copies of his grievances that he could have sent to the superintendent, and (c) by the time in question, Plaintiff had been incarcerated in the New York State Department of Corrections and Community Supervision for some 16 years, and had filed numerous grievance appeals. (*See* Hrg. Ex. D–3; Hrg. Tr. at

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

30–32, 47–80.) *See also* 7 N.Y.C.R.R. § 701.6(g)(2) ("Absent [an] extension, matters not decided within the time limits may be appealed to the next step."). With regard to the first reason, the Court notes that, when asked why he wrote directly to CORC, Plaintiff responded vaguely as follows: "I found out through, you know, they got like organizations that tell you how to-how to go about things so they told me that if you don't receive responses, you should write directly to the IGP in Albany." (Hrg. Tr. at 59.) Plaintiff does not specify such details as what "organization" gave him this advice, or even that the advice regarded non-responses from *inmate grievant offices* rather than from superintendents. (*Id.*) With regard to the second reason, the Court notes that, for a misunderstanding of the law to constitute a special circumstance, that misunderstanding must be *reasonable.* FN25

> FN24. *See, supra,* Part I of this Decision and Order.

> FN25. *See Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (explaining that the third or the three caveats for mandatory exhaustion is the existence of "special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement."); *cf. Giano v. Goord,* 380 F.3d 670, 679 (2d Cir.2004) (finding that special circumstances had been demonstrated because plaintiff's action were the result of "reasonable" confusion about the proper administrative channel through which to pursue his claim); *Johnson v. Testman,* 380 F.3d 691, 696–98 (2d Cir.2004) (finding that "special circumstances" included plaintiff's "reasonable" but mistaken belief regarding the grievance process).

With regard to Plaintiff's second excuse (i.e., that his letter of August 30, 2009, to the Superintendent of Elmira C.F. completed the exhaustion process), the Court finds that this excuse does not suffice for three alternative reasons: (a) the subject of the letter of August 30, 2009—i.e., the underlying grievance of August 10, 2009, which was submitted to the inmate grievance office at Upstate C.F.-was untimely and never accepted for filing by the grievance office at Upstate C.F.; (b) the rejection of the underlying grievance of August 10, 2009, at Upstate C.F. needed to be appealed to the Superintendent of *Upstate* C.F., not to the Superintendent of Elmira C.F.; and (c) Plaintiff never received a denial of his letter of August 30, 2009, nor filed an appeal from any such denial with CORC. (Hrg. Exs. P–6, P–8, P–9; Hrg. Tr. at 23–80.) With regard to the first reason, the Court notes, if exhaustion could be accomplished simply through appealing the denial of a request for leave to file an untimely grievance, then the time deadlines contained in the exhaustion process would lose all meaning. *See Smith v. Kelly,* 06–CV–0505, Decision and Order, at 21 (N.D.N.Y. filed Oct. 30, 2013) (Suddaby, J.) ("It would eviscerate the exhaustion requirement to deem an inmate to have exhausted his available administrative remedies where he files a grievance four-and-a-half years late ..., then skips the superintendent and appeals the rejection of his grievance (based on untimeliness) to CORC, which never passes on the merits of his grievance. If exhaustion were permissible under such circumstances, every inmate could exhaust his available administrative remedies without fulfilling the functions of the exhaustion requirement ...."). As the Supreme Court explained, "We are confident that the PLRA did not create such a toothless scheme." *See Woodford v. Ngo,* 548 U.S. 81, 95 (2006) (reversing Ninth Circuit decision holding that prisoner had exhausted his administrative remedies under the PLRA because none remained available to him after his grievance was rejected as untimely by state prison officials).

**\*8** With regard to Plaintiff's third excuse (i.e., that his contact with the Inspector General's Office in September of 2009 completed the exhaustion process), the Court finds that this excuse does not

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

suffice for two alternative reasons: (1) it does not appear that the investigation by the Inspector General was upon *referral* from either the Superintendent of Elmira C.F. or the Superintendent of Upstate C.F.; and (2) it does not appear that Plaintiff appealed a finding of unsubstantiation by the Inspector General's Office to CORC. (Hrg. Tr. at 68–80; Hrg. Ex. P–10.) Both of those things are required in order for an inmate's letter to an Inspector General's Office to complete the exhaustion process. *Goodson v. Silver,* 09–CV–0494, 2012 WL 4449937, at *4, 9 & n. 7 (N.D.N.Y. Sept. 25, 2012) (Suddaby, J.) (collecting cases).

With regard to Plaintiff's fourth excuse (i.e., that his initial exchange of correspondence with Upstate C.F. Superintendent in early July 2009 initiated the exhaustion process), the Court finds that this excuse does not suffice for three alternative reasons: (1) an inmate's direct correspondence with the superintendent, bypassing the inmate grievance office, is not a grievance under the governing regulations (nor did that correspondence even contain a copy of his grievance); FN26 (2) Plaintiff did not file an appeal (from the Superintendent's response) with CORC within seven days of receiving the response on July 12, 2009, as required by 7 N.Y.C.R.R. § 701.5(a)(1); and (3) in Plaintiff's letter of July 28, 2009, to CORC, he did not attach, or even reference, either his letter of July 5, 2009, to the Superintendent or the Superintendent's response of July 12, 2009, despite possessing copies of both documents. (Hrg. Exs. D–4, D–5, P–4; Hrg. Tr. at 11, 16, 18, 20–21, 32–33, 52, 55, 57.) With regard to the first reason, it should be noted that the regulations clearly provide that, any grievances alleging staff misconduct must be filed under the normal procedure with the grievance office, which will then give the grievance a grievance number and send it immediately to the superintendent for review. 7 N.Y.C.R.R. § 701.8(a), (b). With regard to this third reason, it should be noted that the regulations clearly provide that, if possible, appeals to CORC shall contain, *inter alia,* both the underlying grievance and the superintendent's written response

to the grievance. 7 N.Y.C.R.R. § 701.5(d)(1). It should also be noted that, during the time in question, Plaintiff knew how to file an appeal from the denial of a grievance by a superintendent, having done so at least six times. (Hrg. Ex. D–3; Hrg. Tr. at 30–32, 71–73 .)

> FN26. Indeed, the correspondence expressly referred to the grievance as a *separate* document, which the superintendent would receive at some point in the future. (Hrg. Ex. D–4 [stating that "You shall receive a grievance concerning a Sgt Caron and three (3) officers assaulting me while in OMH"].)

For all these reasons, the Court finds that Plaintiff's four proffered excuses—whether considered individually or together—do not constitute special circumstances justifying his failure to exhaust his available administrative remedies before filing this action. A procedure was available for Plaintiff to grieve the assault alleged in this action; and that procedure was made known to him; however, for whatever reason, he simply failed to follow it. Under the circumstances, the sound purposes of the exhaustion requirement (*see, supra,* Part I of this Decision and Order) have been thwarted.

**\*9 ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 8) is ***DISMISSED* in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

N.D.N.Y.,2014.
Collins v. Caron
Slip Copy, 2014 WL 296859 (N.D.N.Y.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 296859 (N.D.N.Y.)
**(Cite as: 2014 WL 296859 (N.D.N.Y.))**

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Shawn Michael SNYDER, Plaintiff,
v.
Glenn S. GOORD, et al., Defendants.
**Civil Action No. 9: 05-CV-01284.**

March 29, 2007.

Shawn Michael Snyder, Pro Se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Christopher W. Hall, Esq., Assistant Attorney General, of counsel, Albany, NY, for Defendants.

### DECISION & ORDER

THOMAS J. McAVOY, Senior United States District Judge.

**\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred by this Court to the Hon. David E. Peebles, United States Magistrate Judge, for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). The Report, Recommendation and Order dated February 27, 2007 recommended

that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 20) be GRANTED, in part, and that plaintiff's legal mail claim be DISMISSED in its entirety, and further that all remaining claims be DISMISSED as against defendants Goord, Roy, Plescia and Miller, but that it otherwise be DENIED, and that the matter proceed with regard to

plaintiff's constitutional claims against defendants Whittier and Funnye based upon events occurring at the Washington Correctional Facility.

Rep., Rec. & Ord., p. 33.

Plaintiff and Defendants have filed objections to the Report-Recommendation. When objections to a magistrate judge's Report-Recommendation are lodged, the Court reviews the record *de novo. See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge]. The [Court] may also receive further evidence or recommit the matter to the magistrate [judge] with instructions." *Id.*

Having reviewed the record *de novo* and having considered the issues raised in the objections, this Court has determined to accept and adopt the recommendation of Magistrate Judge Peebles for the reasons stated in the February 28, 2007 Report-Recommendation with one modification as set forth below.

In this regard, it is hereby

**ORDERED** that Defendants' motion for summary judgment [dkt. No. 20] is **GRANTED in part and DENIED in part.** Plaintiff's legal mail claim is **DISMISSED in its entirety.** Further all remaining claims against Defendants Goord, Roy, Plescia and Miller are **DISMISSED.** The motion is denied with regard to Plaintiff's constitutional claims against Defendants Whittier and Funnye based upon events occurring at the Washington Correctional Facility, but Defendants are **granted leave to renew** the motion following a period of discovery. Accordingly, Defendants may assert in their renewed motion, should they decide to file one, that Plaintiff failed to exhaust his administrative remedies by failing to promptly file a grievance once at Groveland Correctional Facility.

**IT IS SO ORDERED.**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

*REPORT, RECOMMENDATION AND ORDER*

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Shawn Michael Snyder, an openly gay New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 to complain principally of a series of occurrences which he attributes to his sexual orientation, including harassment by prison workers and fellow inmates and, in one instance, an assault by a corrections officer. Plaintiff's complaint, which is comprehensive, asserts constitutional claims under the First, Fourth, Eighth and Fourteenth Amendments arising out of those incidents as well as his apparently unsuccessful efforts to contact the National Gay and Lesbian Task Force to elicit that agency's assistance.

*2 In lieu of answering his complaint, defendants have instead moved for summary judgment dismissing plaintiff's claims based upon his failure to exhaust available administrative remedies before commencing suit and, in the case of some of the defendants and one entire claim, plaintiff's failure to allege and establish their personal involvement in the constitutional deprivations at issue. For the reasons set forth below I recommend that plaintiff's claims against defendants Goord, Roy, Miller and Plescia, as well as his cause of action for alleged interference with his legal mail, be dismissed on the basis of a lack of sufficient personal involvement in the constitutional violations alleged. Finding the existence of a genuine issue of material fact surrounding plaintiff's efforts to exhaust administrative remedies, however, I recommend that the portion of defendants' motion seeking dismissal of plaintiff's remaining claims on this procedural basis be denied.

I. *BACKGROUND* [FN1]

> FN1. The vast majority of the information serving as a backdrop for the court's decision is drawn from plaintiff's complaint which, as notarized, qualifies as a functional equivalent of an affidavit for purposes of the pending motion. 28 U.S.C. § 1746 (1994); Fed.R.Civ.P. 56(e); *Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1998) (citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir .1995); *Yearwood v. LoPiccolo,* No. 95 CIV. 2544, 1998 WL 474073, at *5-*6 & n. 2 (S.D.N.Y. Aug. 10, 1998); *Ketchmore v. Gamache,* No. 96 CIV. 3004, 1997 WL 250453, at *4 n. 1 (S.D.N.Y. May 12, 1997). As required, for the purpose of analyzing defendants' arguments I have drawn all inferences, and resolved any ambiguities, in favor of the plaintiff, as the non-moving party. *See Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997).

Plaintiff, who at the times relevant to his claims was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"), has over time been confined in various DOCS facilities. Complaint (Dkt. No. 2) at 2. The bulk of plaintiff's claims were precipitated by events which transpired while he was housed in the Washington Correctional Facility ("Washington") although, as will later be seen, certain of the occurrences which followed his transfer out of Washington and ultimately into the Groveland Correctional Facility ("Groveland") are relevant to some of his claims, as well as to the issue of whether he properly exhausted available administrative remedies before commencing this action. *Id.; see also* O'Brien Aff. (Dkt. No. 20) ¶ 4. The plaintiff is gay, a fact which according to him was common knowledge within Washington during the time of his confinement within that facility. Complaint (Dkt. No. 2) ¶ 2.

The circumstances giving rise to plaintiff's centerpiece claim date back to May of 2005, when he was transferred from another location within Washington into the prison's B-2 housing dormitory. Complaint (Dkt. No. 2) ¶ 1. Immediately following that transfer Snyder began to experience verbal threats and abuse, attributed by the plaintiff to his sexual orientation, at the hands of defendant Whittier, a corrections officer. *Id.* ¶ 1. According to Snyder the abuse spread, fueled by encouragement from defendant Whittier, resulting in harassment from fellow inmates, who engaged in a variety of abusive and hostile acts which included the throwing of trash, objects, debris and body fluids at him. *Id.* ¶¶ 2-27.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

Defendant Whittier's ongoing harassment of the plaintiff led to a confrontation between the two on June 1, 2005, during the course of which Snyder was physically assaulted by the officer, who thrust his elbow and forearm into plaintiff's throat, forcing him to the floor. *Id.* ¶¶ 24-36. Once plaintiff was on the floor, defendant Whittier placed his knees on Snyder's middle back area and neck, and pulled his left arm up behind his back. *Id.* Toward the end of the encounter defendant Whittier pulled the plaintiff up by his arm and hair and dragged him out of the area, pushing him into a wall and punching his kidney area several times in the process. *Id.* ¶¶ 33-39.

**\*3** On June 3, 2005 plaintiff was treated for injuries sustained during the encounter with Corrections Officer Whittier, and was transferred into the E-1 dormitory within Washington. Complaint (Dkt. No. 2) ¶¶ 47, 51. While housed in that unit Snyder was approached and advised by several inmates that they had been encouraged by other inmates, as well as by defendant Whittier, to assault him. *Id.* ¶¶ 51-54.

Plaintiff was again transferred within Washington on or about June 20, 2005, on this occasion having been re-assigned to the D-1 housing dormitory. Complaint (Dkt. No. 2) ¶ 57. While residing within that unit, plaintiff had his locker broken into and some of his personal property stolen, an event for which he blames fellow inmates. *Id.* ¶¶ 70.

Out of concern over reprisals which could result from his taking such action, plaintiff did not file a formal grievance regarding the assault by Corrections Officer Whittier while at Washington. Complaint (Dkt. No. 2) ¶¶ 51-54. As justification for that fear, plaintiff cites defendant Whittier's reported efforts to have him harmed by other inmates following his transfer out of the dormitory to which Whittier was assigned. *Id.* Plaintiff did, however, take other steps while at Washington to lodge complaints regarding defendant Whittier's actions. After earlier complaints registered verbally to other prison employees, including Corrections Officers Funnye and Graves, went unaddressed, *see* Complaint (Dkt. No. 2) ¶¶ 21, 42, plaintiff sent a letter dated July 7, 2005 to Corrections Lieutenant Greene, complaining of the assault by

defendant Whittier and expressing fear of retribution at the hands of that corrections officer; a copy of that letter was forwarded by Snyder to Corrections Lieutenant Hopkins.[FN2] Complaint (Dkt. No. 2) ¶ 60 & Exh. 1. Five days later, apparently precipitated by his letter to Lieutenant Greene, plaintiff was asked by Corrections Sergeant Belden to provide a formal, written statement regarding the assault, and was taken by Sergeant Belden to the prison infirmary for a medical evaluation. Complaint (Dkt. No. 2) ¶ 61.

> FN2. Plaintiff's complaint does not provide specifics regarding the official positions of Lieutenants Greene and Hopkins including, notably, whether either could properly be characterized as Corrections Officer Whittier's supervisor, nor does he indicate whether those individuals were officially designated by prison officials at Washington to receive inmate complaints regarding the actions of corrections workers.

On July 14, 2005, plaintiff was transferred temporarily into the Great Meadow Correctional Facility, where he was interviewed on the following day by defendant Miller, an Assistant Deputy Inspector General for the DOCS, regarding the alleged assault by defendant Whittier. Complaint (Dkt. No. 2) ¶¶ 62-64. During that session, defendant Miller advised Snyder that he had been transferred out of Washington for his safety, and that in light of his sexual orientation and the significant probability that similar acts would recur in the future, his contemplated transfer into the Greene Correctional Facility had been rescinded, and instead he would be moved "West and closer to home [.]" *Id.* ¶ 66. Later that day, plaintiff was transferred into the Groveland Correctional Facility. *Id.* ¶ 67.

Plaintiff reiterated his interest in pursuing his claims against Corrections Officer Whittier by letter dated July 22, 2005 sent to Investigator Miller. Complaint (Dkt. No. 2) Exh. 3. Despite sending subsequent written communications to defendant Miller and others, however, as of the time of commencement of this action plaintiff still had not been apprised of the status of the Inspector General's investigation into his allegations regarding Corrections Officer Whittier. *Id.* ¶¶ 67-69; *see also*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

Complaint (Dkt. No. 2) Exhs. 9, 17.

**\*4** On August 24, 2005, while at Groveland, plaintiff filed a formal grievance regarding the physical assault involving Corrections Officer Whittier. Complaint (Dkt. No. 2) ¶ 76 and p. 60, ¶ B. That grievance was rejected, however, based upon the fact that it was filed beyond the fourteen day deadline for initiating such grievances, and did not recite any mitigating circumstances which would provide a ground for overlooking its lateness. [FN3] *Id.; see also* O'Brien Aff. (Dkt. No. 20) ¶ 8 & Exh. 2; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 22) ¶ 27. Plaintiff did not appeal that determination, or any other grievance alleging harassment, excessive force, or other similar claims arising out of events at Washington, to the Central Officer Review Committee ("CORC"). Eagan Aff. (Dkt. No. 20) ¶ ¶ 5-6.

> **FN3.** DOCS Directive 4040, which governs the filing of inmate grievances, permits an Inmate Grievance Program Supervisor ("IGPS") to permit the late filing of grievances when presented with "mitigating circumstances." *See* O'Brien Aff. (Dkt. No. 20) ¶ 12.

On August 19, 2005 plaintiff endeavored to send a letter to the National Gay and Lesbian Task Force seeking the assistance of that organization; claiming that it qualified as legal mail, Snyder attempted to forward that communication without paying for postage. Complaint (Dkt. No. 2) ¶ 71. Prison officials rejected plaintiff's efforts, however, concluding that the communication did not fall within the prevailing definition of legal mail, and returned it to the plaintiff on August 22, 2005. *Id.* Plaintiff thereafter resent the letter on August 23, 2005 with proper postage affixed. *Id.* ¶ 72. The letter was later returned to the plaintiff on September 2, 2005, marked as "undeliverable". *Id.* ¶ 73. When the letter was returned plaintiff found that it had been opened, apparently by personnel within the Groveland mailroom. *Id.*

On August 29, 2005 plaintiff filed a grievance at Groveland seeking, as relief, a determination that the National Gay and Lesbian Task Force constituted a legal entity and that, as such, he should be permitted to send and receive correspondence from that organization as "legal

mail". *Id.* ¶ 74 & Exh. 16. Plaintiff's grievance was denied at the local level, including by the facility superintendent, and that unfavorable determination was upheld on appeal to the CORC. *Id.* ¶ 75 & Exh. 16.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on or about September 27, 2005.[FN4] Dkt. No. 2. Named as defendants in Snyder's complaint are DOCS Commissioner Glenn S. Goord; Richard Roy, the DOCS Inspector General; Assistant Deputy Inspector General Mark Miller; James Plescia, the Superintendent at Washington; and Corrections Officers Whittier and Funnye. *Id.* Plaintiff's complaint asserts a variety of claims growing out of the events at Washington and Groveland, alleging deprivation of his rights under the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution, as well as a host of pendent state statutory and common law claims.[FN5] As relief, plaintiff seeks both the entry of an injunction and awards of compensatory and punitive damages.

> **FN4.** This action was initially filed in the United States District Court for the Western District of New York, but was transferred here by order issued by District Judge David G. Larimer on September 29, 2005. *See* Dkt. No. 4.

> **FN5.** Plaintiff's complaint, which is comprised of seventy-two typewritten pages and several attached exhibits, is not lacking in detail. Despite its refreshing clarity, however, plaintiff's complaint is in many respects repetitive and fails to comply with the governing provisions of the Federal Rules of Civil Procedure which require, *inter alia,* that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed.R.Civ.P. 8(a). This requirement is more than merely technical, and instead is designed to permit a responding party and the court to accurately gauge the allegations of a complaint and permit the issues in a case to be properly framed. *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103 (1957); *Phillips v. Girdich,* 408 F.3d 124, 127-29 (2d Cir.2005); *Salahuddin v. Cuomo,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

861 F.2d 40, 42 (2d Cir.1988); *In re Ferro Corp. ERISA Litig.*, 422 F.Supp.2d 850, 857 (N.D.Ohio 2006); *Rashidi v. Albright*, 818 F.Supp. 1354, 1355-56 (D.Nev.1993).

**\*5** In lieu of answering plaintiff's complaint, defendants instead have chosen to interpose a motion seeking the entry of summary judgment. Dkt. No. 20. In that motion, which was filed on March 9, 2006, defendants assert that plaintiff's harassment and excessive force claims are procedurally barred based upon his failure to file and pursue to completion an internal grievance regarding those matters before commencing suit. *Id.* Defendants also argue that defendants Goord, Ray, Plescia, and Miller were not personally involved in any of the violations asserted, and that all of the defendants lack personal involvement with regard to plaintiff's legal mail cause of action. *Id.* Plaintiff responded in opposition to defendants' motion on April 12, 2006, Dkt. No. 23, and defendants have since filed a reply in further support of their motion. Dkt. No. 23.

Defendants' motion, which is now ripe for a determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Consequences of Defendants' Failure to Answer or Move to Dismiss*

While plaintiff has not raised this issue, one could argue that by their failure either to answer or to interpose a motion cognizable under Rule 12(b) of the Federal Rules of Civil Procedure within the allotted time, defendants are in default. Defendants' motion is brought under Rule 56 of the Federal Rules of Civil Procedure and does not, as an alternative, seek dismissal under Rule 12(b). While Rule 12(b) of the Federal Rules of Civil Procedure contains a specific provision in effect staying the requirement of answering a complaint during the pendency of a motion brought under its provision, Rule 56 does not contain a parallel provision.

Some courts confronted with this procedural setting have concluded that the interposition of a motion for summary judgment qualifies as otherwise defending against a complaint, and that as such no default is presented under the circumstances. *See, e. g., Rashidi*, 818 F.Supp. at 1355-56. Other courts, however, have noted that there is no automatic entitlement to a delay of the time to answer as a result of the filing of a summary judgment motion, the matter instead being addressed to the discretion of the court to extend that period, as authorized under Rule 6(b) of the Federal Rules of Civil Procedure.[FN6] *See, e.g., Poe v. Cristina Copper Mines, Inc.*, 15 F.R.D. 85, 87 (D.Del.1953).

> FN6. That rule provides, in relevant part, that
>
> [w]hen by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged.
>
> Fed.R.Civ.P. 6(b).

Since this is not a situation where a motion to dismiss was initially filed but converted by the court to a summary judgment motion, a circumstance which would warrant a finding that the stay provisions of Rule 12 apply, *see Brooks v. Chappius*, No. 05-CV-6021, 2006 WL559253, at *1 (W.D.N.Y. Mar. 1, 2006), defendants are technically in default. In light of the circumstances presented, however, I find that the defendants have demonstrated their intention to defend against plaintiff's claims and, concluding that there is good cause for doing so, will order a stay of their time to answer plaintiff's complaint until ten days after a determination by the assigned district judge in connection with the pending motion. *See Rashidi*, 818 F.Supp. at 1355-56.

#### B. *Summary Judgment Standard*

**\*6** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision,

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if "it might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson).* A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313

F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

C. *Failure to Exhaust Administrative Remedies*

**\*7** In their motion defendants assert that plaintiff's harassment and assault claims growing out of events which occurred at Washington are procedurally barred, based upon his failure to file and pursue to completion a timely grievance relating to those claims. Plaintiff responds by asserting that his failure to file a grievance regarding the matter while at Washington was the product of his fear of retaliation, and further argues that the requirement of exhaustion should be excused based upon the fact that his claims were, in fact, investigated by the DOCS Inspector General.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), altered the inmate litigation landscape considerably, imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. One such restriction introduced by the PLRA requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992 (2002). The PLRA's exhaustion requirement thus applies to plaintiff's excessive force claims absent a finding of sufficient basis to find that plaintiff's failure to exhaust was justified or should be excused. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

New York prison inmates are subject to an Inmate Grievance Program established by the DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb. 20, 2004) (citing

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

*Mojias v. Johnson,* 351 F.3d 606 (2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The New York Inmate Grievance Program consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within fourteen days of the incident.[FN7] 7 N.Y.C.R.R. § 701.7(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. 7 N.Y.C.R.R. § 701.7(a). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.7(b). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id.* § 701.7(c). Absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

> **FN7.** The Inmate Grievance Program supervisor may waive the timeliness of the grievance submission due to "mitigating circumstances." 7 N.Y.C.R.R. § 701.7(a)(1).

**\*8** The record before the court confirms Snyder's awareness of New York's IGP. Plaintiff in fact grieved the failure of prison officials at Groveland to treat his correspondence to the National Gay and Lesbian Task Force as legal mail and unsuccessfully pursued that grievance through to a determination by the CORC. Accordingly-and defendants do not argue otherwise-plaintiff has fulfilled his obligation to exhaust administrative remedies with regard to his legal mail claim before commencing this action.

Distinctly different circumstances obtain with regard to plaintiff's claims of the use of excessive force and harassment by prison officials and fellow inmates. While plaintiff did file a grievance regarding those matters, the grievance was rejected as untimely, and that determination was neither appealed to the CORC, nor did plaintiff commence a second grievance challenging the untimeliness rejection, a course which was apparently

available to him under the IGP.[FN8]

> **FN8.** Although there is no need to address this argument since plaintiff failed to pursue the matter through to the CORC, had he done so with regard to the excessive force and harassment grievance filed at Groveland, he nonetheless would have failed to satisfy the PLRA's exhaustion requirement since, as the Supreme Court has now made clear, the filing and pursuit to completion of an untimely grievance does not satisfy the Act's exhaustion requirement. *Woodford v. Ngo,* --- U.S. ----, 126 S.Ct. 2378, 2382 (2006).

This is not to say that plaintiff cannot be said to have exhausted available administrative remedies. It should be noted that the three tiered IGP set forth in the controlling regulations does not describe the sole method for a New York State prison inmate to complain of prison conditions including, notably, the use of excessive force. *Heath v. Saddlemire,* No. 9:96-CV-1998, 2002 WL 31242204, at *4 (N.D.N.Y. Oct. 7, 2002). Indeed, the IGP regulations themselves provide that the three tiered mechanism " 'is intended to supplement, not replace, existing formal or informal channels of problem resolution.' " *Id.* (quoting 7 N.Y.C.R.R. § 701.1(a)). One of those alternative methods is a process for informal, expedited review of allegations of harassment by prison officials. 7 N.Y.C.R.R. § 701.11; *Perez,* 195 F.Supp.2d at 543. In this instance, an issue of fact exists surrounding whether plaintiff complied with section 701.11 by submitting a letter regarding Corrections Officer Whittier's actions to Lieutenant Greene. *See Perez,* 195 F.Supp.2d at 543.

Even assuming that plaintiff's efforts to address Corrections Officer Whittier's actions by writing to Lieutenant Green did not suffice to exhaust available remedies, the court must determine whether there is a basis to overlook this deficiency and permit the plaintiff to nonetheless proceed with his excessive force and harassment claims. The situations under which courts have excused an inmate's failure to comply with the IGP's three tier system generally one or more of the categories, including when 1) administrative remedies are not in fact available to the prisoner; 2) the defendants have either waived the defense or engaged in conduct which should

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

estop them from raising it; and 3) other special circumstances, including a reasonable misunderstanding of the grievance procedure, which justify the inmate's failure to comply with the applicable administrative procedural requirements.[FN9] *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Ruggiero,* 467 F.3d at 175 (citing *Hemphill* ). If the court deems any of these three categories applicable, then plaintiff's claims may be considered exhausted and should not be dismissed.[FN10] *Hemphill,* 380 F.3d at 690-91.

> **FN9.** As this case aptly illustrates, many of the typical fact patterns presented in cases involving an inmate's failure to exhaust do not fit neatly into any single category, but instead may overlap into two, or potentially even all three, of the groupings identified in *Hemphill. See Giano v. Goord,* 380 F.3d 670, 677 n. 6. This fact may well account for a blurring of these categories in a large share of Second Circuit PLRA cases. *Id.*

> **FN10.** Relying upon case law which has since been supplanted in light of the Supreme Court's contrary decision in *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983 (2002), plaintiff argues that he was not required to exhaust administrative remedies in light of the nature of his claim. The case upon which Snyder principally relies, however, *Lawrence v. Goord,* 238 F.3d 182 (2d Cir.2001), has since been vacated, 535 U.S. 901, 122 S.Ct. 1200 (2002), and the Court has now made it clear in *Porter* that PLRA's exhaustion requirement applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992; *Ruggiero,* 380 F .3d at 173 (citing *Porter* ). The contention implicit in plaintiff's argument, to the effect that his reliance upon pre-*Porter* case law as a basis for not filing a formal grievance was appropriate, citing *Rodriguez v. Westchester County Jail Correctional Dept.,* 372 F.3d 485 (2d Cir.2004), is misplaced, since *Porter* was decided some three years prior to the events at issue.

1. *Availability Of Administrative Remedies*

**\*9** Under certain circumstances the behavior of prison officials may have the legal affect of rendering administrative remedies functionally unavailable. *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004). In such cases, the finding that the three tiered IGP was open to the plaintiff inmate does not necessary end the inquiry. *Hemphill,* 380 F.3d at 686-88. Like the plaintiff in *Hemphill,* Snyder argues that he was deterred from filing a grievance while at Washington in light of threats made against him, principally by Corrections Officer Whittier. As was also the situation in *Hemphill,* however, plaintiff did avail himself of other avenues of recourse including to write a letter of complaint to a corrections lieutenant, thereby potentially signaling that his claims of fearing retribution are less than genuine.

When, as in this case, an inmate asserts that his or her resort to the grievance process was deterred based upon conduct such as threats by prison officials, the question of whether a sufficient basis to negate a finding of "availability" has been established entails an objective inquiry, focusing upon whether " 'a similarly situated individual of ordinary firmness' [would] have deemed them available." *Id.* at 688 (citing *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). Plaintiff's complaint and papers in opposition to defendants' motion, in which he asserts that his fears of retribution were based in part upon defendant Whittier's reported efforts to have him harmed by other inmates following his transfer out of the dormitory to which he had been assigned, raises genuine issues of material fact in connection with the objective test to be applied under *Hemphill,* thus precluding the entry of summary judgment.

Urging the court to disregard the strictures associated with evaluation of a summary judgment motion and to proceed to assess plaintiff's credibility, in reliance upon the Second Circuit's decision in *Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir.2005) (characterizing plaintiff's version of the events as so wholly credible that no reasonable jury could believe it), defendants contend that plaintiff's claimed fear of retribution does not suffice under *Hemphill* to serve as a counterweight to the availability of the IGP in New York. I recommend that the court decline defendants' invitation to assure the role of factfinder, and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

instead find that plaintiff's assertion that he feared reprisal is sufficient to raise a genuine issue of material fact regarding whether administrative remedies were available to him.

### 2. *Waiver and Estoppel*

Since defendants have raised exhaustion of remedies, an affirmative defense, at the earliest available opportunity, they have not waived the defense. The circumstances now presented, however, do provide a basis upon which an estoppel could potentially be predicated.

Prison officials may be estopped from defending against an inmate civil rights action based upon the plaintiff's failure to exhaust available administrative remedies, including when "(1) an inmate was led to believe by prison officials that his alleged incident was not a 'grievance matter' and assured that his claims were otherwise investigated ... (2) an inmate makes a 'reasonable attempt' to exhaust his administrative remedies, especially where it is alleged that corrections officers failed to file the inmate's grievances or otherwise impeded or prevented his efforts, and (3) the state's time to respond to the grievance has expired." *Martinez v. Williams,* 349 F.Supp.2d 677, 683 (S.D.N.Y.2004) (citing and quoting, *inter alia, O'Connor v. Featherston,* No. 01 Civ. 3251, 2002 WL 818085, at *2-*3 (S.D.N.Y. Apr. 29, 2002)). Thus, for example, a defendant who fails to forward an inmate's complaint to a grievance officer in a timely manner may be estopped from invoking the defense. *Hemphill,* 380 F.3d at 688-89. Similarly, an estoppel may be found where a defendant's use of force or threats inhibit an inmate's ability to utilize grievance procedures. *Ziemba v. Wezner,* 366 F.3d 161, 162-64 (2d Cir.2004).

**\*10** In this instance there is a potential basis for finding an estoppel. Plaintiff's complaints against Corrections Officer Whittier were the subject of an investigation by the DOCS Inspector General, a fact of which the plaintiff was keenly aware. Plaintiff's apparent belief that this investigation obviated the need for him to file a grievance regarding the issue was in all likelihood fortified when, in response to his grievance filed at Groveland, he was advised by the IGP Supervisor at that facility that if the matter had previously been brought "to some administration's attention [,] ... it is not necessary to have this matter readdressed." *See* Complaint (Dkt. No. 2) Exh. 12. This response may well have dissuaded the plaintiff from pursuing the matter further, including to press his otherwise untimely grievance to the CORC or to attempt to convince officials at Groveland that mitigating circumstances existed to accept his otherwise untimely grievance. *See* 7 N.Y.C.R.C. § 701.7(a)(1). Accordingly, in my view a reasonable factfinder could conclude that defendants should be estopped from asserting a defense based upon failure to exhaust. [FN11]

> FN11. It should be noted that fear of retribution can also provide a basis for finding that a defendant should be estopped from asserting failure to exhaust as a defense. *See Hemphill,* 380 F.3d at 688-89.

### 3. *Special Circumstances*

The third category of circumstances under which an inmate's failure to exhaust may be excused was addressed by the Second Circuit in *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004). In *Giano,* the court rejected the concept of a categorical statement regarding the "special circumstances" exception, instead, determining that the court should "[look] at the circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way." 380 F.3d at 678.

Defendants claim that plaintiff has not shown special circumstances which might explain why his grievance was late. Plaintiff counters that he should be entitled to the benefit of this special circumstances exception for two reasons. First, Snyder again asserts that his failure to file a grievance was motivated out of fear of retribution, based upon his efforts to seek review of the matter by the Inspector General's office. Additionally, plaintiff notes that his complaint regarding Corrections Officer Whittier was the subject of at least one letter to prison officials, resulting in an investigation by the DOCS Inspector General. Such efforts can provide a basis for finding exhaustion notwithstanding the technical failure of a prisoner to avail himself or herself of the three tiered IGP set forth in the governing regulations. *See Heath,* 2002 WL 31242204, at *4-*5; *Perez,* 195 F.Supp.2d at 545-46;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

*see also Marvin v. Goord,* 255 F.3d 40, 43 n. 3 (2d Cir.2001) ("Resolution of the matter through informal channels satisfies the exhaustion requirement, as, under the administrative scheme applicable to New York prisoners, grieving through informal channels is an available remedy."). In order to avail himself of this exception, however, plaintiff must demonstrate that his informal complaints led to a favorable resolution in communication with his charges of misconduct. *Thomas v. Cassleberry,* 315 F.Supp.2d 301, 304 (W.D.N.Y.2004) (rejecting plaintiff's argument that defendants' motion for summary judgment for failure to exhaust should be denied because although plaintiff complained to the Inspector General's Office, there were no allegations that his complaints resulted in a favorable resolution); *Grey v. Sparhawk,* No. 99 CIV. 9871, 2000 WL 815916, at *2 (S.D.N.Y. June 23, 2000) (complaint filed directly with the Inspector General found insufficient to fulfill exhaustion requirement); *cf. Giano,* 380 F.3d at 679 (finding that plaintiff's attempt to expose allegedly retaliatory behavior during a disciplinary hearing which centered upon the same retaliatory act which he complains provided a basis to find justification for plaintiff's failure to exhaust). While plaintiff is unable to make this claim, it is purely the product of the failure of prison officials to notify him of the results of the Inspector General's investigation despite his written requests for this information. I am therefore unable to state with certainty that plaintiff is not entitled to the benefit of the special circumstances exception to the PLRA's exhaustion requirement.

**\*11** In sum, applying the tripartite test announced in the Second Circuit's August, 2004 collection of exhaustion cases and their progeny, I find genuine issues of fact including summary judgment on the issue of plaintiff's alleged failure to exhaust available administrative remedies, and therefore recommend denial of defendants' motion to dismiss on this procedural basis.

## C. *Personal Involvement*

Turning to the merits of plaintiff's claims, defendants allege that Snyder's complaint discloses potential personal involvement in the events occurring at Washington on the part of only defendants Whittier and Funnye, and that none of them are implicated in the legal mail claims

stemming from plaintiff's incarceration in Groveland. This, defendants argue, provides a basis for dismissal of certain of plaintiff's claims.

Personal involvement of a defendant in alleging a constitutional deprivation is a prerequisite to an award of damages against that person under section 1983 against that person. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

### 1. *Events at Washington*

The only defendants alleged by the plaintiff to have had direct involvement in or knowledge of the events at Washington are two corrections officers directly implicated, defendants Whittier and Funnye, as well as the Assistant Inspector General involved in the investigation of those matters, Mark Miller. Nothing in the record now before the court suggests any actual involvement of or awareness by DOCS Commissioner Goord, Inspector General Roy, or Washington Superintendent Plescia, in any of the relevant events. Instead, plaintiff's claims against those defendants appear to be based purely upon their supervisory positions and Snyder's contention that by virtue of their roles, they must have known about the incident, or the very least should be charged with constructive knowledge of the constitutional violations alleged. These allegations are insufficient to implicate those defendants in the matters involved; it is well established that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501.

It is true that a supervisory official can be found liable in a civil rights setting such as that now presented in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986). The plaintiff, however, has failed to present any evidence which tends to establish a basis for finding liability on the part of defendants Goord, Roy, or Plescia under any of those theories. Accordingly, I recommend a finding that claims against them based upon lack of personal involvement.

**\*12** Plaintiff's claims against defendant Miller present a slightly different situation. Defendant Miller was charged with investigating the incident implicated in plaintiff's excessive force claims. At the time of the investigation, however, any harassment of him by Whittier had ended, and plaintiff had been transferred out of Washington. Plaintiff does not allege the existence of any lingering effects of the events at Washington, following his transfer out of that prison, which could have been prevented had defendant Miller acted to end the constitutional violations involved. Plaintiff's only quarrel with defendant Miller appears to be his failure, and the failure of his office, to notify him of the status of the investigation conducted in response to his communications inquiring in that regard. This fact alone, however, provides no basis for a finding that defendant Miller was involved in the constitutional violations alleged. *Cf. Greenwaldt v. Coughlin,* No. 93 Civ. 6551, 1995 WL 232736, at \*4 (S.D.N.Y. Apr. 19, 1995) ("It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent of prison where only allegation was that he ignored inmate's request for an investigation)).

### 2. *Plaintiff's Legal Mail Claims*

Plaintiff's legal mail claims involve actions taken by prison officials at Groveland, including those working in the prison mail room. None of the individuals named in plaintiff's complaint, however, was employed at Groveland, and plaintiff has identified no basis to conclude that any of them, including particularly DOCS Commissioner Goord, had any awareness of or involvement in the decision to deny legal mail status to his communications to the National Gay and Lesbian Task Force or to open his returned mail sent to that agency. Plaintiff's legal mail claim is subject to dismissal for failure to name, as a defendant, anyone proven to have been personally involved in that deprivation. *Bass,* 790 F.2d at 263.

### IV. *SUMMARY AND RECOMMENDATION*

While plaintiff failed to file a grievance, and thereby avail himself of the comprehensive inmate grievance program offered to him as a New York State prisoner, to address the harassment allegedly endured at Washington at the hands of defendant Whittier and fellow inmates, in light of the existence of genuine issues of material fact I am unable to state that no reasonable factfinder could discern a proper basis exists to excuse this failure and find that plaintiff should not be barred on this procedural basis from pursuing his claims surrounding the events at Washington. I therefore recommend that defendants' motion for summary judgment dismissing plaintiff's excessive force and harassment claim on this procedural ground be denied. I do find, however, that plaintiff has failed to demonstrate the personal involvement of any of the defendants in his legal mail claim, and of defendants Goord, Roy, Plescia and Miller in connection with the claims growing out of events occurring at Washington, and therefore recommend that defendants' motion for summary judgment dismissing all claims against those defendants be granted.

**\*13** Based on the foregoing, it is hereby

ORDERED that the time within which defendants must answer plaintiff's complaint in this matter is hereby stayed and extended until ten days following the issuance of a decision by Senior District Judge Thomas J. McAvoy deciding the present summary judgment motion, or such other time as Judge McAvoy shall direct; and it is further

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 20) be GRANTED, in part, and that plaintiff's legal mail claim be DISMISSED in its entirety, and further that all remaining claims be DISMISSED as against defendants Goord, Roy, Plescia and Miller, but that it otherwise be DENIED, and that the matter proceed with regard to plaintiff's constitutional claims against defendants Whittier and Funnye based upon events occurring at the Washington Correctional Facility.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir.1993).

The clerk is directed to promptly forward copies of this order to the parties in accordance with this court's local rules.

N.D.N.Y.,2007.
Snyder v. Goord
Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4246443 (N.D.N.Y.)

(Cite as: 2007 WL 4246443 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jose RODRIGUEZ, Plaintiff,
v.
Glen S. GOORD, et al, Defendants.
No. 9:04-CV-0358 (FJS/GHL).

Nov. 27, 2007.
Jose Rodriguez, Willard, NY, pro se.

Andrew M. Cuomo, Attorney General of the State of New York, David L. Cochran, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### DECISION AND ORDER

FREDERICK J. SCULLIN, Senior District Judge.

**\*1** The above-captioned matter having been presented to me by the Report-Recommendation of Magistrate Judge George H. Lowe filed November 6, 2007, and the Court having reviewed the Report-Recommendation and the entire file in this matter, and no objections to said Report-Recommendation having been filed, the Court hereby

**ORDERS,** that Magistrate Judge Lowe's November 6, 2007 Report-Recommendation is **ACCEPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS,** that Defendants' motion, pursuant to Local Rule 41.2(b), to dismiss for Plaintiff's failure to provide notice to the Court of a change of address, is **GRANTED;** and the Court further

**ORDERS,** that the Clerk of the Court enter judgment in favor of the Defendants and close this case.

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, filed pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Jr., Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court. Generally, Jose Rodriguez ("Plaintiff") alleges that, while he was an inmate at Oneida Correctional Facility in 2003 and 2004, ten employees of the New York State Department of Correctional Services ("Defendants") were deliberately indifferent to his serious medical needs, and subjected him to cruel and unusual prison conditions, in violation of the Eighth Amendment. (Dkt. No. 27 [Plf.'s Am. Compl.].) Currently pending is Defendants' motion to dismiss for failure to provide notice to the Court of a change of address, pursuant to Local Rule 41.2(b) of the Local Rules of Practice for this Court. (Dkt. No. 86.) Plaintiff has not opposed the motion, despite having been given more than six weeks in which to do so. Under the circumstances, I recommend that (1) Defendants' motion to dismiss be granted, and (2) in the alternative, the Court exercise its inherent authority to *sua sponte* dismiss Plaintiff's Amended Complaint for failure to prosecute and/or failure to comply with an Order of the Court.

### I. DEFENDANTS' MOTION TO DISMISS

Under the Local Rules of Practice for this Court, Plaintiff has effectively "consented" to the granting of Defendants' motion to dismiss, since (1) he failed to oppose the motion, (2) the motion was properly filed, and (3) Defendants have, through the motion, met their burden of demonstrating entitlement to the relief requested in the motion. L.R. 7.1(b)(3).

In particular, with regard to this last factor (i.e., that Defendants have met their burden of demonstrating entitlement to the relief requested), Defendants argue that their motion to dismiss should be granted because (1) Local Rule 41.2(b) provides that "[f]ailure to notify the Court of a change of address in accordance with [Local Rule] 10.1(b) may result in the dismissal of any pending

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4246443 (N.D.N.Y.)

(Cite as: 2007 WL 4246443 (N.D.N.Y.))

action," (2) on April 15, 2004, Plaintiff was specifically advised of this rule when (through Dkt. No. 5, at 4) the Court advised Plaintiff that "his failure to [promptly notify the Clerk's Office and all parties or their counsel of any change in his address] will result in the dismissal of his action," (3) on May 22, 2007, Plaintiff was released from the Willard Drug Treatment Center, (4) since that time, Plaintiff has failed to provide notice to the Court (or Defendants) of his new address, as required by Local Rule 10.1(b)(2), and (5) as a result of this failure, Defendants have been prejudiced in that they have been unable to contact Plaintiff in connection with this litigation (e.g., in order to depose him, as authorized by the Court on May 4, 2007). (Dkt. No. 86, Part 4, at 1-2 [Defs.' Mem. of Law].)

**\*2** Authority exists suggesting that an inquiry into the third factor (i.e., whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1[b][3] ) is a more limited endeavor than a review of a contested motion to dismiss.[FN1] Specifically, under such an analysis, the movant's burden of persuasion is lightened such that, in order to succeed, his motion need only be "facially meritorious." [FN2] Given that Defendants accurately cite the law and facts in their memorandum of law, I find that they have met their lightened burden on their unopposed motion. Moreover, I am confident that I would reach the same conclusion even if their motion were contested.

> FN1. *See, e.g., Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8, 2003 WL 22143709 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before an unopposed motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious* ") [emphasis added; citations omitted]; *Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-10 (N.D.N.Y.2003)* (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *see also Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M .J.) (applying prior version of Rule 7.1

[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-0989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, J.), *adopted by 983 F.Supp. 595 (N.D.N.Y.1996)* (Pooler, J.).

> FN2. *See, e.g., Hernandez,* 2003 U.S. Dist. LEXIS 1625 at *8.

For these reasons, I recommend that the Court grant Defendants' motion to dismiss.

## II. *SUA SPONTE* DISMISSAL

Even if Defendants have not met their burden on their motion to dismiss, the Court possesses the inherent authority to dismiss Plaintiff's Amended Complaint *sua sponte* under the circumstances. Rule 41 of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a proceeding for (1) failure to prosecute the action and/or (2) failure to comply with the Federal Rules of Civil Procedure or an Order of the Court. Fed.R.Civ.P. 41(b).[FN3] However, it has long been recognized that, despite Rule 41 (which speaks only of a *motion* to dismiss on the referenced grounds, and not a *sua sponte* order of dismissal on those grounds), courts retain the "inherent power" to *sua sponte* "clear their calendars of cases that have remained dormant because of the inaction or dilatoriness of the parties seeking relief." *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); *see also Saylor v. Bastedo,* 623 F.2d 230, 238 (2d Cir.1980); *Theilmann v. Rutland Hospital, Inc.,* 455 F.2d 853, 855 (2d Cir.1972). Indeed, Local Rule 41.2(a) not only recognizes this authority but *requires* that it be exercised in appropriate circumstances. *See* N.D.N.Y. L.R. 41.2(a) ("Whenever it appears that the plaintiff has failed to prosecute an action or proceeding diligently, the assigned judge *shall* order it dismissed.") [emphasis added].

> FN3. Fed.R.Civ.P. 41(b) (providing, in pertinent part, that "[f]or failure of the plaintiff to prosecute or to comply with these rules or any

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4246443 (N.D.N.Y.)

(Cite as: 2007 WL 4246443 (N.D.N.Y.))

order of court, a defendant may move for dismissal of an action or of any claim against the defendant").

**A. Failure to Prosecute**

With regard to the first ground for dismissal (a failure to prosecute the action), it is within the trial judge's sound discretion to dismiss for want of prosecution.[FN4] The Second Circuit has identified five factors that it considers when reviewing a district court's order to dismiss an action for failure to prosecute:

> FN4. *See Merker v. Rice,* 649 F.2d 171, 173 (2d Cir.1981).

[1] the duration of the plaintiff's failures, [2] whether plaintiff had received notice that further delays would result in dismissal, [3] whether the defendant is likely to be prejudiced by further delay, [4] whether the district judge has taken care to strike the balance between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard and [5] whether the judge has adequately assessed the efficacy of lesser sanctions.[FN5]

> FN5. *See Shannon v. GE Co.,* 186 F.3d 186, 193 (2d Cir.1999) (affirming Rule 41[b] dismissal of plaintiff's claims by U.S. District Court for Northern District of New York based on plaintiff's failure to prosecute the action) [citation and internal quotation marks omitted].

**\*3** As a general rule, no single one of these five factors is dispositive.[FN6] However, I note that, with regard to the first factor, Rule 41.2 of the Local Rules of Practice for this Court provides that a "plaintiff's failure to take action for four (4) months shall be presumptive evidence of lack of prosecution." N.D.N.Y. L.R. 41.2(a). In addition, I note that a party's failure to keep the Clerk's Office apprised of his or her current address may also constitute grounds for dismissal under Rule 41(b) of the Federal Rules of Civil Procedure.[FN7]

> FN6. *See Nita v. Conn. Dep't of Env. Protection,* 16 F.3d 482 (2d Cir.1994).

> FN7. *See, e.g., Robinson v. Middaugh,* 95-CV-0836, 1997 U.S. Dist. LEXIS 13929, at *2-3, 1997 WL 567961 (N.D.N.Y. Sept. 11, 1997) (Pooler, J.) (dismissing action under Fed.R.Civ.P. 41[b] where plaintiff failed to inform the Clerk of his change of address despite having been previously ordered by Court to keep the Clerk advised of such a change); *see also* N.D.N.Y. L.R. 41.2(b) ("Failure to notify the Court of a change of address in accordance with [Local Rule] 10.1(b) may result in the dismissal of any pending action.").

Here, I find that, under the circumstances, the above-described factors weigh in favor of dismissal. The duration of Plaintiff's failure is some six-and-a-half months, i.e., since April 22, 2007, the date of the last document that Plaintiff attempted to file with the Court (Dkt. No. 85). Plaintiff received adequate notice (e.g., through the Court's above-referenced Order of April 15, 2004, and Defendants' motion to dismiss) that his failure to litigate this action (e.g., through providing a current address) would result in dismissal. Defendants are likely to be prejudiced by further delays in this proceeding, since they have been waiting to take Plaintiff's deposition since May 4, 2007. (Dkt. No. 84.) I find that the need to alleviate congestion on the Court's docket outweighs Plaintiff's right to receive a further chance to be heard in this action.[FN8] Finally, I have considered all less-drastic sanctions and rejected them, largely because they would be futile under the circumstances (e.g., an Order warning or chastising Plaintiff may very well not reach him, due to his failure to provide a current address).

> FN8. It is cases like this one that delay the resolution of other cases, and that contribute to the Second Circuit's dubious distinction as having (among the twelve circuits, including the D.C. Circuit) the longest median time to disposition for prisoner civil rights cases, between 2000 and 2005 (9.8 months, as compared to a national average of 5.7 months). Simply stated, I am unable to afford Plaintiff with further special solicitude without impermissibly burdening the Court and unfairly tipping the scales of justice against Defendant.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4246443 (N.D.N.Y.)

(Cite as: 2007 WL 4246443 (N.D.N.Y.))

**B. Failure to Comply with Order of Court**

With regard to the second ground for dismissal (a failure to comply with an Order of the Court), the legal standard governing such a dismissal is very similar to the legal standard governing a dismissal for failure to prosecute. "Dismissal ... for failure to comply with an order of the court is a matter committed to the discretion of the district court." [FN9] The correctness of a dismissal for failure to comply with an order of the court is determined in light of five factors:

FN9. *Alvarez v. Simmons Market Research Bureau, Inc.,* 839 F.2d 930, 932 (2d Cir.1988) [citations omitted].

(1) the duration of the plaintiff's failure to comply with the court order, (2) whether plaintiff was on notice that failure to comply would result in dismissal, (3) whether the defendants are likely to be prejudiced by further delay in the proceedings, (4) a balancing of the court's interest in managing its docket with the plaintiff's interest in receiving a fair chance to be heard, and (5) whether the judge has adequately considered a sanction less drastic than dismissal.[FN10]

FN10. *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996) [citations omitted].

Here, I find that, under the circumstances, the above-described factors weigh in favor of dismissal for the same reasons as described above in Part II.A. of this Report-Recommendation. I note that the Order that Plaintiff has violated is the Court's Order of April 15, 2004, wherein the Court ordered Plaintiff, *inter alia,* to keep the Clerk's Office apprised of his current address. (Dkt. No. 5, at 4.) Specifically, the Court advised plaintiff that *"[p]laintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in plaintiff's address; his failure to do same will result in the dismissal of this action."* (*Id.*) I note also that, on numerous previous occasions in this action, Plaintiff violated this Order, resulting in delays in the action. (*See* Dkt. Nos. 47, 48, 49, 50, 54, 59, 72, 78, 79 & Dkt. Entry for 12/15/06 [indicating that mail from the Court to Plaintiff was returned as undeliverable.])

**\*4** As a result, I recommend that, should the Court decide to deny Defendants' motion to dismiss, the Court exercise its authority to dismiss Plaintiff's Amended Complaint *sua sponte* for failure to prosecute and/or failure to comply with an Order of the Court.

**ACCORDINGLY,** for the reasons stated above, it is

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 86) be ***GRANTED%;*** and it is further

**RECOMMENDED** that, in the alternative, the Court exercise its inherent authority to *SUA SPONTE DISMISS* Plaintiff's Amended Complaint for failure to prosecute and/or failure to comply with an Order of the Court.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e)..

N.D.N.Y.,2007.

Rodriguez v. Goord
Not Reported in F.Supp.2d, 2007 WL 4246443 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2013 WL 4774731 (S.D.N.Y.)
**(Cite as: 2013 WL 4774731 (S.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Stanley HILBERT, Plaintiff,
v.
Brian FISCHER, et al., Defendants.

No. 12 Civ. 3843(ER).
Sept. 5, 2013.

**OPINION AND ORDER**

EDGARDO RAMOS, District Judge.

**\*1** Plaintiff Stanley Hilbert ("Plaintiff"), proceeding *pro se,* brings this action pursuant to 42 U.S.C. § 1983, the Americans With Disabilities Act and the Rehabilitation Act against Brian Fischer, Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"); Green Haven Correctional Facility ("Green Haven") Superintendent William Lee; and various Green Haven "contractors and employees" (collectively, the "Defendants").FN1 Presently before the Court is Defendants' motion to partially dismiss Plaintiff's Amended Complaint.FN2 Doc. 65. Specifically, Defendants seek dismissal of Plaintiff's claim of deliberate medical indifference for failure to exhaust administrative remedies. Defendants Fischer and Lee move in the alternative to dismiss Plaintiff's deliberate indifference claim because Plaintiff has failed to demonstrate that they were personally involved in the alleged Constitutional violation. For the reasons discussed below, Defendants' motion for partial dismissal of the Amended Complaint is GRANTED.

> FN1. On June 5, 2012, the Court dismissed DOCCS as a Defendant in this action. Doc. 6.

> FN2. Plaintiff filed a Notice of Motion along with his opposition papers for an "Order pursuant to Rule 7(b) of the Federal

Rule[s] of Civil Procedure granting a trial concerning the complaint." Doc. 77. As the motion is procedurally improper, the Court assumes that Plaintiff filed the Notice of Motion in further support of his opposition to Defendants' motion to dismiss, and will consider it accordingly.

**I. Factual Background**

The Court accepts the factual allegations in the Amended Complaint as true for purposes of Defendants' motion. *Famous Horse Inc. v. 5th Ave. Photo Inc.,* 624 F.3d 106, 108 (2d Cir.2010).

In September 2011, Plaintiff was incarcerated at Marcy Correctional Facility's ("Marcy") Residential Mental Health Unit ("RMHU"). Amended Complaint ("Am.Compl.") ¶ 42. Plaintiff sought mental health treatment at that facility; however, due to the unavailability of observational cells, he was transferred to Green Haven.FN3 *Id.* ¶¶ 42–43. On September 27, 2011, at approximately 10:40 am, while still at Green Haven, Plaintiff complained of chest pains and was escorted to the facility infirmary. *Id.* ¶ 45. After Plaintiff had been examined, Defendants Kowalchuk, Rodriguez and Surprenant escorted him back to his cell. *Id.* ¶ 47. On the way back to the cell, Surprenant told Plaintiff that he was "full of shit," that he was "bullshitting and wasting his time," and that "this ain't Marcy [and] we have another way to treat mental illness and you're going to find out soon enough." *Id.* ¶¶ 48–50. Upon hearing this, Plaintiff requested that Surprenant allow him to see a mental health therapist. *Id.* ¶ 51. Defendant Rodriguez then interjected and said that "we got some therapy for you" and that "your [sic] going to need a physical therapist to teach you how to walk again." *Id.* ¶ 52.

> FN3. The exact date on which Plaintiff was transferred to Green Haven is not clear from the face of the Amended Complaint.

Upon returning to his cell, Plaintiff was

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ordered to face the wall, which he did. *Id.* ¶ 53. Surprenant then instructed Plaintiff, who was still in restraints, to turn around and face him. *Id.* ¶ 54. After Plaintiff complied, Surprenant "got nose to nose" with him and stated, "you played games and wasted my time. I told you we have another way to treat mental illness." *Id.* ¶ 55. At that point, Rodriguez "[s]uddenly" punched Plaintiff in the left eye. *Id.* ¶ 56. Defendants Kowalchuk, Rodriguez and Surprenant then began beating Plaintiff "mercilessly with their hands and feet," and "punched and kicked [him] repeatedly about the body, face and head." *Id.* ¶¶ 57–58. Plaintiff alleges that upon information and belief, Defendant Rodriguez then "stepped on [his] lower back while Defendants Surprenant, Tillotson, Kowalchuk, Keran [sic], and Brothers held [him] down and removed the restraints." *Id.* ¶ 59. Defendants then left the cell and locked it behind them. *Id.* ¶ 61.

**\*2** Plaintiff alleges that he then informed Defendant Kowalchuk that he was in "excruciating pain and need[ed] medical attention," *id .* ¶ 60; however, Kowalchuk refused Plaintiff's request. *Id.* ¶ 62. Approximately one hour later, Defendant Miller, a nurse, arrived at Plaintiff's cell with a corrections officer to take photographs. *Id.* ¶ 63. At that point, Plaintiff's nose was bleeding profusely, he was bleeding out of his left eye, and he could barely stand up. *Id.* ¶ 64. Plaintiff informed Miller that he was in excruciating pain, but she did not "even [perform] a cursory examination ... [and] told Plaintiff that there was nothing wrong." *Id.* ¶¶ 64–65. Plaintiff alleges that Miller told him to "stop whining" and that crying is what babies do. *Id.* ¶ 66. She then exited the cell with the corrections officer. *Id.* ¶ 67.

Over the next two days, from September 27 to 29, 2011, Plaintiff alleges that he requested medical assistance for his injuries from Defendants Morlas, Patil, Panuto, Zwillinger, O'Conner, Brandow, Hannd, Sposato, Santoro, Edwards, Kutz, Kowalchuk, Lamay, and Gotsch, and that these Defendants all denied his requests. *Id.* ¶¶ 68–81. On the

morning of September 29, 2011, a doctor came to Plaintiff's cell and, after examining him, determined that he was seriously injured and in need of immediate medical attention. *Id.* ¶ 82. Plaintiff was then transferred to an outside hospital, Westchester County Medical Center, where he was treated and later released. *Id.* ¶ 83. Plaintiff claims that he suffers from frequent migraines, "extreme debilitating back pain," loss of vision and a broken nose. *Id.* ¶ 84.

## II. Plaintiff has not Exhausted Administrative Remedies with Respect to his Eighth Amendment Deliberate Medical Indifference Claim

Plaintiff claims that Defendants violated his Eighth Amendment rights by using unnecessary and excessive force against him and by acting with "deliberate indifference or reckless disregard toward [his] serious medical needs by failing to take the steps necessary to ensure that [he] received treatment for his injuries." Am. Compl. ¶ 87. Defendants argue that Plaintiff's deliberate medical indifference claim should be dismissed because he failed to exhaust the administrative remedies available under DOCCS' three-tiered Inmate Grievance Program ("IGP"). Specifically, Defendants argue that Plaintiff's grievance only alleged that he was assaulted by several officers at Green Haven, and did not include any allegations that Defendants were deliberately indifferent to his medical needs.

### a. Prison Litigation Reform Act

The Prison Litigation Reform Act ("PLRA") "requires prisoners to exhaust prison grievance procedures before filing suit." *Jones v. Bock,* 549 U.S. 199, 202 (2007) (citations omitted). The PLRA's exhaustion requirement is "mandatory," *Porter v. Nussle,* 534 U .S. 516, 524 (2002), and " 'applies to all inmate suits about prison life.' " *Johnson v. Killian,* 680 F.3d 234, 238 (2d Cir.2012) (quoting *Porter,* 534 U.S. at 532). The Supreme Court has held that "the PLRA exhaustion requirement requires proper exhaustion." *Id.* (quoting *Woodford v. Ngo,* 548 U.S. 81, 93 (2007)) (internal quotation marks omitted). That is, "prisoners must complete

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself." *Id.* (quoting *Jones,* 549 U.S. at 218).

**\*3** In New York, prisoners must exhaust each level of the three-tiered IGP. *Kasiem v. Switz,* 756 F.Supp.2d 570, 575 (S.D .N.Y.2010). Under the IGP, an inmate must: (i) file a complaint with the grievance clerk; (ii) appeal an adverse decision by the Inmate Grievance Resolution Committee ("IGRC") to the superintendent of the facility; and (iii) appeal an adverse decision by the superintendent to the Central Officer Review Committee ("CORC"). N.Y. Comp.Codes R. & Regs. ("NYCRR") tit. 7, § 701.5. The IGP regulations provide that an inmate must submit a complaint on an inmate grievance complaint form, or on plain paper if the form is not readily available. 7 NYCRR § 701.5(a)(1). The regulations further require that "the grievance ... contain a concise, specific description of the problem and the action requested." 7 NYCRR § 701.5(a)(2).

Although failure to exhaust is "an absolute bar to an inmate's action in federal court," *George v. Morrison–Warden,* No. 06 Civ. 3188(SAS), 2007 WL 1686321, at \*2 (S.D.N.Y. June 11, 2007), the Second Circuit has recognized three grounds for exceptions to the exhaustion requirement. *See Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). First, a court must ask "whether administrative remedies were in fact 'available' to the prisoner." *Id.* (citation omitted). Second, a court must determine whether the defendant forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendant's own actions estop him from raising the affirmative defense of non-exhaustion. *Id.* Finally, if the court finds that administrative remedies were available to the plaintiff, and that the defendant is not estopped and has not forfeited his non-exhaustion defense, a court should consider whether any " 'special circumstances' have been plausibly alleged that justify

'the prisoner's failure to comply with administrative procedural requirements.' " *Id.* (quoting *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir.2004)).

**b. The Court May Consider Extrinsic Material Because Plaintiff was on Notice that Defendants' Motion to Dismiss Might be Converted to One for Summary Judgment and had the Opportunity to Submit Evidence Relevant to the Issue of Exhaustion**

Defendants move to dismiss Plaintiff's deliberate indifference claim pursuant to Fed.R.Civ.P. 12(b)(6). Along with their moving papers, Defendants submit the declaration of Jeffery Hale, as well as a copy of the grievance Plaintiff filed at Marcy, numbered MCY–15928–12. *See* Doc. 68. On a Rule 12(b)(6) motion, a district court generally must confine itself to the four corners of the complaint and look only to the allegations contained therein. *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007). Accordingly, courts in this district have held that where non-exhaustion is clear from the face of a complaint, a court should dismiss the complaint under Rule 12(b)(6). *See Mateo v. Bristow,* No. 12 Civ. 5052(RJS), 2013 WL 3863865, at \*3 (S.D.N.Y. July 16, 2013) (citing *Kasiem,* 756 F.Supp.2d at 575; *McCoy v.. Goord,* 255 F.Supp.2d 233, 251 (S.D.N.Y.2003)). However, where non-exhaustion is not clear from the face of the complaint, courts should convert a Rule 12(b) motion into a Rule 56 motion for summary judgment "limited to the narrow issue of exhaustion and the relatively straightforward questions about ... whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused." *Id.* (quoting *McCoy,* 255 F.Supp.2d at 251). Before converting a Rule 12(b)(6) motion into a Rule 56 motion, courts must notify the parties and "afford [them] the opportunity to present supporting material." *Id.* (quoting *Friedl v. City of New York,* 210 F.3d 79, 83 (2d Cir.2000)). Such notice and opportunity are "especially important when a plaintiff is *pro se." Id.* (quoting *McCoy,* 255 F.Supp.2d at 251).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*4** Here, non-exhaustion is not clear from the face of Plaintiff's complaint. Accordingly, the Court must convert the current motion to one for summary judgment and look to extrinsic evidence. Before converting the motion, however, the Court must determine whether Plaintiff has been given "unequivocal notice" of his obligation to submit evidentiary materials and an opportunity to do so. *See McCoy,* 255 F.Supp.2d at 255.

The Court finds that Plaintiff has been given both notice and opportunity. First, Defendants moved to dismiss specifically on the ground of failure to exhaust and notified Plaintiff that the Court might choose to treat the motion to dismiss as one for summary judgment, and that to oppose it, he would need to submit evidence, such as affidavits. Doc. 67 (Notice to Pro Se Litigant); *see Kasiem,* 756 F.Supp.2d at 575 (holding that formal notice of conversion was not necessary where defendants attached as exhibits to their motion the records they had of plaintiff's grievances and appeals and notified plaintiff that the court might treat the motion to dismiss as one for summary judgment and that plaintiff must therefore submit evidence to oppose the motion); *see also McCoy,* 255 F.Supp.2d at 255–56 (holding that formal notice was not necessary where defendants moved to dismiss specifically on the ground of exhaustion and where plaintiff directly addressed exhaustion in his opposition papers and referred the court to documentary evidence). Additionally, in his opposition papers, Plaintiff directly addresses the issue of exhaustion and refers the Court to documentary evidence, including a copy of Plaintiff's hospital records and "Special Watch Log Book # S1533," attached to his brief as exhibits. *See* Doc. 80. Accordingly, the Court finds that Plaintiff had "unequivocal notice" that the Court might convert Defendants' motion to dismiss to one for summary judgment and that Plaintiff had the opportunity to submit extrinsic materials pertinent to that issue.

**c. Plaintiff did not Exhaust Administrative Remedies with Respect to his Claim of Deliberate In-**

**difference to his Medical Needs**

Defendants argue that Plaintiff has not exhausted administrative remedies with respect to his claim of deliberate medical indifference because his grievance does not contain any allegations regarding Plaintiff's medical care; rather, Plaintiff's grievance only alleges that he was subjected to excessive force by several of the Defendants. Accordingly, Defendants argue that Plaintiff's grievance failed to " 'alert[ ] the prison to the nature of the wrong for which redress is sought,' " thereby failing to afford it "time and opportunity to address [his] complaints internally before allowing the initiation of a federal case." *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004) (quoting *Porter,* 534 U.S. at 524–25; *Strong v. David,* 297 F.3d 646, 650 (7th Cir.2002)).

The Second Circuit has held that "a claim may be exhausted when it is closely associated with, but not explicitly mentioned in, an exhausted grievance, as long as the claim was specifically addressed in the prison's denial of the grievance and, hence, was properly investigated." *Percinthe v. Julien,* No. 08 Civ. 893(SAS), 2009 WL 2223070, at *4, *4 n. 9 (S.D.N.Y. July 24, 2009) (citing *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009) (holding that the plaintiff's claim for denial of medical care was exhausted by a grievance alleging excessive force and retaliation, explaining, "while Espinal's grievance ... does not explicitly discuss the misconduct by medical personnel which is alleged in the complaint, it is clear that the State considered these allegations when reviewing Espinal's grievance," because denial of medical care was addressed in the grievance's denial)). Ultimately, the question for the Court is "whether [the] plaintiff's grievance sufficiently alerted prison officials that he was alleging some wrongdoing beyond" that alleged against the individual or individuals specifically named in the grievance. *Id.*

**\*5** Here, Plaintiff's grievance merely alleges that he was subjected to excessive force by Defendants Surprenant, Rodriguez, Tillotson, Brothers, Krein, and Kowalchuk;[FN4] it does not allege that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendants were deliberately indifferent to Plaintiff's medical needs. *See* Hale Decl., Ex. A. Indeed, the *only* reference in the grievance to Plaintiff's medical care is his allegation that on September 29, 2011, he was taken to Westchester Medical Center "for a cat scan for [his] left eye and a broken nose." *Id.* The Court also notes that Plaintiff's subsequent communications with prison officials regarding his grievance failed to mention any allegations of deliberate indifference to Plaintiff's medical needs. For example, in a December 26, 2011 letter to DOCCS' employee Teri Thomas, Plaintiff refers to his grievance as a "grievance of assault." *Id.* Similarly, in a January 14, 2012 letter to Karen Bellamy, Director of the IGP, regarding the status of his grievance, Plaintiff states that he "was assaulted in Green Haven Facility on 9/27/11" and makes no mention of Defendants' alleged denials of his requests for medical care. *Id.* Moreover, the Court's review of Plaintiff's grievance file indicates that the State did not investigate Plaintiff's allegation of deliberate indifference.[FN5] Indeed, the grievance file contains memoranda specifically regarding the alleged use of force by only those Defendants actually named in Plaintiff's grievance. Accordingly, the Court finds that Plaintiff's grievance did not "sufficiently alert[ ] prison officials that [Plaintiff] was alleging some wrongdoing beyond" the allegation that he was subjected to excessive force by Defendants Surprenant, Kowalchuk, Brothers, Krein, Tillotson, and Rodriguez.

> FN4. The grievance mistakenly refers to Defendants Krein, Kowalchuk and Surprenant as "Keran," "Wallchuck" and "Suprintnay," respectively.

> FN5. As Defendants mention in their motion papers, a September 27, 2011 memorandum from Defendant Surprenant to Defendant Lee regarding the incident states that "RN Miller reported to PSU to conduct the medical exam of inmate Hilbert in the cell. Swelling to his left eye and a

small abrasion on the right arm was reported on the medical exam. All injuries were deemed minor in nature and the inmate remained in MH–OB–004 on the 1 to 1 watch." Hale Decl., Ex. A. Defendant Surprenant's reference to Plaintiff's medical examination and status immediately following the alleged excessive use of force does not suggest that the State investigated Plaintiff's claim of deliberate indifference. Moreover, Defendant Surprenant's description of Plaintiff's medical exam by Defendant Miller would not put the State on notice of any potential allegations regarding Defendants' alleged refusal of Plaintiff's requests for medical care. Additionally, Plaintiff's grievance file includes the medical report by Defendant Miller, dated September 27, 2011, describing the nature of Plaintiff's injuries. That report, however, also does not suggest that the State investigated or considered Plaintiff's claim of deliberate indifference; nor would the report have put the State on notice of such a claim.

Moreover, the Court finds that none of the three exceptions to the exhaustion requirement articulated by the Second Circuit in *Hemphill,* 380 F.3d at 686, are applicable to Plaintiff's case. First, administrative remedies were clearly "available" to Plaintiff, as he filed a grievance at Marcy on December 8, 2011, which was subsequently investigated by the Inspector General's Office. Hale Decl., Ex. A. Second, Defendants have not forfeited the affirmative defense of non-exhaustion, nor are they estopped from asserting it. Estoppel is found where "an inmate reasonably understands that pursuing a grievance through the administrative process will be futile or impossible." *Winston v. Woodward,* No. 05 Civ. 3385(RJS), 2008 WL 2263191, at *9 (S.D.N.Y. May 30, 2008) (citations omitted). As such, the Second Circuit has held that a plaintiff's non-exhaustion may be excused on the grounds of estoppel where the plaintiff was misled,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

threatened or otherwise deterred from fulfilling the requisite procedures. *Id.* (citing *Hemphill,* 380 F.3d at 688–89; *Ziemba v. Wezner,* 366 F.3d 161, 163–64 (2d Cir.2004)). Here, Plaintiff does not allege that Defendants improperly deterred him from filing a grievance regarding the alleged deliberate indifference, and the record does not evidence the existence of any such threats or misconduct on the part of Defendants.

**\*6** With respect to the third exception, the Second Circuit has held that "there are certain 'special circumstances,' " such as a reasonable misunderstanding of grievance procedures, "in which, though administrative remedies may have been available and though the government may not have been estopped from asserting the affirmative defense of non-exhaustion, the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified." *Hemphill,* 380 F.3d at 689 (citations omitted). While Plaintiff does not specifically allege any "special circumstances" justifying his failure to exhaust administrative remedies, he states in his opposition papers that he "was told that his grievance was untimely" when he attempted to file it at Marcy, and that he believed he had "taken all the proper steps" by filing a complaint "with risk management at CNYPC [Central New York Psychiatric Center] for the excessive force claim and medical negligence." PL's Affirmation in Support of Motion (Doc. 78); *see also* PL's Mem. L. Opp. 6 (stating that Plaintiff filed a complaint concerning his "medical issues" with the risk management office at CNYPC on October 14, 2011). In light of its obligation to interpret Plaintiff's submissions as raising the strongest arguments that they suggest, *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006), the Court will treat Plaintiff's argument regarding his failure to exhaust administrative remedies as a request to excuse his non-exhaustion under the third *Hemphill* exception.

A review of the grievance file indicates that Plaintiff remained at Green Haven until October 13,

2011, where he was in a psychiatric observation cell in the Mental Health Unit and did not have access to any writing tools. Hale Deck, Ex. A. Plaintiff was then transferred to CNYPC, where he claims to have filed a complaint with "risk management." *Id.* After Plaintiff returned to Marcy on December 8, 2011, his grievance regarding the September 27, 2011 assault was rejected as untimely. *Id.* However, after prison officials confirmed that Plaintiff did not have access to the grievance process while at Green Haven and determined that he had shown "mitigating circumstances," Plaintiff's grievance was filed at Marcy on January 27, 2012. *Id.* Accordingly, the record indicates that despite initially being informed that his grievance was untimely, Plaintiff was ultimately permitted to file his grievance upon his return to Marcy.

Moreover, to the extent that Plaintiff argues that his attempt to file a complaint while at CNYPC constitutes a "special circumstance" justifying his failure to exhaust administrative remedies, the Court disagrees. First, Plaintiff failed to provide the Court with a copy of the complaint that he allegedly filed at CNYPC, and the declaration of Jeffery Hale, Assistant Director of the IGP for DOCCS, states that after conducting a "diligent search for grievances and appeals filed by [Plaintiff] based on grievances filed at the facility level," Mr. Hale determined that Plaintiff "did not file a grievance alleging that defendants were deliberately indifferent to his medical needs while at Green Haven in September 2011." Hale Decl. ¶ 10. Plaintiff's unsupported allegation that he filed a grievance at CNYPC is insufficient to withstand a motion for summary judgment. *See Santiago v. Murphy,* No. 08 Civ.1961(SLT), 2010 WL 2680018, at \*2–\*3 (E.D.N.Y. June 30, 2010) (dismissing complaint where declarations submitted by defendant stated that there was "no record of any grievance" for the alleged incident and holding that plaintiff's unsupported allegation that he filed a grievance is insufficient to withstand a motion for summary judgment). Second, even assuming that Plaintiff did file a com-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

plaint with the risk management office at CNYPC, that complaint was clearly not exhausted. The IGP requires that inmates file grievances "with an IGP clerk." 7 NYCRR § 701.2(a); *see also id.* §§ 701.4(g), 701.5. Accordingly, Plaintiff's complaint to the risk management office was not properly filed. Additionally, Plaintiff does not assert that he appealed from the denial of that grievance, nor is there any record of such appeal. *Santiago,* 2010 WL 2680018, at *3. Finally, even if at the time of allegedly filing his complaint at CNYPC Plaintiff misunderstood the grievance procedure, his failure to exhaust administrative remedies would still not be justified. Upon his return to Marcy, Plaintiff clearly had an understanding of the grievance procedure sufficient enough to allow him to properly file a grievance regarding the excessive force allegation in accordance with the IGP. Plaintiff has provided the Court with no explanation to justify his failure to include in that grievance the allegation regarding Defendants' alleged deliberate indifference to his medical needs. Accordingly, as the record establishes that Plaintiff is aware of and has shown that he is capable of following the correct grievance procedure, the Court finds that he has failed to demonstrate the existence of "special circumstances" sufficient to excuse his non-exhaustion. [FN6] *See Kasiem,* 756 F.Supp.2d at 577–78 (holding that the plaintiff failed to demonstrate the existence of "special circumstances" justifying his non-exhaustion where he had previously shown that he was capable of following the correct grievance procedure).

> FN6. The Court notes that the exhibits attached to Plaintiffs' opposition papers, which include a copy of Plaintiff's hospital records and "Special Watch Log Book # S1533," do not compel a different outcome, as they do not go to the issue of exhaustion.

**\*7** The Court therefore finds that Plaintiff has failed to exhaust administrative remedies with respect to his deliberate medical indifference claim

and that none of the three exceptions to the exhaustion requirement apply. Where a claim is dismissed for failure to exhaust administrative remedies, dismissal without prejudice is appropriate if the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Prisoners have 21 days from the date of the alleged occurrence to initiate the first formal step of the IGP, subject to exceptions "based on mitigating circumstances." 7 NYCRR §§ 701.5(a)(1), 701.6(g)(1)(i)(a). However, an exception to the time limit may not be granted if the request is made more than 45 days after the alleged occurrence. 7 NYCRR § 701.6(g)(1) (i)(a). Accordingly, because the time to both file a grievance and request an exception to the time limit has long expired, and because Plaintiff has not offered any reason for his delay in filing a grievance with respect to his deliberate indifference claim, the claim is dismissed with prejudice.[FN7] *See Santiago,* 2010 WL 2680018, at *3 (dismissing complaint with prejudice because "[a]ny grievance or appeal would now be untimely under 7 NYCRR § 701.5, and the time limit for seeking an exception to the time limitations under 7 NYCRR § 701.6 has also passed"); *see also Bridgeforth v. Bartlett,* 686 F.Supp.2d 238, 240 (W.D.N.Y.2010) (dismissing complaint with prejudice where the time limits for plaintiff to file an administrative appeal had long since passed and plaintiff did not allege "any facts excusing his failure to exhaust").

> FN7. The Supreme Court has held that the PLRA does not require dismissal of an entire complaint when a prisoner has failed to exhaust some, but not all, of the claims included in the complaint. *Jones,* 549 U.S. at 223–24. Accordingly, although the Court finds that Plaintiff's deliberate indifference claim should be dismissed for non-exhaustion, his remaining exhausted claims may proceed.

**d. Fischer and Lee are Dismissed as Defendants**

Defendants move in the alternative to dismiss

the Amended Complaint against Defendants Fischer and Lee. Plaintiff's sole allegation with respect to these Defendants relates exclusively to his deliberate medical indifference claim. *See* Am. Compl. ¶ 5. Accordingly, because the Court finds that Plaintiff has failed to exhaust administrative remedies with respect to his deliberate indifference claim, Defendants' motion to dismiss with respect to Defendants Fischer and Lee is granted.

Moreover, to the extent that Plaintiff seeks to hold Defendants Fischer and Lee liable for his excessive force claim, that claim is also dismissed against them. Case law is clear that supervisors may not be held vicariously liable for their subordinates' violations. *See Rahman v. Fisher,* 607 F.Supp.2d 580, 584–85 (S.D.N.Y.2009). It is therefore "well settled" that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Id.* at 585 (citation omitted). Neither the factual allegations contained in the Amended Complaint nor the grievance file submitted by Defendants indicate that Defendants Fischer or Lee were "personally involved" in the alleged violation, either by directly participating in it or by failing to stop it. Although a review of Plaintiff's grievance file indicates that Defendant Lee received a memorandum from Defendant Surprenant regarding the alleged excessive use of force, case law is clear that "[a]fter the fact notice of a violation of an inmate's rights is insufficient to establish a supervisor's liability for the violation." *Id.*

## III. Conclusion

**\*8** For the reasons set forth above, Defendants' partial motion to dismiss is GRANTED. Accordingly, Plaintiff's First Cause of Action for Deliberate Indifference to an Inmate's Medical Needs in Violation of the Eighth and Fourteenth Amendments is DISMISSED with prejudice. [FN8] The only remaining claims are those for unnecessary and excessive use of force in violation of the Eighth Amendment; violations of the Americans with Disabilities Act; and violations of the Rehabilitation Act. The only remaining Defendants in this action are Surprenant, Tillitson, Brothers, Krein, Kowalchuk, and Rodriguez.

> FN8. Although Defendants Santoro, Krein and Rodriguez did not join in Defendants' partial motion to dismiss, because the Court finds that Plaintiff failed to exhaust administrative remedies with respect to his deliberate medical indifference claim, that claim is dismissed as to those Defendants as well.

The Clerk of the Court is respectfully directed to terminate the motions. Docs. 65, 77. The parties are directed to appear for a status conference on October 2, 2013 at 9:30 am.

It is SO ORDERED.

S.D.N.Y.,2013.
Hilbert v. Fischer
Slip Copy, 2013 WL 4774731 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2001 WL 138765 (S.D.N.Y.)

(Cite as: 2001 WL 138765 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Richard COLE, Plaintiff,
v.
Doctor Felicitas MIRAFLOR, Otisville Correctional
Facility, Defendant.
No. 99 CIV 0977 RWS.

Feb. 19, 2001.
Nixon Peabody, LLP, Buffalo, By Allison P. Gioia, Esq.,
Of Counsel, for Plaintiff.

Honorable Eliot L. Spitzer, Attorney General of the State
of New York, New York, By Stacy R. Sabatini, Assistant
Attorney General, Of Counsel, for Defendant.

OPINION

SWEET, D.J.

**\*1** Plaintiff Richard Cole ("Cole") has moved for
permission to file a Second Amended Complaint, pursuant
to Federal Rule of Civil Procedure 15(a), and defendant
Felicitas Miraflor, M.D. ("Miraflor") has cross-moved to
dismiss the complaint on statute of limitations grounds,
pursuant to Federal Rule of Civil Procedure 12(b)(6). For
the reasons set forth below, the motion by Cole is granted,
and the motion by Miraflor is denied.

*The Parties*

Cole was at all relevant times an inmate under the
care and custody of the New York State Department of
Corrections ("DOCs"). The facts underlying Cole's claim
against Miraflor arose while Cole was incarcerated at
Otisville Correctional Facility ("Otisville").

Miraflor was at all relevant times a treating physician
of Cole's while he was incarcerated at Otisville.

*Prior Proceedings*

This action was initiated by the filing of a *pro se*
complaint in the Southern District of New York on
October 15, 1998, against Christopher Artuz ("Artuz"),
Superintendent of the Green Haven Correctional Facility
("Green Haven") in Stormville, New York, Norman
Selwin ("Selwin"), Medical Director at Green Haven, and
Jane Doe ("Doe"), a doctor at Otisville (collectively,
"Original Defendants").[FN1] The complaint alleged
deliberate indifference to Cole's medical needs in violation
of the Eighth Amendment and 42 U.S .C. § 1983, as well
as deprivation of Cole's right to meaningful access to the
courts in violation of the Constitution and 42 U.S.C. §
1983.

FN1. In this Court's previous opinion in this case,
*Cole v. Artuz*, 97 Civ. 977, 2000 WL 760749, at
*1 (S.D.N.Y. June 12, 2000)*, it is stated that
Cole filed his complaint on February 2, 1999.
This is the date reflected in the courthouse
records. However, in connection with the instant
motion Cole has submitted a copy of a *pro se*
complaint with a partially obliterated date-stamp
that appears to reflect receipt by the Pro Se
Office for the Southern District of New York on
October 15, 1998. Cole contends that this is the
date he filed his complaint, and Miraflor assumes
arguendo that this is the proper date. In addition,
although it is the law of this circuit that a
prisoner's complaint is deemed filed upon his
handing of a complaint to prison officials, *see*
*Dory v. Ryan*, 999 F.2d 679 (2d Cir.1993),
which would presumably have occurred before
October 15, 1998, Cole has not argued for
application of an earlier date.

As against Doe, Cole alleged in his *pro se* complaint
that, during the period of his incarceration at Otisville,
which began when he was transferred to Otisville in
November 1995 and continued until he was transferred
from Otisville to Green Haven in or about January, 1997:

Plaintiff informed Jane Doe on repeated occasions
that he had a serious back ailment. That having to climb
up and jump down from a TOP BUNK was aggravating
that injury. Defendant Doe refused to medically excuse

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 138765 (S.D.N.Y.)

(Cite as: 2001 WL 138765 (S.D.N.Y.))

plaintiff from having to sleep in a top bunk, verify the ailment or provide appropriate medical treatment.

On or about April 29, 1999, the Original Defendants, represented by the Office of the Attorney General of the State of New York (the "New York Attorney General"), filed a motion to dismiss the complaint. On or about May 11, 1999, the Original Defendants requested that all discovery be stayed pending resolution of the motion to dismiss. The request was granted on May 13, 1999.

On September 3, 1999, Nixon Peabody LLP filed a notice of appearance and has since been acting as counsel for Cole in this action.

On September 14, 1999, counsel for Cole wrote to Assistant Attorney General Stacy Sabatini ("Sabatini"), counsel for the New York Attorney General in this case:

In light of the statements made in defendants' motion to dismiss concerning your representation of "[d]efendants Superintendent Christopher Artuz; Medical Director Norman Selwin, Green Haven Correctional Facility; and Otisville Correctional Facility," I write to request your assistance in identifying the Jane Doe defendant, a doctor or medical professional at Otisville Correctional Facility.

**\*2** On October 27, 1999, counsel for Cole requested his medical records.

On November 2, 1999, this Court denied the Original Defendants' motion to dismiss and granted Cole twenty days to file an amended complaint. On December 14, 1999, Cole filed an amended complaint.[FN2] On January 6, 2000, the Original Defendants filed a motion to dismiss the amended complaint.

> FN2. For unknown reasons, Nixon Peabody did not receive a copy of this Court's November 2, 1999 order until after the twenty days had expired. Notwithstanding this confusion, the Court permitted Cole to serve and file an amended complaint.

Cole's medical records were received by his counsel on March 6, 2000.

In a letter to this Court dated April 11, 2000, counsel for Cole stated that Sabatini had not responded to the September 14, 1999, letter requesting assistance in identifying the Doe defendant.

On June 12, 2000, the Original Defendants' motion to dismiss the amended complaint was granted with respect to Selwin and Artuz, but denied with respect to Doe. *See Cole,* 2000 WL 760749, at \*7.

Also on June 12, 2000, the stay of discovery was lifted. Ultimately, the discovery period was extended through October 12, 2000.

Immediately following receipt of the Court's June 12, 2000 decision and order, Cole's counsel again sought assistance from the New York Attorney General in identifying the Doe defendant. Having received no response, on July 20, 2000, a third-party subpoena was served on the Medical Director of the Otisville Correctional Facility. Sabatini, on behalf of the New York Attorney General, responded to the subpoena.

On July 25, 2000, counsel for Cole provided Cole's medical records from Otisville to the New York Attorney General, and on July 28, 2000, the New York Attorney General provided the names of the medical personnel who were among those individuals who treated Cole during his period of incarceration at Otisville. On August 28, 2000, in response to a request from Cole's counsel, Otisville provided pictures and descriptions of two Otisville medical professionals.

On or about September 14, 2000, a Second Amended Complaint was served identifying the Doe defendant as Miraflor and alleging deliberate indifference by Miraflor to Cole's serious medical needs, in violation of the Eighth Amendment. The specific factual allegations against Miraflor are identical to those made against Doe in the original *pro se* complaint, and continue to allege unconstitutional conduct for the period spanning November 1995 through in or about January 1997.

On September 25, 2000, Miraflor filed the instant motion to dismiss the Second Amended Complaint on

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 138765 (S.D.N.Y.)

(Cite as: 2001 WL 138765 (S.D.N.Y.))

statute of limitations grounds. In a letter dated September 26, 2000, Cole requested permission to file the Second Amended Complaint, which letter was treated as a motion. Oral argument was heard on November 8, 2000, at which time the matter was marked fully submitted.

*Discussion*

I. *The Governing Legal Standards*

A. *The Standard Under Rule 12(b)(6)*

On a Rule 12(b)(6) motion to dismiss, the factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in the plaintiffs' favor and against the defendants. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *Dwyer v. Regan,* 777 F.2d 825, 828-29 (2d Cir.1985).

**\*3** Rule 12(b)(6) imposes a substantial burden of proof upon the moving party. A court may not dismiss a complaint unless the movant demonstrates if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." ' *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249-50 (1989) (citation omitted); *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

B. *The Applicable Statute Of Limitations*

There is no federal statute of limitations for § 1983 actions. Accordingly, a federal court must "borrow" the limitations period from the most appropriate or analogous state statue. *See Board of Regents v. Tomanio,* 446 U.S. 478, 483-84 (1980); *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 462 (1975). New York's three-year period for personal injury actions § 1983 actions in New York State. *See Owens v. Okure,* 488 U.S. 235, 249 (1989) (holding that New York's three-year statute of limitations for general personal injury actions applies to constitutional torts claims under § 1983); N.Y. C.P.L.R. § 214(5).

The date of accrual of a § 1983 claim, however, is governed by federal law. *See Morse v. University of*

*Vermont,* 973 F.2d 122, 125 (2d Cir.1992). Such claims accrue when the plaintiff "knows or has reason to know of the injury which is the basis of his action." *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980).

II. *Cole's Naming Of Miraflor Does Not Relate Back*

Cole's claim accrued when he knew or had reason to know of his injury. Miraflor contends that this occurred when he was transferred to Otisville in November 1995, at which time he notified the Otisville medical staff that he had back pain and, according to the Second Amended Complaint, was denied proper care by Miraflor. The New York Attorney General contends that Cole's claim is time-barred because, based on a November 1995 accrual date, the three-year statute of limitations against Miraflor ran out in November 1998, yet Cole failed to name her until September 2000.

Cole contends that his Second Amended Complaint identifying Miraflor "relates back" to his original *pro se* complaint and, therefore, is timely under Federal Rule of Civil Procedure 15(c).[FN3]

> **FN3.** For purposes of his relation back argument, Cole agrees arguendo that his claim accrued in November 1995. However, as discussed below, he also raises an alternative, tolling argument.

Rule 15(c) provides that an amendment changing the name of a defendant relates back to the original pleading if the claims against the new party arise out of the same conduct or occurrence set forth in the original pleading, and, within 120 days of filing the original complaint, the new defendant (1) had received such notice of the action that he will not be prejudiced in maintaining his defense on the merits, Fed.R.Civ.P. 15(c)(3)(A), and (2) knew or should have known that, but for a mistake concerning the identity of the proper party the action would have been brought against him, Fed.R.Civ.P. 15(c)(3)(B). *See, e.g., Soto v. Brooklyn Corr. Facility,* 80 F.3d 34, 35 (2d Cir.1996).

**\*4** According to Miraflor, Cole's Second Amended Complaint does not relate back because Cole's inability to discover Miraflor's name before the running of the limitations period is not a "mistake," as that term was

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 138765 (S.D.N.Y.)

(Cite as: 2001 WL 138765 (S.D.N.Y.))

defined by the Second Circuit in *Barrow v. Wethersfield Police Dep't,* 66 F.3d 466 (2d Cir.1995), *modified,* 74 F.3d 1366 (2d Cir.1996).

In *Barrow,* the Second Circuit held that a "mistake" in identifying a defendant occurs for purposes of Rule 15(c) when it is the result of "misnomer or misidentification," or when a plaintiff omits the individual defendant altogether in the erroneous belief that suing a government department will suffice. 66 F.3d at 469. However, the court stated, "the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake." *Id.* at 470. The relation back doctrine did not apply in *Barrow* because, after having been directed by the court to name the individual officers whom he accused of violating his rights under § 1983, the plaintiff, after the deadline set by the court, filed an amended complaint in which he identified these defendants only as John Doe, and then amended his complaint to name the actual officers almost two years after the state of limitations had run. *See id.* at 476. Under these circumstances, the court held, there was no "mistake" within the meaning of Rule 15(c). *See id.* The *Barrow* rule was recently reaffirmed by the Second Circuit in *Malesko v. Correctional Servs. Corp.,* 229 F.3d 274, (2d Cir.2000) ("A plaintiff is not considered to have made ... a 'mistake' [within meaning of Rule 15(c) ] however, if the plaintiff knew that he was required to name an individual as a defendant but did not do so because he did not know the individual's identity.") (*citing Barrow,* 66 F.3d at 470).

In *Byrd v. Abate,* 964 F.Supp. 140, 145-46 (S.D.N.Y.1997), this Court distinguished *Barrow,* and applied the relation back doctrine to a plaintiff who initially sued John Doe defendants and then later, after the statute of limitations had run, named the actual defendants. It was noted that in *Barrow* the plaintiff disregarded an explicit direction from the court to obtain the officers' identities. *See id.* at 145. By contrast, in *Byrd,* the plaintiff "made a series of efforts to obtain the identity of the individual officer without prompting, and well before the end of the limitations period." *Id.* (Byrd's counsel first requested officer's name from Corporation Counsel for the City of New York nine months before statute of limitations expired). These circumstances warranted the

conclusion that a "mistake" had been made for purposes of Rule 15(c) and, indeed, "[t]o hold that Rule 15(c) does not permit relation back in such circumstances would permit defense counsel to eliminate claims against any John Doe defendant merely by resisting discovery responses until the statute of limitations ended." *Id.* at 146; *see also Thomas v. Arevalo,* 95 Civ. 4704, 1998 WL 427623, at *15 (S.D.N.Y. July 28, 1998) (distinguishing *Barrow,* and applying relation back rule, because "in naming 'John Doe' defendants, plaintiff was merely following the Court's own directive ... [the] language [of the court's order] was imprecise and did not properly warn the *pro se* plaintiff of the consequences should be not be able to meet the requirements of Rule 15(c)(3) for any newly-added defendants").

**\*5** Here, Cole did not make a legal or factual mistake. He did not, for example, neglect to include an individual defendant based on the misconception that he was not required to do so. Indeed, he included an individual "Jane Doe" defendant in his original *pro se* complaint. Nor did he mistakenly name a different doctor than Miraflor. There is no dispute that the reason Cole did not name Miraflor is that he did not know her identity. This, standing alone, cannot support application of the relation back rule under the precedent in this circuit. *See Barrow,* 66 F.3d at 470.

Counsel for Cole has described how, once they became involved in September 1999, they made repeated efforts to identify the Doe defendant, and the protracted amount of time this process took. They also point to ways in which they contend the New York Attorney General was not as helpful as it might have been. In addition, it must be noted that discovery was stayed in this action from May 13, 1999, until June 12, 2000. The problem, however, is that by the time Cole's counsel appeared in this action-and indeed, by the time of the discovery stay-the three-year statute of limitations had already run if the claim accrued in November 1995. Nor has any evidence been offered as to efforts by Cole himself to identify the Doe defendant prior to November 1998. Unlike the plaintiffs in *Barrow,* Cole did not disregard an order by this Court directing him to identify the individual defendant. However, this case cannot be distinguished from *Barrow* on the ground that he was stymied in efforts

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 138765 (S.D.N.Y.)

(Cite as: 2001 WL 138765 (S.D.N.Y.))

made before the limitations period expired to identify Miraflor, *see Byrd, 964 F.Supp. at 145,*[FN4] or was understandably confused by some directive of this court, *see Thomas, 1998 WL 427623, at \*15.*[FN5]

> FN4. For example, Cole's *pro se* complaint nowhere references attempts to identify the Doe defendant.

> FN5. In this Court's previous opinion, the contention that the complaint should be dismissed for failing to identify the Doe defendant was rejected. *See Cole, 2000 WL 760749, at \*6.* The issue at that juncture did not involve a statute of limitations argument. *See id.* Nonetheless, the wording of the decision might have confused a *pro se* plaintiff. However, Cole was no longer *pro se* at that time and, moreover, if his claim accrued on November 1995, the statute of limitations had expired long before.

Cole fails to address the issue of whether he made a "mistake" within the meaning of Rule 15(c), focusing instead on the other factors to be considered in the relation back analysis, namely, whether the underlying transactions are the same as in the underlying pleading, whether Miraflor was on notice or constructive notice, and whether Miraflor has been prejudiced. *See Soto, 80 F .3d at 35* (setting forth factors). It is not necessary to address these issues, however, because his argument that the relation back doctrine applies fails for the reasons set forth above.

## III. *Cole's Claim Was Tolled By The "Continuous Violation" Doctrine*

Cole contends that, even if the Second Amended Complaint does not relate back, his claim against Miraflor is timely based on the "continuous treatment" doctrine. According to Cole, pursuant to this doctrine, his claim against Miraflor did not accrue until in or about January 1997, when he was transferred out of Otisville and was therefore no longer under Miraflor's care.[FN6]

> FN6. Cole also offers November 17, 1996, as the earliest possible date when his claim could have accrued under the "continuous treatment" rule. However, he offers no explanation for this date.

In any case, because of the sequence of events, including in particular the stay of discovery, it is immaterial for purposes of this discussion whether the accrual date is November 17, 1996 or January 1997.

Cole's argument that the "continuous treatment" doctrine applies is misplaced. This doctrine is borrowed not from the law governing personal injury actions but, rather, from the law governing professional malpractice claims. *See, e.g., Borgia v. City of New York, 237 N.Y.S.2d 319 (N.Y.1962)* (applying continuous treatment doctrine to medical malpractice claim); *see also West v. City of New York, No. 88 Civ. 1801, 1992 WL 249966, at \*5* (S.D.N.Y. Sept. 22, 1992) (citing various types of professional malpractice cases in which continuous treatment/representation doctrine applies under New York law). It is well-established, of course, that a claim for medical malpractice does not state a claim under § 1983. *See Cole, 2000 WL 760749, at \*6* (internal citation omitted). In *West,* the Honorable Charles S. Haight reasoned that the continuous treatment doctrine cannot apply to a § 1983 deliberate indifference claim because, first, "courts have carefully distinguished deliberate indifference from medical malpractice," and, second, "the Supreme Court has stated ... that the statute of limitations provisions of personal injury actions shall apply to all section 1983 cases." *1992 WL 249966, at \*5* (*citing Owens, 488 U.S. at 242).* In addition, it must be noted that, given that a § 1983 is governed by the personal injury statute of limitations, the rationale underlying the continuous treatment doctrine is inapposite. *See N.Y. C.P.L.R. § 214-a,* Practice Commentary C214-a:2 (McKinney 1990) (rationale for continuous treatment doctrine is that patient may be deterred from bringing malpractice claim where there is continuous relationship of trust and confidence between patient and doctor); *cf. N.Y. C.P.L.R. § 214,* Practice Commentary C214:6 (McKinney 1990) (rationale for continuous representation doctrine, which tolls statute of limitations in attorney malpractice cases, is that client has right to place confidence in attorney's ability and good faith during course of representation).

**\*6** The doctrine Cole wishes to invoke is actually the "continuing violation" or "continuing harm" rule. It is

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 138765 (S.D.N.Y.)

(Cite as: 2001 WL 138765 (S.D.N.Y.))

well-established that this rule applies in Title VII claims, which is a type of § 1983 action. *See Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998) (internal citations omitted) (statute of limitations period is extended for "all claims of discriminatory acts committed under an ongoing policy of discrimination"). Of course, Cole's claim is not brought under Title VII. However, while no decision within this circuit has been found in which this rule was applied to toll the statute of limitations for a deliberate indifference claim, the Second Circuit has recognized that the rule may apply in such a case. *See Pino v. Ryan,* 49 F.3d 51, 54 (affirming *sua sponte* dismissal of prisoner's deliberate indifference claim "where ... the injuries complained of occurred ... well outside the applicable three-year limitations period ... and plaintiff has alleged no facts indicating a continuous or ongoing violation of his constitutional rights"). Further support for this view is provided by the fact that in Title VII cases brought in New York, as in this case, the statute of limitations period is borrowed from the New York three-year rule governing personal injury cases. *See Morse v. University of Vermont,* 973 F.2d 122, 126 (2d Cir.1992).

Therefore, based on the continuing harm rule, Cole's claim against Miraflor accrued in or about January 1997.

At the time discovery was stayed, there were approximately eight months left to run on the statute of limitations if the harm continued through January 1997. The limitations period was equitably tolled during the stay of discovery. The stay was lifted on June 12, 2000, and on September 26, 2000, Cole requested permission to file a Second Amended Complaint identifying the Doe defendant, at which point approximately four more months had run on the statute of limitations. Therefore, the Second Amended Complaint was timely, and the motion to dismiss will be denied.[FN7]

> FN7. The Second Amended Complaint would also be timely if the November 17, 1996 accrual date were used, since, based on that date, there were approximately six months left of the limitations period when discovery was stayed.

Finally, it is noted that the Second Amended Complaint includes Artuz and Selwin as defendants. Since the claims asserted against those defendants have been dismissed, before filing the complaint Cole is directed to amend the caption to reflect that the only defendant is Miraflor.

*Conclusion*

Therefore, for the reasons set forth above, the motion to file a Second Amended Complaint is granted, and the motion to dismiss the Second Amended Complaint is denied. A pretrial order shall be filed within sixty (60) days, and the action marked ready for trial.

It is so ordered.

S.D.N.Y.,2001.

Cole v. Miraflor
Not Reported in F.Supp.2d, 2001 WL 138765 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31640585 (S.D.N.Y.)
**(Cite as: 2002 WL 31640585 (S.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Trent PATTERSON, Plaintiff,
v.
Glenn S. GOORD, et al., Defendants.

No. 02 Civ. 759(JSM).
Nov. 21, 2002.

David J. Eskin, Law Offices of Monica S. Eskin, Bronx, New York, for Plaintiff.

Bruce A. Brown, Assistant Attorney General, New York, NY, for Defendant.

OPINION AND ORDER

MARTIN, J.

**\*1** This is the second action filed by the Plaintiff who seeks damages for injuries he suffered when attacked by a fellow inmate at the Greenhaven Correctional Facility. The prior action was dismissed voluntarily in October, 2000, so that Plaintiff could attempt to exhaust his administrative remedies. Approximately six months thereafter, Plaintiff submitted grievances relating to the two incidents in which he was injured, both of which occurred in 1999. The prison officials rejected the grievances as untimely.

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under Section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). As Judge Buchwald explained in *Byas v. New York,* No. 99 Civ. 1673, 2002 WL 1586963, at \*2 (S.D.N.Y. Jul. 17, 2002):

'[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong'....Failure to exhaust prior to bringing suit will result in dismissal, regardless of a plaintiff's later efforts to exhaust. *Id.* at 117–118. Thus, even if a plaintiff files a valid grievance, he must still exhaust all appeals before filing suit.

Plaintiff's failure to file a grievance is not excused by the alleged threats by guards at Greenhaven to retaliate against him if he filed a grievance. *See Saunders v. Goord,* No. 98 Civ. 8501, 2002 WL 1751341, at \*3 (S.D.N.Y. Jul. 29, 2002). Even if the Court had equitable power to toll the time in which Plaintiff was required to file his grievance, there is no basis here to exercise such power. Accepting as true Plaintiff's claim that guards at Greenhaven threatened to retaliate against him, there is no excuse for his failure to file a grievance within a reasonable time from his transfer from that institution. *Cf. Burns v. Moore,* No. 99 Civ. 0966, 2002 WL 91607, at \*6 (S.D.N.Y. Jan. 24, 2002). In addition, Plaintiff's delay of almost six months in filing the grievance after his original action was dismissed was also unreasonable.

Since Plaintiff has now attempted to file a grievance and the appropriate prison officials have found that there are no mitigating circumstances that would permit him to file an untimely grievance, it is appropriate to dismiss this action with prejudice. *See Polanco v. N.Y. Dep't. of Corrs.,* No. 01 Civ. 759, 2002 WL 272401, at \*3 (Feb. 26, 2002 S.D.N.Y.); *Byas v. State of New York, supra.*

SO ORDERED.

S.D.N.Y.,2002.
Patterson v. Goord
Not Reported in F.Supp.2d, 2002 WL 31640585 (S.D.N.Y.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31640585 (S.D.N.Y.)
**(Cite as: 2002 WL 31640585 (S.D.N.Y.))**

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.